UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RELX INC.,

                              Plaintiff,

        v.

INFORMATICA CORP.,

                              Defendant.

1:16-cv-9718-AKH

INFORMATICA LLC,

                Counterclaim Plaintiff,

        v.

RELX INC. and RELX GROUP PLC,

                Counterclaim Defendants.

**MEMORANDUM OF LAW IN
SUPPORT OF
INFORMATICA'S MOTION
FOR SUMMARY JUDGMENT**

FRIED, FRANK, HARRIS, SHRIVER
 & JACOBSON LLP
John A. Borek
One New York Plaza
New York, New York 10004
(212) 859-8000
john.borek@friedfrank.com

FRIED, FRANK, HARRIS, SHRIVER
 & JACOBSON LLP
Scott W. Doyle (*pro hac vice*)
Jonathan R. DeFosse (*pro hac vice*)
801 17th Street, N.W.
Washington, D.C. 20006
(202) 639-7000
scott.doyle@friedfrank.com
jonathan.defosse@friedfrank.com

Attorneys for Defendant and Counterclaim Plaintiff
 *Informatica LLC*

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................1

II. FACTUAL BACKGROUND ...................................................................................3

    A. Informatica and Its Copyrighted Software ............................................. 3

    B. The Agreement for Services .................................................................... 4

    C. The Master Software License Agreement ................................................ 4

    D. RELX Over-Deployed Informatica's Software ....................................... 7

    E. RELX Controlled the Software Installations .......................................... 9

    F. RELX Knew How Many CPU Cores Were Found in Its Servers ....................... 10

    G. RELX Attempted to Conceal Its Infringement ................................... 12

    H. Informatica Terminated the MSLA, but RELX Continues to Use the Software .. 12

III. LEGAL STANDARD..............................................................................................13

IV. ARGUMENT ..........................................................................................................14

    A. Informatica Is Entitled to Summary Judgment on Its Claim of Copyright
       Infringement............................................................................................ 14

        1. Informatica Owns Valid Copyrights Covering the B2B Data Exchange
           Works............................................................................................ 14

        2. RELX Copied Informatica's Software without Permission..................... 15

        3. RELX's defenses have no merit ................................................... 16

        4. Informatica is entitled to damages on its copyright infringement claim .. 20

    B. Informatica Is Entitled to Summary Judgment on Its Claim that RELX Breached
       the MSLA................................................................................................ 21

        1. The MSLA is a valid contract between RELX and Informatica.............. 21

        2. Informatica performed its obligations under the MSLA......................... 21

        3. RELX violated multiple provisions of the MSLA ................................. 21

           a. Provisions restricting deployment of Informatica's software ....... 21

b.  Provisions requiring RELX to immediately remit any shortfall in payment ...................................................................................... 23

c.  Termination provisions of the MSLA ......................................... 23

4.  Informatica has suffered damages attributable to the breach ................... 24

C.  Informatica Is Entitled to Summary Judgment on Its Claim of Unjust Enrichment ...................................................................................... 25

1.  RELX benefited from Informatica's software and support services ........ 25

2.  RELX's benefit came at Informatica's expense ..................................... 26

3.  Informatica is entitled to restitution ......................................................... 26

D.  Informatica Is Entitled to an Award of Attorneys' Fees ...................................... 27

V.  CONCLUSION ..................................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Andersen v. Andersen*, 69 A.D.3d 773 (NY 2d App. Div. 2010) ................................................. 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................ 14

*Arisa Records LLC v. Doe*, 604 F.3d 110 (2d Cir. 2010) ............................................................. 14

*Bryant v. Media Right Productions, Inc.*, 603 F.3d 135, 144 (2d Cir. 2010) .............................. 30

*Cartoon Network LP, LLP v. CSC Holdings Inc.*, 536 F.3d 121 (2d Cir. 2008) ........................ 17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................... 13

*Doe v. Alsaud*, 12 F. Supp. 3d 674 (S.D.N.Y. 2014) .................................................................. 19

*Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l. N.V.*, 425 F. Supp. 2d 458 (S.D.N.Y.
2006) .............................................................................................................................................. 27

*Feist Publishings, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) ......................................... 14

*Fioranelli v. CBS Broadcasting Inc.*, -- F. Supp. 3d --, 2017 WL 1400119 (S.D.N.Y. Jan. 19,
2017) ........................................................................................................................................ 16, 17

*Firestone v. Miroth Const. Co.*, 215 A.D. 564 (1st Dep't 1926) ................................................ 29

*Fonar Corp. v. Domenick*, 105 F.3d 99 (2d Cir. 1997) ............................................................... 15

*Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511 (2012) .................................................. 27

*Graham v. James*, 144 F.3d 229 (2d Cir. 1998) ......................................................................... 17

*Granite Partners, L.P. v. Bear, Stearnes & Co.*, 17 F. Supp. 2d 275 (S.D.N.Y. 1998) .............. 27

*Gym Door Repairs, Inc. v. Young Equipment Sales, Inc.*, 206 F. Supp. 3d 869 (S.D.N.Y. 2016) 15

*Jacobsen v. Katzer*, 535 F.3d 1373 (Fed. Cir. 2008) ............................................................ 16, 17

*John Wiley & Sons, Inc. v. Kirtsaeng*, No. 08 Civ. 7834, 2016 WL 7392210 (S.D.N.Y. Dec. 21,
2016) .............................................................................................................................................. 30

*Kaye v. Grossman*, 202 F.3d 611 (2d Cir. 2000) ....................................................................... 27

*Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979 (2016) ...................................................... 30

*LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d. 501 (S.D.N.Y. 2015) ........................... 28

*MAI Systems Corp. v. Peak Computer Inc.*, 991 F.2d 511 (9th Cir. 1993) .................................. 17

*Marshall v. New Kids on the Block Partnership*, 780 F. Supp. 1005 (S.D.N.Y. 1991) ............... 16

*Matsushita Elec. Indus. Co., Ltd v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ........................... 14

*MDY Indus., v. Blizzard Entertainment, Inc.*, 629 F.3d 928 (9th Cir. 2010) ............................... 16

*MGN Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ........................................................... 19

*Newbro v. Freed*, 2007 U.S. App. LEXIS 4769 (2d Cir. 2007) ................................................... 28

*On Davis v. The Gap, Inc.*, 246 F.3d 152, 166 (2d Cir. 2001) ...................................................... 21

*Saks Inc. v. Attachmate Corp.*, No. 14 Civ. 4902, 2015 U.S. Dist. LEXIS 52867 (S.D.N.Y. Apr.

    17, 2015) ................................................................................................................................. 16

*Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir. 1963) .......................... 14, 18

*Small Business Bodyguard Inc. v. House of Moxie, Inc.*, -- F. Supp. 3d. --, 2017 WL 455561

    (S.D.N.Y. Jan. 31, 2017) ...................................................................................................... 22

*Strong v. Strong*, 277 A.D. 2d 533 (3d Dep't 2000) .................................................................... 28

*Tasini v. NY Times Co.*, 206 F.3d 161 (2d Cir. 2000) ................................................................. 17

*Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398 (E.D.N.Y. 2010) ...................................... 29

*Walker v. Carter*, 210 F. Supp. 3d 487 (S.D.N.Y. 2016) ............................................................ 14

*Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F.2d 452 (2d Cir. 1989) .................................. 15

**Statutes**

17 U.S.C. § 505 .............................................................................................................. 27, 28, 29

17 U.S.C. §410(c) ......................................................................................................................... 14

17 U.S.C. §504(b) ............................................................................................... 20

Fed. R. Civ. P. 56(a). .......................................................................................... 13

Defendant and Counterclaim Plaintiff Informatica LLC ("Informatica") respectfully submits this memorandum of law, together with the accompanying declarations of Nalin Mishra, Brandon Billingsley, and Jonathan DeFosse, in support of its motion for summary judgment on its claims for copyright infringement, breach of contract, and unjust enrichment against Plaintiff and Counterclaim Defendant RELX, Inc. and Counterclaim Defendant RELX Group PLC (collectively, "RELX").[1]

## I.     INTRODUCTION

This case concerns RELX's wanton infringement of Informatica's copyrighted software and breach of the parties' Master Software License Agreement ("MSLA").  The material facts are not in dispute.  On May 28, 2010, the parties executed the MSLA.  Under that agreement, RELX obtained a license to certain copyrighted software programs that execute data management and processing operations.  RELX's license, however, was limited in scope; RELX was only permitted to install the software on servers with up to a maximum number of CPU cores.[2]  Initially, RELX was authorized to install the software on servers with up to 16 CPU cores.  In December 2011, RELX increased the total number of licensed CPU cores to 20.  Then, in June 2012, the parties amended the MSLA to allow RELX to install the software on servers with up to 72 CPU cores.  Finally, in February 2015, the parties again amended the MSLA to reduce the number of licensed CPU cores to 56.

On February 24, 2016, Informatica commenced an audit to determine RELX's compliance with the MSLA.  The audit ultimately revealed three surprising facts.  First, for

---

[1] The supporting declarations will be referred to herein as the "Mishra Decl.," the "Billingsley Decl.," and the "DeFosse Decl."

[2] "CPU core" is a widely-used term that refers to the computation engine of a CPU (central processing unit) – i.e., the part of the CPU that reads and executes computer programs.  (Billingsley Decl., ¶ 15.)  For example, many modern personal computers have "quad-core" processors, which are processors with four computation engines.  (*Id.*)

almost the entire period from January 2012 until May 2016, RELX **vastly** exceeded the scope of its license. Between January 2012 and June 2012, RELX installed Informatica's software on servers with 32 CPU cores (compared to a limit of 20 CPU cores). Between March 2013 and February 2014, RELX installed the software on servers with 104 CPU cores (compared to a limit of 72 CPU cores). Between February 2015 and May 2016, RELX installed the software on servers with 104 CPU cores (compared to a limit of 56 CPU cores).

Most disturbing, the audit revealed that RELX misled Informatica in February 2015 when RELX asked to reduce the number of licensed CPU cores without making any changes to the deployment of the software. Following this same trend, the audit indicated that RELX attempted to conceal its violation of the MSLA by removing servers with 48 CPU cores from its system (bringing the total number of CPU cores to precisely 56) just before responding to the audit.

Informatica informed RELX of its audit findings in October 2016 and notified RELX that the shortfall in its payments was in excess of $7.7 million. RELX refused to remit the shortfall and instead filed this lawsuit. On May 9, 2017, Informatica formally terminated the MSLA and the licenses granted under that agreement. RELX, however, has continued its unlicensed use of Informatica's software, further breaching the MSLA and infringing Informatica's copyrights.

Informatica is entitled to summary judgment on its counterclaims. There is no dispute that RELX has violated multiple provisions of the MSLA, including (i) the conditions limiting the installation and use of Informatica's software; (ii) the obligation to immediately remit any shortfall in payment; and (iii) the requirement to stop using and destroy Informatica's software upon termination of the MSLA. There is also no dispute that RELX engaged in copyright infringement when it (i) installed copies of Informatica's software outside the scope of the MSLA; and (ii) continued to use the software after the termination of the MSLA. Finally, there

is no genuine dispute that RELX has been unjustly enriched as a result of its unpaid and unauthorized use of Informatica's copyrighted software, as well as the associated support and maintenance services.

Informatica respectfully requests that the Court enter an award of summary judgment finding that RELX breached the MSLA, infringed Informatica's copyrights, and was unjustly enriched as a result of its unauthorized use of Informatica's software. Informatica further requests that the Court enter summary judgment finding that Informatica is entitled to recover its attorneys' fees. Finally, Informatica requests that the Court set an expedited schedule for determining the quantum of damages and restitution owing on Informatica's counterclaims.

## II.     FACTUAL BACKGROUND

### A.     Informatica and Its Copyrighted Software

Informatica is a software development and licensing company headquartered in Redwood City, California. (Billingsley Decl., ¶ 2.) Informatica is a leading provider of data integration software and services. (*Id.*) Informatica's products allow businesses to collect, aggregate, convert (if necessary), format, and integrate large amounts of data from a wide variety of sources for delivery to business users. (*Id.* at ¶ 3.) Informatica is the owner of valid and enforceable copyrights in its software programs, including the following registered copyrights:

| Title of Work | Registration Number |
|---|---|
| Informatica B2B Data Transformation 9.6.1 | TX 8-331-442 |
| Informatica B2B Data Exchange 9.6.1 | TX 8-331-795 |
| Informatica HParser 9.6.1 | TX 8-331-933 |
| Informatica PowerCenter Enterprise Grid Option 9.6.1 | TX 8-331-715 |
| Informatica B2B Data Transformation 10.1 | TX 8-330-961 |
| Informatica B2B Data Exchange 10.1 | TX 8-328-376 |
| Informatica HParser 10.1 | TX 8-330-963 |

(Billingsley Decl., ¶ 4 and Exs. A – G.)

### B.    The Agreement for Services

In September 2009, RELX and Informatica entered into a master consulting agreement – the "Agreement for Services" – under which Informatica agreed to provide consulting services specified in subsequent written "Statements of Work" ("SOWs").  (Billingsley Decl., Ex. H.) Between 2009 and 2014, the parties executed at least six SOWs, as well as several addenda to one of the SOWs, pursuant to the Services Agreement.  (*Id.*, ¶ 13, Exs. P-U.)  As a general matter, the SOWs provided that Informatica would perform technical consulting services to assist RELX in transitioning aspects of its existing data management system to the Informatica software platform.  (*Id.*)

Under the Agreement for Services and various SOWs, Informatica agreed to provide technical consultants to work on-site at RELX's facilities.  (Billingsley Decl., Ex. H at 7.) Mishra was one of those on-site consultants.  (Mishra Decl., ¶ 3.)  The parties agreed that the on-site consultants would "perform their assignments in accordance with the directions of their REED ELSEVIER [RELX] Project Coordinator."  (Billingsley Decl., Ex. H at 7.)  The services provided by these on-site consultants were technical in nature.  (Mishra Decl., ¶ 4; Billingsley Decl., Exs. P-U.)  For example, the consultants installed software based on instructions from their RELX Project Coordinators.  (Mishra Decl., ¶¶ 6, 8, 9.)  The technical consultants were not involved in sales or licensing.  (*Id.*, ¶ 5.)  They did not negotiate licensing agreements and were unfamiliar with the terms of those agreements.  (*Id.*, ¶ 5.)

### C.    The Master Software License Agreement

On May 28, 2010, the parties executed the Master Software License Agreement ("MSLA").  (Billingsley Decl., Ex. I.)  Under the MSLA, RELX obtained a limited license to certain "Informatica Products," including B2B Data Exchange, Data Transformation Accelerator, and Enterprise Grid Option software (collectively, the "B2B Data Exchange Works").  (*Id.*, Ex. I

at 1, 11.) The B2B Data Exchange Works are "enterprise" software, meaning software commonly licensed and used by businesses and large organizations, as opposed to software for personal use by individuals. (*Id.*, ¶ 14.) As is typical for enterprise software, the MSLA limited the number of "CPU cores" on which the software could be installed. (*Id.*) For example, the MSLA indicates that RELX was originally authorized to deploy the B2B Data Exchange software on 16 CPU cores. (*Id.*, Ex. I at 11, 12.)

The term "core" refers to the computation engine of a CPU – i.e., the part of the microprocessor that reads and executes programs. (Billingsley Decl., ¶ 15.) The term is widely used and commonly understood both in the context of software licensing and the context of computer technology more generally. (*Id.*) For example, Intel's website discloses the number of "cores" for its Core i7 processor:



### Intel® Core™ i7-7920HQ Processor

- 8 MB Cache
- 4 Cores
- 8 Threads

(DeFosse Decl., Ex. AP.) Similarly, the technical specifications for servers used by businesses will typically disclose the number of cores used in the server. (Billingsley Decl., ¶ 15.) For example, the technical specification for the Dell PowerEdge R610 server indicates that it can use processors with either four or six cores:

| Feature | Technical Specification |
|---|---|
| Form Factor | 1U rack |
| Processors | Quad-core or six-core Intel® Xeon® processors 5500 and 5600 series |

(DeFosse Decl., Ex. AQ.)

The MSLA defines CPU cores in accordance with the ordinary and wide-spread use of that term:

**CPU** (Central Processing Unit) or **Single-Core Processor** is a single complete computation engine (execution core) that is fabricated on a single chip that plugs into a single socket. **Multi-Core Processor** integrates two (2) or more execution cores on a single chip that plugs into a single socket.

\*       \*       \*

**Production CPU-cores** (or 'Production CPUs') means the total number of CPU-cores licensed to support one (1) or more Software Application Services in a production environment.

(Billingsley Decl., Ex. J at 2, 3.)

The MSLA made clear that RELX was not permitted to deploy the B2B Data Exchange Works on more than the authorized number of CPU cores: "Customer may use such software in a Flex CPU Environment **provided such use does not exceed the total number of licensed Production CPU-cores**."[3]  (Billingsley Decl., Ex. J at 11.)

RELX was originally authorized to install the B2B Data Exchange software on 16 CPU cores.  (*Id.*, Ex. I at 11, 12.)  In December 2011, RELX obtained the right to deploy the software on four additional CPU cores, bringing the total number of licensed CPU cores to 20.  (*Id.*, ¶ 17.)  In June 2012, the parties amended the MSLA because RELX "wish[ed] to acquire additional Software licenses" to expand its data processing capabilities.  (*Id.*, Ex. K at 1.)  Under the June 2012 Amendment, RELX "Upgraded" certain existing licenses and acquired additional licenses.  (*Id.*)  Following the Amendment, the "sum" of RELX's upgraded and new licenses allowed RELX to install the B2B Data Exchange Works on servers with up to 72 CPU cores.  (*Id.*)  Finally, in February 2015, the parties amended the MSLA to reduce the number of licensed CPU cores to 56, which resulted in Informatica refunding RELX over $75,000 in fees. (*Id.*, Ex. L at 2.)

---

[3] The MSLA defines "Flex CPU Environment" to mean "a group of servers in a grid or name shared, or network, environment in which the Production CPU-cores reside."  (Billingsley Decl., Ex. J at 2.)

**D.     RELX Over-Deployed Informatica's Software**

In 2011, RELX installed the B2B Data Exchange Works on four servers – psc3813, psc3814, psc3815, and psc3816.  (Billingsley Decl., ¶ 20.)  When purchased, these four servers had a total of 32 CPU cores (8 CPU cores on each server).  (*Id.*)  In 2011, however, RELX was only licensed to install Informatica's software on servers with up to 16 CPU cores.   (Billingsley Decl., Ex. I at 11.)  As a result, Brian Wisvari (RELX's Director of Content Conversion and Programming) and Xinwei Li (a RELX engineer) instructed Charles Sedlacko (another RELX engineer) to remove 16 CPU cores from the four servers, bringing the number of CPU cores briefly into compliance with the MSLA.  (Mishra Decl., Ex. Z.)  In 2012, however, Wisvari and Li instructed Sedlacko to reinstall the cores on the servers.  (*Id.*)  As Sedlacko explained in his deposition:

> Q. Okay. Now, when you refer to modifications made to the first four servers, based on their requests, you're referring to requests by Mr. Li and Mr. Wisvari?
>
> A. Correct.
>
> Q. Okay. And that request was directed at what?
>
> A. That request originally when we built the first four servers, the servers come, as I indicated, with two sockets with four cores per socket. They had us build the original four servers with one core -- I'm sorry, one socket with four -- and essentially we removed one of the two sockets. Later, they requested that we put that socket back into the server.
>
> Q. . . . Mr. Li and Mr. Wisvari knew how many cores and sockets were in the original four servers and asked you to remove some of those cores and sockets?
>
> A. They asked me to remove some of the cores and sockets, yes.
>
> *        *        *

Q. . . . [D]id it strike you as strange that they were asking you to remove computing power from the servers?

A. That was something unusual, yes. That's not something that we did before.

Q. Okay. And did you ask them why it was they wanted to remove the cores and sockets?

A. They said it had to do with the licensing. I don't know anything more specific than that, though.

Q. Okay. Did they tell you -- when you say the licensing, you meant the licensing of Informatica software?

A. That's correct, yes.

(DeFosse Decl., Ex. AR at 95:11 – 97:8.)

On November 18, 2012, RELX deployed the software on another eight-core server (psc3817), raising the total deployment to 40 CPU cores across five servers.  (Billingsley Decl., ¶ 20.)  On March 31, 2013, RELX installed the software on two servers with 32 CPU cores each (psc33841 and 33842), resulting in a total deployment of 104 CPU cores across seven servers.  (*Id.*)  From March 31, 2013 through May of 2016, RELX maintained copies of the B2B Data Exchange Works on servers with a total of 104 CPU cores.  (*Id.*)

As reflected in the chart below, RELX's deployment of the B2B Data Exchange Works significantly exceeded the licenses granted under the MSLA for the majority of the period for which the MSLA was in-force.



### E. RELX Controlled the Software Installations

Prior to 2015, Informatica technical consultants installed the B2B Data Exchange Works on the RELX servers at the direction and under the supervision of their supervisors from RELX. (Mishra Decl., ¶¶ 6, 8, 9.) In particular, Wisvari and Li instructed Mishra, to install the B2B Data Exchange Works on each of the servers at issue in this case. (*Id.*, ¶ 9.)

Mishra first installed Informatica software on servers psc3813, psc3814, psc3815, and psc3816 in late 2011. (Mishra Decl., ¶ 8.) Li was responsible for getting Mishra the access rights necessary to install the software. (*Id.*, Ex. AA.) The Informatica software on those four servers was then upgraded in October 2012. Li sent an email announcing the planned software upgrade. (*Id.*, Ex. AC.) Li was the "technical approver" for the upgrade, while Wisvari was the "business approver." (*Id.*, Ex. AD.) In planning the upgrade, Li noted that it would be an "important milestone" and Wisvari stressed the need to get the upgrade completed. (*Id.*, Ex. AE.)

Li and Wisvari also managed the installation of Informatica software on the fifth server (psc33817) in November 2012.  For example, Wisvari instructed that the installation "move forward as planned" and offered to "set up a meeting to flesh out the planning details." (Mishra Decl., Ex. AF.)  Wisvari then specifically approved the addition of the server (*id.*, Ex. AG) and the plan for installing it (*id.*, Ex. AH), and thanked "all that helped to make [the installation] a success" (*id.*).  Again, Wisvari was the "business approver" of the installation and Li was the "technical approver."  (*Id.*, Ex. AG.)

The sixth and seventh servers (psc33841 and psc33842) were installed with Informatica software in March 2013.  Again, the contemporaneous emails make clear that the installation was managed by Li and Wisvari.  (*See* Mishra Decl., Ex. AL (Li informing LexisNexis employees of the installations); Ex. AK (Li communicating plan for making the installations).)

At the time he was instructed to install Informatica software on these servers, Mishra did not know that the installations would cause RELX to exceed the number of licenses it had obtained under the MSLA.  (Mishra Decl., ¶ 13.)  To the contrary, Wisvari had previously (and erroneously) told Mishra that RELX negotiated an unlimited license to install Informatica's software.  (*Id.*, ¶¶ 7, 13; *see also id.* at Ex. X.)  As a result, Mishra had no reason to question the instructions he received from Wisvari and Li to further deploy the software.

Mishra ceased working for RELX in November 2014.  (Mishra Decl., ¶ 3.)  Since that time, any software installations, reboots, or upgrades have been handled by RELX employees. For example, a RELX employee – Dwight Groff – was the "owner" of the Informatica 9.6.1 Upgrade in 2015.  (DeFosse Decl., Ex. AV.)

F.    **RELX Knew How Many CPU Cores Were Found in Its Servers**

The seven "psc" servers at issue in this case were each selected and purchased by RELX. (DeFosse Decl., Ex. AR at 29:22 – 30:11.)  RELX was well aware of the number of CPU cores

present on those servers. (*Id.*, Ex. AR at 22:24 – 23:18, 24:8-10, 107:11-17; Mishra Decl., Ex. Y.) In fact, Wisvari and Li provided very specific instructions to Sedlacko on how many cores they wanted on the seven "psc" servers. As Sedlacko explained in his deposition:

> Q. And at some point, did Mr. Wisvari or his group communicate requirements to you as to what the servers needed to be able to do?
>
> A. Yes.
>
> Q. Okay. Do you recall who it was that made that communication to you?
>
> A. It was working with Brian [Wisvari] and his team.
>
> Q. Okay. What kind of requirements would they communicate?
>
> A. They gave us how many servers that they needed, storage requirements, disk space, and CPU requirements as well.
>
> Q. Okay. What do you mean by "CPU requirements"?
>
> A. They -- the number of specific sockets and cores that the specific servers had.

(DeFosse Decl., Ex. AR at 22:24 – 23:18); *see also id.* at 24:8-10 ("They communicated very specific requirements with the number of sockets and cores."); *id.* at 107:11-17 (confirming that RELX was aware of the number of cores in the servers).

On March 19, 2013, Sedlacko also wrote to Wisvari, Li and numerous other RELX employees working with the Informatica software to "remind" them of the number of CPU cores found on the seven "psc" servers:

> I've added one new server psc33841 to the icce-prod cluster. It should now see the same shared storage as psc3813, psc3814, psc3815, psc3816, psc3817. . . Psc33842 is also ready to add to the cluster as well, but I wanted to hold off on this as this is the first time we've mixed hardware before. **Just as a reminder:**

- **Original servers 2 sockets * 4 cores/socket == equivalent of 8 CPU's**

- **New Servers (psc33841/psc33842) 4 sockets * 8 cores/socket == equivalent of 32 CPU's**

(Mishra Decl., Ex. Y; *see also* DeFosse Decl., Ex. AR at 94:3-8 ("Q. So among - - across the seven PSC servers, how many cores were there? A. I would have to add them up. I - - so there was 32 plus 32, plus 40, 8 - - 5 times 8. Q. Okay. A. So sounds like 104, I believe.").)

## G. RELX Attempted to Conceal Its Infringement

On February 24, 2016, Informatica notified RELX that Informatica would conduct a licensing audit, as permitted by Section 4.3 of the MSLA. (Billingsley Decl., Ex, M.) In connection with the audit, Informatica asked RELX to provide various types of data that would allow Informatica to assess how RELX had deployed the B2B Data Exchange Works. (*Id.*, ¶ 21.) RELX delayed for months before responding. (*Id.*) During that time, RELX decommissioned servers with 48 CPU cores, hoping to conceal its over-deployment of the software. (*Id.*, ¶ 21.)

## H. Informatica Terminated the MSLA, but RELX Continues to Use the Software

In October 2016, Informatica provided RELX an audit report showing the over-deployment of the B2B Data Exchange Works. (Billingsley Decl., Ex. N.) Informatica concluded that the shortfall in payments under the MSLA was in excess of $7.7 million. (*Id.*, Ex. N.) Pursuant to the MSLA, Informatica asked RELX to remit the shortfall in payment. (*Id.*, ¶ 22.) Informatica also sought to engage RELX in negotiations in hopes of reaching a business resolution. (*Id.*) When RELX refused to meaningfully engage, Informatica sent RELX a Notice of Default under the MSLA. (Billingsley Decl., Ex. W.) RELX's response was to file this lawsuit, apparently seeking to gain negotiating leverage. In filing the Complaint, RELX

intentionally altered an exhibit that was damaging to its case. Specifically, RELX attached a March 2013 email chain as Exhibit I to the Declaration of Jeff Reihl, RELX's Chief Technology Officer. (See DeFosse Decl., Exs. AN.) In its full form, the March 2013 email chain contained the email (quoted above) from Charles Sedlacko "remind[ing]" the RELX project team that RELX's servers had 104 CPU cores. (Mishra Decl., Ex. Y (attaching full email chain).) RELX intentionally removed Sedlacko's email from Exhibit I to Reihl's declaration. (Compare DeFosse Decl., Exs. AN, with Mishra Decl., Ex.Y.)

On May 9, 2017, Informatica provided RELX with written notice terminating the MSLA. (Billingsley Decl., Ex. O.) Under the termination provisions of the MSLA, RELX was required to "promptly, and in any event within thirty (30) days following termination, destroy the Informatica Products." (*Id.*, Ex. I at § 10.3.) To date, however, RELX has not destroyed the Informatica Products, including the B2B Data Exchange works. (DeFosse Decl., Ex. AS at 328:8-10.) To the contrary, RELX continues to use Informatica's software despite the termination of the MSLA. (*Id.*)

## III.   LEGAL STANDARD

Summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard, summary judgment is warranted where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party cannot simply rely on the denials in its pleadings, but must instead adduce sufficient facts admissible in evidence that show there is a genuine issue for trial. *E.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 259 (1986); *Walker v. Carter*, 210 F. Supp. 3d 487, 498 (S.D.N.Y. 2016) (non-moving party must provide

admissible, significantly probative evidence that there is a material factual dispute). A genuine issue of fact exists where a reasonable finder of fact, taking the record as a whole, could render a verdict in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV. ARGUMENT

### A. Informatica Is Entitled to Summary Judgment on Its Claim of Copyright Infringement

To prevail on its claim of copyright infringement, Informatica must establish two elements: (i) that it owns a valid copyright, and (ii) that RELX copied Informatica's copyrighted work without authorization. *Feist Publishings, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *see also Arisa Records LLC v. Doe*, 604 F.3d 110, 117 (2d Cir. 2010). In addition, to prevail on its claim of vicarious copyright infringement, Informatica need only further show that (iii) RELX had the right and ability to supervise the copying of the B2B Data Exhange Works, and (iv) that RELX had an obvious and direct financial interest in the exploitation of the copyrighted materials. *Shapiro v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963); *see also Gym Door Repairs, Inc. v. Young Equipment Sales, Inc.*, 206 F. Supp. 3d 869, 897-98 (S.D.N.Y. 2016). There is no genuine dispute that these elements are satisfied in this case.

### 1. Informatica Owns Valid Copyrights Covering the B2B Data Exchange Works

As set forth above, Informatica owns registered copyrights for versions 9.6.1 and 10.1 of the B2B Data Exchange Works. (Billingsley Decl., ¶ 16; *id.*, Exs, A-G.) These copyrights are presumptively valid. *See* 17 U.S.C. §410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright."). As the Second Circuit has noted, "[a] certificate of copyright registration is prima facie evidence that the copyright is valid. Moreover,

possession of a registration certificate creates a rebuttable presumption that the work in question is copyrightable." *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997); *accord Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F.2d 452, 455 (2d Cir. 1989).

## 2. RELX Copied Informatica's Software without Permission

There is also no genuine dispute that RELX made unauthorized copies of Informatica's copyrighted software. In early 2015, RELX installed version 9.6.1 of the B2B Data Exchange Works on seven servers (psc3813, psc3814, psc3815, psc3816, psc33817, psc33841, and psc33842). (DeFosse Decl., Exs. AV, AW, AX.) These servers collectively had **104 CPU cores**. (Dkt. 1-1, ¶¶ 33-34; Mishra Decl., Ex. Y; *see also* DeFosse Decl., Ex. AR at 94:3-8.) At the time of this installation, however, RELX only had authorization to install the software on servers with up **56 CPU cores**. (Billingsley Decl., Ex. L ("For avoidance of doubt, the retirement of the licenses (16 CPU-cores) reduces the number licensed for this configuration to 56 CPU-cores.").)

RELX's copying of Informatica's software outside the scope of the MSLA is a paradigmatic case of copyright infringement. As this Court has repeatedly recognized, "if a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action for copyright infringement." *Fioranelli v. CBS Broadcasting Inc.*, -- F. Supp. 3d --, 2017 WL 1400119, at *4 (S.D.N.Y. Jan. 19, 2017); *see also Jacobsen v. Katzer*, 535 F.3d 1373, 1380 (Fed. Cir. 2008) (same). For example, this Court has held that copying software onto a server in violation of a license agreement constitutes copyright infringement. *Saks Inc. v. Attachmate Corp.*, No. 14 Civ. 4902, 2015 U.S. Dist. LEXIS 52867, *27 (S.D.N.Y. Apr. 17, 2015); *see also Marshall v. New Kids on the Block Partnership*, 780 F. Supp. 1005, 1009 (S.D.N.Y. 1991) (copyright infringement claim exists where a defendant "make[s] himself a stranger to the licensor by using the copyrighted material in a manner that exceeds either the duration or the

scope of the license"); *MDY Indus., v. Blizzard Entertainment, Inc.*, 629 F.3d 928, 940 (9th Cir.

2010) (holding that a plaintiff may recover for copyright infringement where the defendant's

copying exceeds the scope of a license agreement).[4]

RELX has also undisputedly engaged in copyright infringement as a result of its

continuing use of Informatica's software following the termination of the MSLA on May 9,

2017. As the Second Circuit has explained, when a licensee materially breaches a license

agreement (as RELX has done here), the licensor may "rescind the license and hold the licensee

liable for infringement for uses of the work thereafter." *Graham,* 144 F.3d at 237. Each time

that RELX launches the Informatica programs, an unauthorized copy of the software is made in

the memory of the computer(s) executing the software. (Billingsley Decl., ¶ 24.) Again, it is

well established that such activity constitutes copyright infringement. *See, e.g., Cartoon

Network LP, LLP v. CSC Holdings Inc.*, 536 F.3d 121, 128 (2d Cir. 2008) (stating that

unauthorized copying of a piece of software into memory constitutes infringement so long as the

copy resides in memory for "a period of more than transitory duration" ); *MAI Systems Corp. v.

Peak Computer Inc.*, 991 F.2d 511 (9th Cir. 1993) ("The law also supports the conclusion that

Peak's loading of copyrighted software into RAM creates a "copy" of that software in violation

of the Copyright Act.").

### 3.    RELX's defenses have no merit

RELX does not dispute the fundamental facts underlying Informatica's claim of

copyright infringement. Instead, RELX has argued that it cannot be held liable for making

---

[4] RELX has cited *Graham v. James*, 144 F.3d 229 (2d Cir. 1998), for the proposition that "[a] copyright owner who
grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright
infringement." *Id.* at 236. As is reflected in *Fioranelli* and *Jacobson*, however, *Graham* does not prevent a licensor
from bringing a copyright infringement suit or seeking copyright damages where the licensee exceeds the scope of
the license. *See also Tasini v. NY Times Co.*, 206 F.3d 161, 170-71 (2d Cir. 2000) ("[T]he fact that a party has
licensed certain rights to its copyright to another party does not prohibit the licensor from bringing an infringement
action where it believes the license is exceeded or the agreement breached.").

unauthorized copies of the software because Mishra installed the original versions of the software on RELX's servers. RELX has also argued that it relied on Mishra to determine how many licenses RELX needed. Both of RELX's arguments are meritless.

As an initial matter, RELX directed and controlled every software installation that Mishra performed. Indeed, under the parties' master consulting agreement, Mishra was required to perform his tasks "in accordance with the directions of [his] REED ELSEVIER [RELX] Project Coordinator," Brian Wisvari.[5] (Billingsley Decl., Ex. H at 7; Mishra Decl., ¶ 6.) In accordance with the terms of the agreement, Mishra installed software on the specific directions from Wisvari and others on Wisvari's team, such as Xinwei Li. (Mishra Decl., ¶¶ 8, 9; *id.*, Exs. Z-AL.) Mishra did not have discretion concerning if, when, or where to install software. (*Id.*) Nor did Mishra have discretion over the number of CPU cores on RELX's servers. (*Id.* at ¶ 10.) Mishra was working as an agent of RELX and RELX is accountable for the actions it directed Mishra to take. *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963) ("the normal agency rule of respondeat superior applies to copyright infringement by a servant within the scope of his employment"); *see also, e.g., Doe v. Alsaud*, 12 F. Supp. 3d 674, 677 (S.D.N.Y. 2014) (claim for respondeat superior exists where "the tortious conduct causing the injury was undertaken within the scope of the employee's duties to the employer and was thus in furtherance of the employer's interests"). Moreover, the above facts establish that RELX is

---

[5] RELX has cited a more general provision of the Agreement for Services – § 24 – which provides that Informatica "is solely responsible and liable for the actions of its employees and any [Informatica] personnel performing work pursuant to this agreement for the supervision, daily direction, and control." (Billingsley Decl., Ex. H at § 24.) This general provision, however, was superseded by the "On-Site Terms" of the Agreement for Services which were "applicable if [Informatica] performs services on Reed Elsevier's premises." (*Id.* at 7 (Exhibit A); *see also id.* at § 27 ("If [Informatica] shall provide Services hereunder on [RELX's] premises, [Informatica] agrees to comply with the On-Site Terms, attached hereto as Exhibit A.").) It is black letter law that specific contract provisions – such as the On-Site Terms – override more general provisions. *Andersen v. Andersen*, 69 A.D.3d 773, 774 (NY 2d App. Div. 2010) ("Where there is an inconsistency between a specific provision and a general provision of a contract, the specific provision controls.").

liable for vicarious copyright infringement as a result of its instructions to Mishra to install software in violation of the MSLA. *See, e.g., MGN Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (holding that a company is vicariously liable for copyright infringement where that company has the authority to stop or limit the infringement, and that company profits from the infringement).[6]

RELX's argument is also meritless because it continued to make unauthorized copies of Informatica's software long after Mishra left in November 2014. Indeed, RELX installed version 9.6.1 of the B2B Data Exchange Works in 2015, *after* Mishra was gone. (DeFosse Decl., Exs. AV, AW, AX.) Moreover, since Informatica terminated the MSLA on May 9, 2017, RELX has engaged in ongoing infringement of Informatica's copyrights. RELX cannot even theoretically use Mishra as a scapegoat for the copies of Informatica's software that RELX made after Mishra's departure.

RELX's second assertion – that it had no idea of the meaning of "CPU core" and therefore relied on alleged licensing advice from Mishra – is also fundamentally flawed. First and foremost (and contrary to RELX's pleadings), the MSLA defines CPU core in Exhibit F. (Billingsley Decl., Ex. J at 1, 2; DeFosse Decl., Ex. AS at 128:11-15 (RELX Chief Technology Officer admitting that "CPU cores" is defined in the MSLA).) The definition in Exhibit F is not unusual. To the contrary, the definition is based on the common and widespread use of the term. (Billingsley Decl., ¶15.) During his deposition, RELX's Chief Technology Officer verified that he understood the widely used meaning of CPU "cores" – "[i]ts [the] number of processing units within a processor on a server." (DeFosse Decl., Ex. AS at 116:22-117:19.) Moreover, RELX had no difficulty in understanding the term over the course of the past seven years when it (1)

---

[6] As discussed with respect to Unjust Enrichment, below, there is also no dispute that RELX was in a position to benefit from the exploitation of Informatica's copyrighted works.

negotiated and executed a software licensing agreement based on the number of CPU cores; (2) purchased licenses to install software on four additional CPU cores in December 2011; (3) increased the total number of licensed CPU cores to 72 in June 2012; (4) decreased the total number of licensed CPU cores to 56 in February 2015; and (5) removed servers with precisely 48 CPU cores from the production server cluster in May 2016 in hopes of concealing its breach of the MSLA and copyright infringement.

RELX not only knew the meaning of "CPU core," but also how many CPU cores were found on the "psc" servers executing Informatica's software. For example, Wisvari – the RELX "Project Coordinator" – provided very specific instructions on how many cores were to be included on RELX's servers. (DeFosse Decl., Ex. AR at 22:24 – 23:18); *see also id.* at 24:8-10 ("They communicated very specific requirements with the number of sockets and cores.").) Moreover, in March 2013, the employee responsible for configuring RELX's servers sent an email to the RELX employees responsible for Informatica's software "remind[ing]" them of the number of CPU cores on the RELX servers installed with Informatica software. (Mishra Decl., Ex. Y.) RELX also knew the relationship between the number of cores on the "psc" servers and the MSLA. In fact, at one point Wisvari even directed the removal of cores from certain servers due to RELX's licensing obligations. (Mishra Decl., Ex. Z; DeFosse Decl., Ex. AR at 95:11 – 97:8.)

RELX's claim that it simply followed Mishra's licensing advice is also meritless. Mishra was a consultant responsible for assisting RELX with **technical** aspects of Informatica's software. (Mishra Decl., ¶ 4.) The scope of services provided by Mishra were defined in the statements of work that the parties executed; all of those services were technical in nature; none involved providing contractual advice. (*See* Billingsley Decl., Exs. P-U.) Mishra has confirmed

that did not have any responsibility for negotiating license terms, determining RELX's compliance with the MSLA, or advising RELX on the number of licenses it needed. (Mishra Decl., ¶ 5.) Indeed, Mishra had never even reviewed the MSLA. (DeFosse Decl., Ex. AU at 91:4-13, 96:20-97:18.) Moreover, Mishra had no reason to provide licensing advice because Wisvari (falsely) informed Mishra in July 2012 that that RELX had obtained an unlimited license to the B2B Data Exchange Works. (Mishra Decl., ¶ 7, Ex. X.) As a result, Mishra never questioned the instructions he received from Wisvari and Li to install copies of the software. (*Id.*, ¶ 13.)

### 4. Informatica is entitled to damages on its copyright infringement claim

There is no genuine dispute that Informatica is entitled to summary judgment on its copyright infringement claim. Under 17 U.S.C. § 504(b), Informatica is entitled to recover its actual damages, which would include the fair value of the software that RELX copied outside the scope of the MSLA. *On Davis v. The Gap, Inc.*, 246 F.3d 152, 166 (2d Cir. 2001) (holding that actual damages under §504(b) may be measured by the fair market value of the uncollected license fee). In addition, Informatica is entitled to "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. §504(b). In establishing RELX's profits, Informatica will only be required to present evidence of RELX's gross revenue; the burden will then shift to RELX to "prove [its] deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. §504(b). As the Court recognized in setting the summary judgment briefing schedule, additional discovery will be necessary to establish the quantum of damages RELX owes Informatica on the copyright claims. Informatica thus requests that the Court, upon awarding Informatica summary judgment, also enter an expedited schedule for determining the quantum of damages.

**B.    Informatica Is Entitled to Summary Judgment on Its Claim that RELX Breached the MSLA**

Under New York law, the elements of a breach-of-contract claim are: (1) the existence of a valid contract between the parties; (2) performance by the party alleging breach; (3) failure of the breaching party to perform; and (4) damages attributable to the breach. *Small Business Bodyguard Inc. v. House of Moxie, Inc.*, -- F. Supp. 3d. --, 2017 WL 455561 (S.D.N.Y. Jan. 31, 2017). Each of these elements is easily satisfied in this case.

**1.    The MSLA is a valid contract between RELX and Informatica**

RELX does not dispute that the MSLA "is a valid and enforceable non-exclusive license agreement governed by New York law." (DeFosse Decl., Ex. AY at ¶ 42.)

**2.    Informatica performed its obligations under the MSLA**

There is also no genuine dispute that Informatica has performed its obligations under the MSLA. Subject to the terms and conditions specified in the MSLA, Informatica granted RELX a non-exclusive license to the identified "Informatica Products." Informatica also provided RELX all support and maintenance required under the MSLA.

**3.    RELX violated multiple provisions of the MSLA**

There is also no genuine dispute that RELX has violated multiple provisions of the MSLA.

**a.    Provisions restricting deployment of Informatica's software**

First and foremost, RELX has repeatedly violated the terms and conditions governing the use and deployment of Informatica's software. Pursuant to Exhibit F of the MSLA, RELX was permitted to install Informatica's software on a group of servers (a "Flex CPU Environment") "**provided such use does not exceed the total number of licensed Production CPU-cores**." (Billingsley Decl., Ex. J at 11.) The terms and conditions of Exhibit F were expressly incorporated into the MSLA. (Billingsley Decl., Ex. I at § 2.1.1 (use of "any/all Informatica

Software" is limited "to the terms and conditions set forth in the Software's Informatica Product Description Schedule current at the time of licensing, a copy of which is attached hereto as Exhibit F"); *see also id.* at § 2.2 ("Use of the Informatica Products by Customer and End Users is further limited as provided in such Exhibits as are or may be attached hereto and incorporated by reference into this Agreement.").)

For almost the entire period from January 2012 until May of 2016, RELX exceeded the total number of licensed Production CPU-cores in violation of the MSLA. In particular, there is no genuine dispute that:

- From January 2012 until June 2012, RELX deployed Informatica's copyrighted software on servers with 32 CPU cores. (Billingsley Decl., ¶ 20.) The total number of licensed Production CPU-cores during this period was 20. (*Id.*, ¶ 17.) As a result, RELX exceeded the total number of licensed CPU-cores by 12.

- From March 2013 until February 2015, RELX deployed the software on servers with 104 CPU cores. (*Id.*, ¶ 20.) The total number of licensed Production CPU-cores during this period was 72.[7] (*Id.*, ¶ 17.) As a result, RELX exceeded the total number of licensed CPU-cores by 32.

- From February 2015 until May 2016, RELX deployed the copyrighted software on servers with 104 CPU cores. (*Id.*, ¶ 20.) The total number of licensed Production CPU-cores during this period was 56. (*Id.*, ¶ 17.) As a result, RELX exceeded the total number of licensed CPU-cores by 48.

---

[7] RELX has alleged that it was permitted to install the Informatica software on servers with 92 CPU cores from June 2012 until February 2015. In particular, RELX has alleged that, following the June 2012 Amendment to the MSLA, it retained the initial 20 CPU-core licenses and added 72 new licenses, for a total of 92 licenses. (DeFosse Decl., Ex. AM at ¶ 15.) No reasonable fact-finder could agree with RELX's position. First and foremost, Informatica refunded RELX more than $1.4 million for the original 20 CPU core licenses as part of the June 2012 Amendment. (Billingsley Decl., ¶ 18.) Second, both the June 2012 Amendment and the February 2015 Amendment make clear that RELX owned a total of 72 CPU core licenses. (Billingsley Decl., Ex. K at 1 (stating that the "sum" of the licenses is 72); *id.*, Ex. L at 2 (stating, "[f]or avoidance of doubt," that following the termination of 16 licenses, "the number license for this configuration" is "56 CPU-cores").) Third, the RELX employee responsible for the Informatica software from May 2013 through February 2015 admitted in her deposition that RELX had a total of 72 licenses from June 2012 until February 2015. (DeFosse Decl., Ex. AT at 47:13-18.)

As the above bullets demonstrate, for over four years, RELX repeatedly violated the fundamental provisions governing the scope of the MSLA, satisfying the third element of Informatica's claim for breach of contract.

> **b.** **Provisions requiring RELX to immediately remit any shortfall in payment**

RELX also violated § 4.3 of the MSLA when it failed to pay Informatica for the over-deployment of Informatica's software. The MSLA gave Informatica authority to conduct an examination of RELX's compliance with the MSLA whenever "Informatica determines that there is or may be a reasonable basis to proceed." (Billingsley Decl., Ex. I at § 4.3.) In the event that "any shortfall in payment [is] disclosed by Informatica's examination," RELX was required to "immediately remit" that amount to Informatica. (*Id.*) Moreover, RELX was required to pay or reimburse Informatica for the cost of the examination if the shortfall was "more than ten percent for any quarter." (*Id.*)

In October 2016, Informatica informed RELX of the shortfall discovered after auditing RELX's records. RELX refused to remit the shortfall in payments and refused to engage in business discussions aimed at settling the matter. Instead, RELX filed this declaratory judgment action. (*Id.*) To date, RELX has not remitted the shortfall in payments, in violation of § 4.3 of the MSLA. (*Id.*, ¶ 23.)

> **c.** **Termination provisions of the MSLA**

RELX has also violated the termination provisions of MSLA. Under § 10.2, "a party may terminate [the MSLA] if the other party materially defaults under this Agreement and fails to cure such default within 30 days after receipt of written notice of such default and intent to terminate from the other party." (Billingsley Decl., Ex. I at § 10.2.) Under § 10.3, "[t]he licenses granted herein shall terminate upon the termination of this Agreement by Informatica as

a result of a breach by Customer.  Upon termination of this Agreement by Informatica in the event of a breach by Customer, Customer shall promptly, and in any event, within thirty days following termination, destroy the Informatica Products." (*Id.* at § 10.3.)

On November 29, 2016, Informatica provided RELX with written notice of default under § 10.2.  (Billingsley Decl., Ex. Y.)  On May 9, 2017, Informatica formally terminated the MSLA. (*Id.*, Ex. O.)  In violation of § 10.3, however, RELX has refused to cease using and destroy Informatica's software.  (DeFosse Decl., Ex. AS at 328:8-10.)

### 4. Informatica has suffered damages attributable to the breach

There is also no legitimate dispute that Informatica has suffered damages as a result of RELX's repeated violations of the MSLA.  Indeed, the only dispute between the parties appears to be the amount of those damages.

First, Informatica is entitled to recover the license fees it lost for each period of RELX's over-deployment of Informatica's software.  These amounts will include, at least, the lost licensing fees (i) for 12 CPU cores from January 2012 to June 2012; (ii) for 32 CPU cores from March 2013 until February 2015; and (iii) for 48 CPU cores from February 2015 until May 2016.

Second, Informatica is entitled to recover fees for the support and maintenance services Informatica provided during the periods of over-deployment.  The MSLA provided that "Maintenance and Support Services Fees for the Informatica Products set forth above and for such Informatica Software as may from time-to-time be purchased by [RELX] under this Agreement shall be charged at a rate of eighteen percent (18%) of the License Fees paid by [RELX] for such Informatica Products."  (Billingsley Decl., Ex. I at 13.)  From January 2012 until June 2012, Informatica provided support and maintenance services for software installed on 32 CPU cores.  During that period, however, RELX only paid for support and maintenance on 20 CPU cores.  Similarly, from March 2013 until May 2016, Informatica provided support and

maintenance for software installed on 104 CPU cores. During that period, RELX only paid

support and maintenance fees on 72 CPU cores (from June 2012 to February 2015) and,

subsequently, 56 CPU cores (from February 2015 to May 2016).

As a result of RELX's over-deployment of Informatica's software and refusal remit the

shortfall in payments, Informatica has lost (and is entitled to recover) the licensing, support and

maintenance fees it was owed under the MSLA. Informatica is also entitled to recover the costs

of its examination pursuant to § 4.3 and the attorneys' fees incurred in this case, as detailed in

Part IV.D, below.

C.     **Informatica Is Entitled to Summary Judgment on Its Claim of Unjust Enrichment**

In order to prove a claim of unjust enrichment under New York law, a claimant must

show that: (i) the defendant benefitted; (ii) the defendant's benefit was at the expense of the

plaintiff; and (iii) equity requires that the plaintiff receive restitution. *Kaye v. Grossman*, 202

F.3d 611, 616 (2d Cir. 2000). In other words, unjust enrichment occurs where "the defendant

receives a benefit of money or property belonging to the plaintiff." *Fed. Treasury Enter.*

*Sojuzplodoimport v. Spirits Int'l. N.V.*, 425 F. Supp. 2d 458, 475 (S.D.N.Y. 2006) (quoting

*Granite Partners, L.P. v. Bear, Stearnes & Co.*, 17 F. Supp. 2d 275, 313 (S.D.N.Y. 1998)).

1.     **RELX benefited from Informatica's software and support services**

A defendant benefits where it gains something of value from a plaintiff with whom the

defendant has a relationship. *See Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516

(2012). It is uncontested that RELX has benefitted greatly from Informatica's software and

support services. RELX's Chief Technology Officer, Jeff Reihl, described Informatica's

software as essential to RELX's operations. (DeFosse Decl., Ex. AS at 323:11 – 324:5.) For

example, Reihl has explained that RELX "uses Informatica's software to normalize formats on

new and existing documents, which is a critical functionality to provide up-to-date information to subscribers." (DeFosse Decl., Ex. AO at ¶ 3.) Indeed, if RELX were unable to use Informatica's software, its "business operations would be significantly impacted because it would be unable to provide timely updates of critical information to professionals in legal, corporate, tax, government, academic and non-profit organizations that rely on its services." (*Id.* at ¶ 40.) As Reihl's statements illustrate, there is no dispute that RELX has obtained a substantial benefit from Informatica's software. *See LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d. 501, 519 (S.D.N.Y. 2015) (finding that improper use of intellectual property is sufficient basis to support a claim of unjust enrichment).

### 2. RELX's benefit came at Informatica's expense

There is also no genuine dispute that the benefit RELX has enjoyed from Informatica's software came at Informatica's expense. Informatica invested substantial time and resources in developing and maintaining the software and services that are providing the "critical functionally" from which RELX is now benefiting. (Billingsley Decl., ¶ 3.)

### 3. Informatica is entitled to restitution

Equity and good conscience require that the plaintiff receive restitution where the benefit the defendant received rightfully belongs with the plaintiff. *Newbro v. Freed*, 2007 U.S. App. LEXIS 4769 at *5 (2d Cir. 2007), citing *Strong v. Strong*, 277 A.D. 2d 533, 534 (3d Dep't 2000) ("It is axiomatic that [a] cause of action for unjust enrichment arises when one party possesses money…that in equity and good conscience they should not have obtained or possessed because it rightfully belongs to another.").

The equities decidedly favor restitution in this case. Over the course of more than four years, RELX benefited from Informatica's software and support services while paying only a fraction of the cost for those products. During that time, RELX erroneously told Informatica's

technical consultant that it had obtained an "unlimited" license to Informatica's software so that he would continue to install the software without raising questions. In February 2015, RELX falsely claimed that it was not fully utilizing its software licenses and tricked Informatica into amending the MSLA and refunding a portion of RELX's prepaid support fees. As noted above, however, RELX continued to deploy the software on servers with 104 CPU cores and benefit from the support services Informatica provided for those installations. Then, facing an audit, RELX sought to conceal its over-deployment of the software. When Informatica ultimately discovered RELX's violations, RELX refused to negotiate in good faith. Instead, RELX filed the instant case in hopes of gaining leverage in negotiations. As courts have repeatedly noted, "it is contrary to equity and good conscience to enable a party to benefit from misleading representations." *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 404 (E.D.N.Y. 2010) (citing *Firestone v. Miroth Const. Co.*, 215 A.D. 564, 565 (1st Dep't 1926)).

As reflected above, there is no genuine dispute that RELX received the benefit of property belonging to Informatica and that restitution is warranted in this case. Informatica thus respectfully requests that the Court enter summary judgment in favor of Informatica on its claim of unjust enrichment and schedule proceedings to determine the amount of restitution.

D.      **Informatica Is Entitled to an Award of Attorneys' Fees**

Informatica is entitled to recover the attorneys' fees and expenses it incurred in this proceeding under the terms of the MSLA. In particular, § 11.4 of the MSLA provides that, "[i]n the event that an action or arbitration is brought to enforce the provisions of this Agreement, the prevailing party in such action, proceeding or arbitration shall be entitled to all reasonable attorneys' fees and expenses incurred in connection therewith." (Billingsley Decl., Ex. I at § 11.4.)

The Court should also exercise its discretion to award Informatica its attorneys' fees and expenses under the Copyright Act.  In particular, 17 U.S.C. § 505 provides that the Court may award "reasonable attorney's fee to the prevailing party" in a copyright infringement action.  In determining whether to award fees under § 505, the Court should take into account all relevant factors.  *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1989 (2016).  For example, the Court should consider "the frivolousness of the non-prevailing party's claims or defenses; [ ] [the] party's motivation; ... and [the goals of] compensation and deterrence."  *Bryant v. Media Right Productions, Inc.*, 603 F.3d 135, 144 (2d Cir. 2010).  Ultimately, awards under § 505 "should encourage the types of lawsuits that promote the Copyright Act's aims of encouraging and rewarding authors' creations while also enabling others to build on that work." *John Wiley & Sons, Inc. v. Kirtsaeng*, No. 08 Civ. 7834, 2016 WL 7392210, at *2 (S.D.N.Y. Dec. 21, 2016).

The facts in this case strongly support an award of attorneys' fees under § 505.  For more than four years, RELX wantonly infringed Informatica's copyrighted software.  When confronted with an audit in 2016, RELX sought to conceal its infringement.  When concealment did not work, and instead of actually responding to the audit in writing, RELX sought to publicly harass and embarrass Informatica into a settlement by filing a frivolous and baseless declaratory judgment lawsuit.  The lawsuit was based on the demonstrably frivolous theory that RELX had no idea about the meaning of its contractual obligations and stood helplessly by while an Informatica technical consultant "improperly" installed software on RELX's servers.  From the outset, RELX was in possession of evidence showing its claims to be untrue.  Indeed, RELX intentionally altered an exhibit submitted with the Complaint to remove a series of emails showing that RELX knew exactly how many CPU cores were on the servers with Informatica software.  RELX also had evidence that every allegedly "improper" software installation was

directed and approved by RELX employees.  RELX, however, persisted with its arguments, forcing Informatica to expend substantial resources, ultimately culminating with this motion for summary judgment.

Under these circumstances, Informatica requests that the Court enter summary judgment finding that Informatica is entitled to its attorneys' fees both (i) under § 11.4 of the MSLA; and (ii) under § 505 of the Copyright Act, the quantum of which will be determined in future proceedings.

## V.    CONCLUSION

For the foregoing reasons, Informatica respectfully requests that the Court award Informatica summary judgment on its claims of copyright infringement, breach of contract, and unjust enrichment.  Informatica further requests summary judgment on its entitlement to attorneys' fees.  Finally, Informatica requests that the Court scheduled expedited proceedings to determine the quantum of damages owing on Informatica's counterclaims and the quantum of attorneys' fees owing to Informatica as a result of these proceedings.

Dated:    New York, New York
            July 21, 2017

FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP

By:                /s/

            Scott W. Doyle *pro hac vice*
          Jonathan R. DeFosse *pro hac vice*

801 17th Street, N.W.
Washington, D.C. 20006
Tel: 202.639.7000
Fax: 202.639.7003
scott.doyle@friedfrank.com
jonathan.defosse@friedfrank.com

FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP
John A. Borek
One New York Plaza
New York, New York 10004-1980
Tel:  (212) 859-8000
Fax:  (212) 859-4000
john.borek@friedfrank.com

Attorneys for Defendant and
   Counterclaim Plaintiff
*Informatica LLC, sued herein as*
   *Informatica Corp.*