1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
2

3    RELX INC.,

4           Plaintiff,

5      vs                          CASE NO: 16-CV-9718 (AKH)

6    INFORMATICA LLC,

7           Defendant.

8    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

9    INFORMATICA LLC,

10          Counter-Plaintiff,

11     vs

12   RELX INC., RELX GROUP PLC,

13          Counter-Defendants.

14   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

15           VIDEOTAPED DEPOSITION OF EXPERT

16                 CHRISTOPHER RUCINSKI

17

18                    June 20, 2018

19                      9:52 a.m.

20

21               One International Place

22                Boston, Massachusetts

23

24   Deborah J. Bateman, Court Reporter



```
 1                 APPEARANCES OF COUNSEL

 2

    On Behalf of the Plaintiff RELX Inc.:
 3
            ROBERT J. SCOTT, ESQ.
 4          BARBARA FREDERIKSEN-CROSS, ESQ.
            SCOTT & SCOTT, LLP
 5          550 Reserve Street, Suite 200
            Southlake, Texas 76092
 6          214.999.2905
            Rjscott@scottandscottllp.com
 7          Julie@scottandscottllp.com

 8
    On Behalf of the Defendant Informatica LLC:
 9
            SCOTT W. DOYLE, ESQ.
10          Greenberg Traurig
            2101 L Street, N.W., Suite 1000
11          Washington, DC 20037
            202.331.3143
12          Doyles@gtlaw.com

13

14  Also Present:

15  Kayli Smendec, Summer Associate
    Couirey Eckmayer, Videographer
16  Paul Levy, Vice President, Informatica
    Barbara Frederiksen-Cross
17

18

19

20

21

22

23

24
```



```
 1               INDEX OF EXAMINATION

 2

 3   WITNESS: CHRISTOPHER RUCINSKI                    Page

 4   EXAMINATION

 5   By Mr. Doyle                                        5

 6

 7              INDEX TO EXHIBITS

 8

 9   DEFENDANT'S        Description               Page

10   Exhibit 1        Rucinski expert report       97

11   Exhibit 2        "Unlock the Potential of

12                    External and Hierarchical Data"  124

13   Exhibit 3        Expert Discovery 000008 Excel

14                    spreadsheet                  177

15   Exhibit 4        Expert Discovery 000002 Excel

16                    spreadsheet                  220

17   Exhibit 5        Two-page spreadsheet         243

18   Exhibit 6        E-mails                      260

19   Exhibit 7        Jeffrey Reihl deposition

20                    transcript                   272

21

22

23

24
```



```
 1              DEPOSITION OF CHRISTOPHER RUCINSKI

 2                     June 20, 2018

 3

 4         THE VIDEOGRAPHER:  This is Tape No. 1 to the

 5   videotaped deposition of Christopher Rucinski in the

 6   matter of RELX Inc., plaintiff versus Informatica LLC,

 7   defendant, being heard before the U.S. District Court,

 8   Southern District of New York, Case No. 16-CV-9718 (AKH).

 9         This deposition is being held at Greenberg

10   Traurig, LLP, in Boston, Massachusetts.  Today's date is

11   2018, June 20, and the time on the record is 9:51 a.m.

12         My name is Couirey Eckmayer, and I am the

13   videographer.  The court reporter is Deborah Bateman.

14         Counsel, will you please introduce yourselves

15   and affiliations, and the witness will be sworn in.

16         MR. DOYLE:  Scott Doyle, counsel to

17   Informatica Corporation.

18         MR. LEVY:  Paul Levy, Vice President for

19   Informatica.

20         MS. SMENDEC:  Kayli Smendec, summer associate

21   for Greenberg Traurig with Informatica.

22         MR. SCOTT:  Rob Scott with Scott & Scott

23   representing the RELX parties.

24         MS. MACHAL-FULKS:  Julie Machal-Fulks also
```



1   representing the RELX parties with Scott & Scott.

2              MS. FREDERIKSEN-CROSS:   Barbara

3   Frederiksen-Cross.   I'm here as an assistant to counsel

4   for Informatica.

5

6              CHRISTOPHER RUCINSKI, having been first

7   satisfactorily identified and duly sworn, testified as

8   follows:

9

10                          EXAMINATION

11  BY MR. DOYLE:

12       Q.    Good morning, Mr. Rucinski.

13       A.    Good morning.

14       Q.    Is that how to say your name properly,

15  "Rucinski"?

16       A.    Yes, that's correct.

17       Q.    Okay.   You understand today you're under oath?

18       A.    I do.

19       Q.    And do you understood that verbal answers are

20  necessary?

21       A.    Yes.

22       Q.    Okay.   One thing that I ask is I'll be asking

23  questions, and I would appreciate if you allowed me to

24  get my question out onto the record and then you can



 1   provide your answer, and I'll try not to interrupt your

 2   answer with a new question.  Do you understand that?

 3        A.    That makes sense to me.

 4        Q.    And do you understand that you need to answer

 5   despite objections unless instructed otherwise by your

 6   counsel?

 7        A.    Yes.

 8        Q.    And today I'm going to assume you understand

 9   any question you answer.  Is that fair?

10        A.    Sure.  And if I don't understand it, I'll just

11   ask you to --

12        Q.    Okay.

13        A.    -- clarify it somehow.

14        Q.    Great.  And if you need a break today, just

15   let us know.  All I ask is that if we have a question on

16   the record, that you answer that first.  Is that all

17   right?

18        A.    Okay.

19        Q.    As you sit here today, any reason why you

20   cannot provide full and truthful testimony?

21        A.    As I sit here right now, I can't think of any

22   other reason.

23        Q.    Okay.  Mr. Rucinski, what did you do today to

24   prepare for your deposition?



1    A.    Today I woke up, I reviewed my two reports

2    briefly, and then met with counsel briefly for about ten

3    minutes before walking up here.  And that's all I did

4    this morning.

5        Q.    Well, other than today, what did you do to

6    prepare for your deposition?

7        A.    Yesterday I reviewed my reports in more

8    detail.  I also met with counsel for about two

9    hours.  I reviewed the deposition transcript of

10   Ms. Frederiksen-Cross.  And in total, yesterday, apart

11   from meeting with counsel, I probably spent three to four

12   hours preparing.

13       Q.    What about before yesterday?

14       A.    Well, I reviewed the deposition transcript of

15   Ms. Frederiksen-Cross before yesterday, but that's all I

16   can think of right now.  I only prepared in the last few

17   days.

18       Q.    Did you have any other meetings with counsel

19   in preparation for your deposition other than the one you

20   had today and yesterday?

21       A.    No.

22       Q.    Did you have conversations with anyone else in

23   preparation for your deposition other than counsel?

24       A.    So let me amend.  So yesterday I spoke on the



1  phone with Dwight Groff to get some clarity on an issue

2  that was raised during Ms. Frederiksen-Cross's

3  deposition, and that call was for about ten minutes or

4  so.

5       Q.    And what was that issue?

6       A.    The issue was the -- in one of the tabs on a

7  spreadsheet relating to the utilization of the RELX

8  servers, there was reference to a user with a name of, I

9  think it was, 1UInform, and that was raised during the

10 deposition of Ms. Frederiksen-Cross.  And so I wanted to

11 talk to Dwight to get some better clarity on -- on why

12 that name had showed up in that spreadsheet.

13      Q.    And what does that name indicate?

14      A.    Understanding from talking with Mr. Groff is

15 that that is the -- the name of the user process that was

16 set up when the servers and the ICCE grid -- and ICCE,

17 that's spelled I-C-C-E -- when those servers were set up

18 with the Informatica software, that was the user that was

19 set up to run parts of the Informatica software, and so

20 that's why it bore a name resembling Informatica.

21      Q.    So does that mean that content data was still

22 going across the Informatica platform at that time and

23 date?

24           MR. SCOTT:  Objection.



1      A.    Would you clarify the time and day that you

2 mean in your question?

3      Q.    Yeah.   Associated with the spreadsheet you

4 were looking at.

5      A.    It's my understanding from talking with

6 Mr. Groff that that user name was associated with -- or

7 was the user name associated with all of the processing

8 that appeared on the spreadsheet; however, after around

9 November 7, that name -- or that user name was still

10 present in the system although it was executing software

11 that was not Informatica software.

12     Q.    And what software was it executing?

13     A.    So from talking with Mr. Groff, my

14 understanding is that it was executing other parts of the

15 ICCE platform which has since, and around that time

16 period, changed to not incorporate the Informatica

17 software.

18     Q.    Do you know if any of the Informatica software

19 was still being used on November 17, 2017?

20     A.    Specifically on that date, my understanding

21 from Mr. Groff's sworn testimony is that it was not

22 running at that time.

23     Q.    Did he provide you any more reports to look at

24 after that date and time?



1              MR. SCOTT:  Objection.

2       A.    After the date and time you mentioned, I don't

3   recall seeing any other reports apart from the ones I

4   mentioned in my report.

5       Q.    Did you ask him to see more reports after

6   November 17?

7       A.    I didn't.  Because, as far as I understood,

8   the Informatica software wasn't running when that date

9   came to pass, so it didn't seem relevant to the items I

10  was looking at for my reports.

11      Q.    So is it your -- it's -- your understanding is

12  that after that date, no more data was running through

13  the Informatica platform?

14      A.    The way I would state it is that the

15  Informatica software -- well, let me restate that.

16              On that -- as of that date, the Informatica

17  software wasn't being used in the ICCE platform to

18  process files; so while the ICCE platform was processing

19  files, it was no longer using Informatica software at

20  that time.

21      Q.    Was Informatica software being used for any

22  other -- as part of any other platform other than ICCE

23  after that time?

24      A.    As far as I know, it was not.



1     Q.    Who told you that?

2     A.    I believe Mr. Groff mentioned that to me.  I

3  think it may also be in the e-mail that he sent, but I'd

4  have to take a second look at that to be sure.

5     Q.    And did you independently verify that?

6     A.    Well, having spoken with Mr. Groff and having

7  read his deposition testimony, I didn't -- because there

8  was nothing to suggest that it wasn't running at that

9  time, I didn't feel it was necessary to look into the

10  issue any further.

11     Q.    What was the activity that, I think you called

12  it -- was it U1 -- let me get this -- U1Inform, is that

13  the name?

14     A.    That's my recollection.

15     Q.    Okay.  What was the activity that U1Inform was

16  processing prior to the date November 17 in 2017?

17          MR. SCOTT:  Objection.

18     A.    So in general, the -- that user process was

19  running processes associated with the ICCE platform.

20  Some of those processes were related to the Informatica

21  software, but others were related to other parts of the

22  ICCE platform.  And, then, in general, after the ICCE

23  platform ceased using Informatica software, it was only

24  processing other programs that were -- or processes that



1    were part of the ICCE platform.

2        Q.    Which processes were associated with the

3    Informatica software?

4        A.    So there were a number of workflows that were,

5    we'll say, kind of defined by the Informatica software in

6    terms of their overall structure, and then there were

7    specific data transformation processes that were executed

8    as part of the Informatica software.

9        Q.    Do you know if that term U1 -- I'm sorry --

10   1UInform is still used as part of the ICCE platform?

11            MR. SCOTT:   Objection.

12       A.    I think it was U1Inform, but I'd have to check

13   the document --

14       Q.    Okay.

15       A.    -- to make sure.  And sorry, would you repeat

16   that question?

17       Q.    Yeah.  The question is do you know if that

18   indicator is still used as part of the Informatica -- I'm

19   sorry.  Strike that.

20            Do you know if the indicator U1Inform is still

21   used in the ICCE platform today?

22            MR. SCOTT:   Objection.

23       A.    I'm not sure if it is or not.

24       Q.    Does Inform -- the -- so the name U1Inform, is



1    the "inform" portion of that name, does that mean

2    Informatica?

3            MR. SCOTT:  Objection.

4        A.   I'm not sure what it means per se, but my

5    understanding from talking to Mr. Groff is that it was

6    related to the fact that when the ICCE platform was first

7    developed, it was designed to use Informatica software.

8        Q.   Which parts of the U1Inform activity were

9    Informatica before November 2017?

10           MR. SCOTT:  Objection.

11       A.   Would you clarify which dates you're referring

12   to?

13       Q.   Yeah.  I'm sorry about that.  Which parts of

14   the U1Inform activity were Informatica before November

15   17, 2017?

16           MR. SCOTT:  Objection.

17       A.   My understanding is that -- first of all, with

18   respect to the dates, my understanding is that the

19   Informatica portion of the ICCE platform was -- no longer

20   took in any documents after November 7, 2017.

21       Q.   Okay.

22       A.   Not the 17th.

23       Q.   Thank you.

24       A.   But on that date and prior, I think as I



1  already discussed a little bit, the portions of the ICCE

2  platform that were Informatica were related to, for

3  instance, the workflows that Informatica defined, and

4  specifically, the data transformation processes that

5  were executed.

6      Q.    And what workflows were those?

7      A.    There were a number of workflows related to

8  processing documents related to, for instance, first

9  retrieving the document from the provider where it

10  originated, and then converting it into a text form, and

11  then doing some other transformations to get it into a

12  master form.

13         And to be clear:  There were portions of those

14  workflows that were implemented by RELX, and so those --

15  those -- the execution of those workflows were more in

16  line with RELX customized software.  There were specific

17  workflows that were implemented using Informatica

18  software.  And then the workflows themselves were kind of

19  part of the framework that Informatica provided.

20      Q.    What percentage of the workflows were

21  associated with Informatica?

22      A.    Would you clarify the time period that you're

23  talking about?

24      Q.    Prior to November 7, 1918 [sic].



1        A.    My understanding is that that changed over

2   time.  The ICCE platform went through at least a couple

3   major versions, and I think there was at least one minor

4   version in between.  So in general, my understanding is

5   that the ICCE platform originally started out using more

6   Informatica workflows that were implemented by

7   Informatica, and then over time, transitioned to using

8   fewer of those workflows.

9        Q.    And when you say "started out," what --

10  approximately what year was that?

11       A.    My understanding is that the ICCE platform

12  began processing documents using the Informatica software

13  for part of that in 2012.

14       Q.    And so in 2012, approximately, what percentage

15  was Informatica of the workflows?

16       A.    Of the workflows that were implemented by

17  Informatica, I'm not certain, as I sit here.  There was a

18  diagram in my report where I labeled a number of -- a

19  number of workflows that were implemented, for instance,

20  in Java that RELX created themselves, and in Perl that

21  RELX created themselves, and then there were others that

22  were labeled as Informatica specific.

23       Q.    Okay.  What about with respect to the data

24  transformation processes?  Were those all Informatica?



1        A.    So when I say data transformation, I'm

2   specifically referring to the Informatica data

3   transformation software.  So yes, by data transformation,

4   you know, upper case, shall we say, I'm talking about

5   Informatica software in that instance.

6        Q.    So before November 7, 2017, is all the CPU

7   data reported in the charts ICCE related?

8              MR. SCOTT:  Objection.

9        A.    Would -- would you state that one more time?

10       Q.    Yeah.  Prior to November 7, 2017, is all the

11  CPU data and CPUs reported in the charts ICCE related?

12             MR. SCOTT:  Objection.

13       A.    My understanding is that because the -- well,

14  let me state it this way:  The CPU data was reported from

15  the operating systems that were executing on the servers

16  that were part of the ICCE platform.  So it's my

17  understanding that they were -- those CPUs were being

18  used to run the various components of the ICCE platform.

19  I'm not aware, as I sit here right now, of other things

20  they might be doing that were apart from the ICCE

21  platform, and, again, noting that the ICCE platform

22  included parts beyond the Informatica software.

23       Q.    Are you aware that some of the U1Inform

24  numbers started on May 15, 2017?



1        A.    That would be consistent with my understanding

2    because the U1Inform user, as far as I know, was the user

3    that was executing processes on the servers in general.

4        Q.    And what did those numbers relate to --

5              MR. SCOTT:  Objection.

6        Q.    -- the new numbers started on May 15?

7              MR. SCOTT:  Objection.

8        A.    Would you clarify what you mean by the

9    "numbers"?

10       Q.    What did -- what did they identify?

11             MR. SCOTT:  Objection.

12       A.    Are we talking about the utilization numbers

13   for the servers or something different?

14       Q.    Certain U1Inform numbers started on May 15,

15   right?

16             MR. SCOTT:  Objection.

17       A.    I'm still not sure what you mean by "numbers"

18   in this instance.

19       Q.    Okay.  Some of the U1Inform identifiers were

20   started on May 15 --

21             MR. SCOTT:  Objection.

22       Q.    -- 2017, are you aware of that?

23       A.    I'm sorry.  I still don't understand what you

24   mean by -- which numbers are we talking about?



1       Q.    Is it fair to say that prior to November 7,

2  2017, that some of the U1Inform were ICCE?

3             MR. SCOTT:  Objection.

4       A.    When you "some of the U1Inform," I'm not sure

5  what you mean by "some of the U1Inform."

6       Q.    Well, I mean -- yeah, let me specify.

7  U1Inform indicated -- you testified earlier, right, that

8  U1Inform referred to Informatica processing; is that

9  right?

10            MR. SCOTT:  Objection.

11      A.    U1Inform is the name of a user on a system.

12  My understanding is that it was named initially because

13  when the ICCE platform was being developed, it was being

14  developed with the incorporation of the Informatica

15  software in mind.

16      Q.    Okay.  And, then, are you -- before November

17  17, 2017 -- strike that.

18            What documents did you review for this

19  deposition?

20      A.    To prepare for this deposition, I reviewed my

21  own reports, two of them; I also reviewed parts of the

22  deposition of Nalin Mishra; and I reviewed the transcript

23  of Ms. Frederiksen-Cross's deposition.

24      Q.    Which portions of the Nalin Mishra deposition



1  transcript did you review?

2       A.    As I sit here right now, the portion I

3  remember is the one in which he was testifying about an

4  e-mail that he received related to the installation of

5  Informatica software onto servers comprising 104 cores

6  and how he -- he was aware that it was installed on

7  servers with 104 cores.

8       Q.    And who was that e-mail from?

9       A.    As I sit here right now, I don't remember who

10 it was from.

11      Q.    Was it from Charles Sedlacko?

12      A.    I think I'd have to see the deposition

13 transcript again to refresh my memory.

14      Q.    Do you recall approximately the date of that

15 e-mail?

16      A.    I think it -- as I sit here right now, I think

17 it was around 2013.

18      Q.    And what was in the e-mail?

19      A.    I think it was related to what -- what servers

20 had the Informatica software installed and how many cores

21 those servers had.

22      Q.    So was it your understanding in 2013 that the

23 software was deployed on 104 CPUs?

24      A.    The way I would state it is that at some point



1    in 2013, Nalin Mishra installed the software on servers,

2    and those servers, in total, had 104 cores at their

3    disposal.

4         Q.    And do you know if Informatica software was

5    installed on those servers?

6         A.    I believe Informatica software was installed

7    on the servers that were running the ICCE platform

8    because my understanding is that the ICCE platform took

9    advantage of the Informatica software for portions of

10   time in order to perform its function.

11        Q.    All right.  And those servers that Informatica

12   software was installed in had 104 total CPU cores,

13   correct?

14        A.    Those servers that Informatica software was

15   installed on had 104 cores to execute the ICCE platform,

16   including the Informatica software, for certain periods

17   of time.

18        Q.    And at that time, how many licenses did RELX

19   have in terms of CPU cores?

20        A.    Would you clarify which time in particular

21   you're talking about?

22        Q.    Same time we're talking about here.  You said

23   2013.

24        A.    Right.  I'm asking for your question,



1   specifically at what point in 2013 are we talking about.

2        Q.    The point of this e-mail that you reviewed.

3        A.    I don't recall the exact date of the e-mail.

4   Would you help me to understand which date you're talking

5   about in particular?

6        Q.    That's the date, the date of the e-mail.

7        A.    I don't --

8        Q.    We'll pull it out later if you don't -- if you

9   don't recall.  Do you not recall?

10       A.    I don't recall the date of the e-mail.

11       Q.    Okay.  Any other documents that you used to

12  prepare for this deposition?

13       A.    Would you state that one more time?

14       Q.    Any other documents that you looked at to

15  prepare for this deposition?

16       A.    There was one other document that I received

17  from counsel.  It was sort of a generic sort of advice

18  for how to prepare for a deposition.  It was two pages

19  long.

20       Q.    Going back to what you reviewed in the Nalin

21  Mishra transcript, was it your understanding in 2013 that

22  when the Informatica software was deployed on 104 cores,

23  that RELX was over deployed in terms of its license

24  agreement?



1        A.    The way I would state it is at some point in

2   2000, the Informatica software was installed on servers

3   that had 104 cores at their disposal to execute the ICCE

4   platform including the Informatica software, and that

5   I believe at some point in 2013, the agreement between

6   RELX and Informatica provided RELX with licenses for 72

7   cores.

8        Q.    And so would that be an overdeployment?

9             MR. SCOTT:   Objection.

10        A.    My understanding is that the -- to the extent

11   there's a legal issue here, that's not what I'm here to

12   testify about, but it is true that 104 cores is more than

13   72 cores, if that's your question.

14        Q.    Anything else that you did to review for this

15   deposition?

16        A.    As I sit here right now, that's all I can

17   think of.

18        Q.    Okay.  How long have you been employed at

19   Stroz?

20        A.    So that's a bit complicated because Stroz

21   Friedberg acquired a company called Elysium Digital in

22   2015, so that acquisition happened around July of 2015.

23   So at Stroz, I've been employed for about three years.

24   Prior to that at Elysium, where I was doing the same



1    sort of work, I was there for about five years before
2    that.
3         Q.    Okay.  What was your first job after
4    graduating college?
5         A.    Working at Elysium was my first job after
6    graduating college.
7         Q.    Okay.  So you've been employed for eight years
8    since college?
9         A.    Yes.
10        Q.    How would you characterize your expertise in
11   computer science?
12        A.    Well, in general -- so I have a degree from
13   Princeton University in computer science.  I also
14   received a certification, the title is the GIAC Certified
15   Forensic Examiner Certification, that was in 2015.  Over
16   my employment at Elysium and Stroz, I've looked at
17   software and technical documents for around 80 different
18   matters including some copyright cases.
19        Q.    What's the GE Forensic -- did I say that
20   correctly?
21        A.    It's G -- GCFE.
22        Q.    GCFE?
23        A.    Yep.
24        Q.    What is that?



1      A.    So it stands for GIAC Certified Forensic

2  Examiner.  GIAC, I believe, stands for Global Information

3  Assurance Certificate.  They're a sort of industry body

4  that provides training for different certifications

5  related to the forensic examination of computer

6  artifacts, and they have other certifications for

7  security and items of that nature.

8      Q.    And do you still do that work today?

9      A.    Would you define "that work"?

10     Q.    Anything covered by your description of

11  forensic examination.

12     A.    Well, I think "forensic examination" is a

13  fairly broad term.  I would in -- in my mind, it means

14  anything related to artifacts that come from computers,

15  so that's most of the work that I do.

16     Q.    Okay.

17     A.    Maybe all of it.

18     Q.    When was the first case you were retained as

19  an expert in?

20     A.    That would be Shurtape v 3M, and that was in

21  2013.

22     Q.    And when was the last time you were deposed?

23     A.    That was sometime in 2015 for the BMG v Cox

24  matter.



1      Q.    Do you know if the list that you provided as

2  part of your expert report is exhaustive with all of your

3  engagements?

4      A.    It includes all of the engagements that I

5  either submitted an expert report for, that I was deposed

6  for, that I testified at trial for, that I submitted a

7  declaration for.  And with those qualifiers, yes, it's

8  exhaustive.

9      Q.    Okay.  And how many copyright infringement

10  cases have you been retained as an expert?

11      A.    So including this case, there are two cases,

12  the other case being BMG v Cox.

13      Q.    I'm sorry.  BMG what?

14      A.    BMG v Cox.  That's Cox Communications, the

15  Internet service provider.

16      Q.    Okay.  Who was plaintiff in that matter?

17      A.    BMG was the plaintiff.

18      Q.    And who were you retained by?

19      A.    I was retained by the law firm Fenwick & West,

20  and they were representing Cox Communications.

21      Q.    Did you testify at trial?

22      A.    I did.

23      Q.    And did it involve copyright infringement

24  software?



1      A.    That case was about copyright infringe- --

2    excuse me -- copyright infringement related to sound

3    recordings, and there was a software issue related to

4    that that I was retained for.

5      Q.    And what was the software issue?

6      A.    So the -- in that case, the software issue was

7    that there was a third party to the case called

8    Rightscorp, and Rightscorp had developed software that

9    they claimed was able to monitor computers who were using

10   the -- or computers that were using the BitTorrent

11   protocol to exchange data related to files.  And so I was

12   retained to examine that software.

13     Q.    And what was your conclusion with respect to

14   your examination?

15     A.    The case was a long time ago.  I think I would

16   want to refer back to my expert reports for that matter

17   before I stated, or summarized in any way, my

18   conclusions.

19     Q.    What year was it?

20     A.    It was 2015.

21     Q.    Do you have any recollection of what you

22   actually did?

23     A.    Sure.  So the Rightscorp software spanned a

24   number of Java files, and so I reviewed those Java files



1  to get a -- an understanding of how they executed.  I

2  also looked at -- there were a number of database records

3  that were also produced in that matter that were related

4  to recordkeeping for how the Rightscorp software kept

5  track of, for instance, which IP addresses it was

6  monitoring, which sound recordings it was trying to find.

7  And it also kept track of, I think, just other kind of

8  recordkeeping that was related to the operation of the

9  software.

10        I also reviewed deposition transcripts of

11  employees from Rightscorp who testified about how the

12  software operated.  I also attended a couple of those

13  depositions to better understand how the software

14  operated.

15    Q.    Did you testify that the software did its job

16  in terms of monitoring?

17    A.    Well, my recollection, as I sit here right

18  now, is that there were certain things that the software

19  didn't do and that there were issues related to

20  recordkeeping of the software itself, which is to say

21  that rather than using a version control system to keep

22  track of multiple versions over the time period that the

23  software was executing, there was no such system in

24  place, and so there was no dispositive record of what



1  software was running at certain times in the past when

2  the software was alleged to have correctly created

3  records related to how data files were alleged to be

4  shared with the BitTorrent protocol.

5      Q.    Did Cox win the case?

6      A.    My recollection is that BMG won the case

7  initially, and then Cox appealed the case, and I believe

8  it's going to retrial sometime soon.

9      Q.    Do you know what issues are going to retrial?

10      A.    As I sit here right now, I'm not sure exactly

11  what issues are going to retrial.

12      Q.    Do you know if any of your opinion testimony

13  was excluded by the Court?

14      A.    My understanding is that none of it was

15  excluded.

16      Q.    Have you ever been involved in copyright

17  cases where the allegations were directed to executable

18  code?

19           MR. SCOTT:  Objection.

20      A.    Yes, several.

21      Q.    Did you testify in any of those cases?

22      A.    I don't think I did for any of those cases.

23      Q.    Were you deposed in any of those cases?

24      A.    No, I was not for any of those.



```
 1        Q.    Did you draft expert reports for any of those
 2   cases?
 3        A.    For those cases related to?
 4        Q.    Executable code.
 5        A.    Well, related to copyright for executable
 6   code --
 7        Q.    Yeah.
 8        A.    -- for those cases.  Other than the ones --
 9   well, for the cases we're talking about where there was
10   issues of copyright related to executable software, for
11   none of those cases did I write an expert report.
12        Q.    And how many cases were there that you were
13   retained on?
14        A.    I'm not sure, as I sit here right now, but I
15   would guess maybe ten or so.
16        Q.    Can you recall what they were?
17        A.    Well, let me see.  So there was a case
18   recently that was related to -- it was software for
19   keeping track of wedding venues in the Las Vegas area and
20   in general, and so in that case, I looked at two
21   different implementations of the -- of that software, and
22   there were copyright claims with respect to whether
23   certain code was copied by the defendants.
24              There was another case that I was recently
```



 1  retained as an expert related to a dispute between a

 2  software vendor and a cosmetics company, and the software

 3  vendor had been retained to help the company to implement

 4  part of their online kind of magazine spread, and then

 5  the company had retained another vendor afterwards.  And

 6  the allegation was that there -- there was still

 7  copyrighted code in the system from the previous vendor.

 8         Those are the ones that come to mind right

 9  now.  I think there were probably others because those

10  were both in the last few months, and we do frequently

11  get retained for copyright -- for cases where there's a

12  copyright issue related to software, usually a company's

13  trade secret claims for software.

14     Q.   With respect to those two cases, who were you

15  representing?

16         MR. SCOTT:  Objection.

17     A.   Do you mean in terms of plaintiff or defendant

18  or the specific parties that retained us?

19     Q.   Those specific parties that retained you.

20     A.   So generally, we try to not disclose who we

21  are retained by unless it is somehow released to the

22  other side, so let me just make sure that's the case.  So

23  for the cosmetics company, the other side does know about

24  that, so we were retained by Mary Kay.  They -- and they



1   are the defendants in that matter.  That's in state court

2   in Texas, I think.

3           And then, the other case, we were -- or I was

4   retained by the plaintiffs.  And there were a number of

5   companies that were named as parties, one of them was

6   Chapel of the Flowers.  That was a company in Las Vegas.

7   I think there was another corporate entity in there

8   somewhere, but there was a merger and so I forget who the

9   other company was.

10      Q.    Who was the plaintiff that retained you in

11  that case?

12      A.    Chapel of the Flowers was the company.

13      Q.     In those cases, or any others, did you

14  actually examine the executable code?

15      A.     Well, in those cases, I was looking at the

16  source code --

17      Q.    Okay.

18      A.     -- as distinguished from the executable code.

19  The source code is the code that's human readable and is

20  usually what -- it's my understanding, at least, that

21  tends to be the more important thing to look at with

22  respect to copyright cases of software, if you want to

23  compare, you know, someone's work, a party's expression

24  of -- of something.



1    Q.    And what analysis did you perform in those

2    cases?

3    A.    Well, I reviewed the -- the source code for

4    both of the parties and looked for -- well, I need to

5    distinguish between the two of them.

6          The case for Mary Kay is quite recent, so for

7    that case, I looked at a limited amount of code that is

8    available -- and by "code," I mean source code.  So

9    there's some source code that's available on the Mary Kay

10   website.  There's a small amount that has been produced

11   in the litigation.  I don't think any of it I've seen so

12   far has been confidential to the plaintiffs in that

13   matter.

14         For the case involving Chapel of the Flowers,

15   there was production from -- from both sides, and so I

16   reviewed the source code implementations for both the

17   plaintiffs and defendants and looked at previous versions

18   of the source code for plaintiffs and defendants, and

19   tried to see to what extent there was sort of exact

20   matches in the literal expression in the code, and also

21   whether there was structural similarities between the two

22   implementations.

23   Q.    And is that your understanding of what you

24   need to do as part of copyright infringement: compare the



1    plaintiffs code to the defendant's code?

2             MR. SCOTT:   Objection.

3        A.   Well, I can't speak to it in general because

4    I'm not a lawyer, but for those specific cases, those

5    seemed to be the most relevant questions and the ones

6    that I was asked to -- to examine.

7        Q.   So for those two cases, you examined the

8    source code of your client and compared it to the source

9    code of the -- of the other party?

10       A.   Well, it's not true for the Mary Kay matter

11   because I didn't have access to the other party's code.

12       Q.   Okay.

13       A.   That's just from public -- what's available on

14   their website.  And then in the matter for Chapel of the

15   Flowers, yes, I did look at the source code for both the

16   plaintiffs and defendants and tried to see to what degree

17   they were similar.

18       Q.   And was there any determination of copyright

19   infringement in that case?

20       A.   Neither of those cases have even got through

21   expert reports at this point.

22       Q.   In either of those cases -- well, not Mary

23   Kay, but the other one, Chapel of the Flowers, do you

24   believe there to have been copyright infringement?



1              MR. SCOTT:  Objection.

2        A.    Well, I haven't come to an opinion yet in

3   either of those cases.

4        Q.    If it turns out that there's a substantial

5   similarity between the code that you're examining and

6   comparing, would you come to the conclusion that

7   copyright infringement occurred?

8              MR. SCOTT:  Objection.

9        A.    It's hard to say because there's a lot of

10  factors.  So, for instance, when you're comparing source

11  code implementations, just because there is some

12  similarity, doesn't necessarily convince me that there is

13  a copyright violation.  Because, for instance, both

14  implementations of the source code could have drawn from

15  a third source that could perhaps be open source.  There

16  could be also other reasons in the case why it was, for

17  some reason, okay for a certain code to be used, if there

18  was some other agreement, for instance.

19             And in general, I don't -- I wouldn't want to

20  go on the record as saying in a hypothetic universe, if

21  there were similarities, that I would always come to a

22  certain conclusion.  I just think there are other factors

23  that might influence my opinion.

24        Q.    Okay.  Did you do that in this case?



1            MR. SCOTT:  Objection.

2       A.    Would you define what you mean by "do that"?

3       Q.    Compare source code to source code.

4       A.    So in this case, my understanding is that RELX

5    never had access to Informatica source code, and I didn't

6    review it because there wasn't access.  And I understand

7    that Ms. Frederiksen-Cross also has not reviewed the

8    source code.

9       Q.    Did you ask for source code in this case?

10       A.    I don't think I ever explicitly asked for it

11    in this matter.

12       Q.    Do you believe there's a question as to

13    whether or not code was copied in this case?

14            MR. SCOTT:  Objection.

15       A.    When you say "code," do you mean source code

16    or do you mean something different?

17       Q.    Source or executable code.

18       A.    So in the previous cases, just to clarify,

19    we've been talking about with Mary Kay and Chapel of the

20    Flowers, that's -- that's all been source code.  In this

21    matter, to the extent there was any copying, I believe

22    it's only executable code.  And I think there are --

23    there are questions that are in dispute about, for

24    instance, who -- or what party was responsible for



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                      36

1   installing the Informatica software, where installing

2   would include some copying onto the machines in the ICCE

3   platform, for instance.

4        Q.    But what did you do to satisfy yourself that

5   copying either occurred here or did not occur here as it

6   related to the copyrighted software?

7             MR. SCOTT:  Objection.

8        A.    Well, I understand that Informatica software

9   was copied onto the machines, and I don't think it was --

10  well, there wasn't much of a question there from a

11  computer science perspective in terms of who was actually

12  responsible.  That seems more like a question with

13  respect to contractual obligations or who actually

14  performed certain actions.

15            I did, however, review some of the

16  installation scripts that are mentioned in my report

17  that relate to the installation of the software.

18       Q.    So what's your understanding of the copying in

19  this case?

20            MR. SCOTT:  Objection.

21       A.    It's a bit of a broad question.  Could you

22  maybe narrow it a little bit so I can give a direct

23  answer?

24       Q.    Well, does the -- when you load or install the



 1  software, is it copied on the servers?

 2      A.   Well, maybe we can do it one at a time.  You

 3  said load and install.  Which --

 4      Q.   Go ahead and answer each.  Start with load.

 5      A.   Would you define what you mean by "load" in

 6  that case.

 7      Q.   Do you not know what "load" means?

 8      A.   I'd like to know what you mean in terms of the

 9  question because I don't understand --

10      Q.   Do you have an understanding of what the term

11  "load" means as it relates to software?

12      A.   Well, the way I would phrase it is like this:

13  When software executes on a computer, generally the

14  software is resident on persistent storage on the

15  computer, so that could be a hard drive, for instance.

16  And then when the program is executed by the computer,

17  portions of that program are transferred to memory as

18  necessary so that the processor can access the

19  instructions it needs to access and relevant data

20  perhaps.  Excuse me.  And so in that sense of loading

21  where it's transferring from a hard disc to memory, you

22  have portions of the program being transferred in the

23  normal execution of software on the computer.

24      Q.   So are they copied in that case?



1            MR. SCOTT:  Objection.

2       A.    Again, the way I would state it is there are

3  portions of the program that exist at the same time on

4  the hard disc as well as memory -- RAM, in this case --

5  while the processor is executing instructions, and then

6  different portions may be swapped in or out of the memory

7  as the execution of the program continues.

8       Q.    And is it your understanding under copyright

9  that that is a copy --

10           MR. SCOTT:  Objection.

11      Q.    -- that function?

12      A.    That sounds like a legal question to me, and

13  I'm not a lawyer, so I don't know if I can offer an

14  opinion directly related to copyright.

15      Q.    Well, I'm just asking -- you know, you've done

16  this in other cases purportedly -- aren't you looking to

17  see whether software gets copied --

18           MR. SCOTT:  Objection.

19      Q.    -- onto the computers?  Isn't that what you're

20  doing in these other cases?

21           MR. SCOTT:  Objection.

22      A.    In the other cases, I'm -- I'm more looking

23  at -- for a record of the source code that both of the

24  parties possess, is there an expression that is similar



1   or the same between them.  It's -- the questions in those

2   cases haven't turned on whether or not certain software

3   was actually on a computer.  It's just about the software

4   that's -- that's produced.

5        Q.    Do you believe in this case that installing

6   software, the Informatica software makes a copy of the

7   software on the computer?

8        A.    I would clarify that if you're -- if you're

9   installing the software on a computer, you are placing

10  another copy of the executable form of that software onto

11  the computer on which you're installing it if you're

12  installing to the hard drive.

13       Q.    Okay.  And each time you install, the software

14  makes a copy?

15            MR. SCOTT:  Objection.

16       A.    I wouldn't say that's always the case.

17       Q.    In the case here with Informatica, do you have

18  any instance that you can recall where the Informatica

19  software was installed and a copy wasn't made?

20            MR. SCOTT:  Objection.

21       A.    I'm sorry.  Would you restate that one more

22  time?

23            MR. DOYLE:  Can you read that back, please.

24            (Question read)



1        A.    So the case I examined most directly was the

2   upgrade of Informatica software to Version 9.6.1.  And

3   while there was -- while there were certain, at least,

4   portions of the software that was rsynced -- and I'll

5   spell that.  Rsync is r-s-y-n-k -- or sorry -- y-n-c --

6   in that case, there were at least portions of software

7   that were transferred onto the servers.  But having

8   not looked in detail in terms of whether a previous

9   version was still resident, I'm not -- basically, I'm

10  not sure whether there was a complete copy of the new

11  version that was transferred on or if it was just an

12  incremental improvement to the existing software on those

13  computers.

14       Q.    In general, when you execute software, does

15  that also make a copy of the software?

16            MR. SCOTT:   Objection.

17       A.    So I'll have to explain like I did earlier.

18  When you execute a program on a computer, what generally

19  happens is -- assuming that the executable software is

20  distinct from the source code, is resident on the hard

21  disc.  Portions of that executable software are copied

22  into memory so that the processor can execute it more

23  easily.

24            Over time, other portions of the software may



1    be copied into memory and certain portions may be removed

2    from memory to make space because it's sometimes the case

3    that there isn't enough memory available on the computer

4    to hold the entire program, and in general, a computer

5    won't copy an entire software program into memory just to

6    execute a small part of it.

7        Q.    So here, executing the Informatica software

8    makes a copy of the software?

9            MR. SCOTT:   Objection.

10       A.    Well, I'm trying to explain the -- the

11   complexity of it.  I certainly wouldn't say that the

12   entirety of the Informatica software was copied into

13   memory without being provided certain evidence that would

14   suggest that.  Because, in general, when you have a

15   program that's resident on hard disc, only a portion is

16   copied into memory in order to execute that specific

17   portion of it.

18       Q.    But would you expect at least portions of the

19   Informatica software to be copied when you execute the

20   software?

21       A.    Well, it's my understanding that a computer

22   processor can't execute, or in general, doesn't execute

23   programs directly from the hard disc.  So in order to

24   execute portions of the program, yeah, I think portions



1  would have to get moved into memory for the processor to

2  execute it.

3      Q.    Do you know what portions of the Informatica

4  software were copied here?

5          MR. SCOTT:  Objection.

6      A.    Well, I don't have a record of exactly which

7  portions were copied.  In general, if -- if there is an

8  instruction for a program that is going to be executed by

9  the processor, it needs to get moved into memory.  So if

10 there are portions of a program that either -- that are

11 part of the executable but in the course of the program

12 wouldn't actually execute at any point in time, either

13 because that -- that executable code just logically with

14 the program wouldn't ever execute, or if it was

15 configured to never execute, or if the circumstances for

16 that execution never arose, then those certain portions

17 wouldn't get copied into memory because the processor

18 wouldn't have to execute them.

19     Q.    But some portions are copied into memory,

20 correct?

21     A.    During the execution of a software program,

22 certain portions of the software program do need to be

23 moved into memory if they are to be executed by the

24 processor.



1      Q.    Are there separate copies made of the software

2   when the software is run across multiple cores in a

3   server?

4           MR. SCOTT:   Objection.

5      A.    I think it would depend on the software.   I

6   can give you an example.   So if you have a program that

7   is -- those running on multiple threads -- so a thread is

8   kind of like a -- it's like an individual task that might

9   get executed as part of a program, and that individual

10  task can run on multiple CPUs, for instance -- but all of

11  those tasks, if they're run as part of the same program,

12  might share the same it's called "address space" for

13  memory.   Computers have a limited amount of memory, and

14  programs have their own address space to kind of make

15  sure that they don't overwrite other portions of the

16  memory that other programs are using.

17          So if the program has multiple threads, and

18  they're each running on different processors, they may

19  all access the same address space, which means that they

20  don't actually need to have multiple copies of the

21  software in memory.   They can just all work off of the

22  same one because they're all accessing the same address

23  space as the memory.

24     Q.    And was that -- what is your understanding



 1  of the situation with respect to the Informatica

 2  software?

 3          MR. SCOTT:   Objection.

 4      A.    I'm not exactly sure how the Informatica

 5  software works in terms of whether it has multiple

 6  threads or whether it's implemented in some different

 7  way.

 8      Q.    Did you ask for that information?

 9      A.    I don't recall that I did at any point.

10      Q.    Why not?

11      A.    Generally, the reason I was retained here was

12  to look at primarily the question of the degree to which,

13  if any, RELX benefited from having more cores available

14  for the Informatica software that was part of the ICCE

15  platform -- at certain times, more cores than the number

16  of licenses that they had at the same time.

17          On the question of copyright, I was -- the

18  primary thing I was looking at was the upgrade scripts

19  and, in general, how portions of the Informatica software

20  were -- were installed on the disc and then, you know,

21  its kind of normal operation.

22      Q.    So if you're called to testify at trial

23  and you're -- you're asked did copyright infringement

24  occur with respect to the Informatica software, what



1  would be your testimony?

2         MR. SCOTT:  Objection.

3     A.    Well, I don't think I can testify directly on

4  the issue of copyright infringement as that strikes me as

5  a legal conclusion.

6     Q.    So you won't provide any testimony to that

7  question?

8         MR. SCOTT:  Objection.

9     A.    I may provide testimony that counsel might

10  rely upon to come to legal conclusions, but I myself am

11  not here to offer legal opinions.

12     Q.    Okay.  What testimony would you provide that

13  counsel may rely on?

14     A.    Well, my opinions are laid out in my expert

15  reports, and I took a fair bit of time to -- to write

16  them in a careful way and one that was correct, so I

17  hesitate to restate those opinions as I sit here right

18  now lest I forget something that I wrote down.

19     Q.    So are you saying you need your expert reports

20  at trial to testify if you're asked that question?

21     A.    That's not what I'm saying.  I'm saying, as I

22  sit here right now, if you're asking me what opinions am

23  I going to give, then my opinions are in my expert

24  reports.  I just don't want to misstate them.



1    Q.    So what are your opinions with respect to

2  whether or not copies were made and whether or not

3  there's copyright infringement?

4          MR. SCOTT:   Objection.

5    A.    So I'm not going to speak to -- I'm not going

6  to speak to copyright infringement because that's a legal

7  question, but with respect to opinions related to

8  question of copyright, as I said, my opinions are stated

9  very carefully in my expert report, and I wouldn't want

10 to misstate them here as that would be a disservice to

11 everyone here.

12   Q.    So you're not -- are you willing to summarize

13 your opinions as it relates to copyright infringement?

14   A.    I can sit here and, from memory, try and

15 recall at a high level what those opinions are, if you'd

16 like.

17   Q.    Please do.

18   A.    So this will be a non-exhaustive list as I

19 would prefer to have my expert report in front of me,

20 but, in general, the opinions that I offer in my report

21 relate to whether or not copying that occurred included

22 source code or whether instead it was related to

23 executable code.  And my opinion is that the copying that

24 had occurred at certain points in time and certain



1  portions was related to the executable code and not to

2  source code.

3      Q.    So there was copying of executable code in

4  this case; is that correct?

5      A.    There was at least portions of executable code

6  that were copied at specific points in time, as far as I

7  understand.

8      Q.    And what are those specific points in time?

9      A.    So, as I sit here right now, my recollection

10 is that executable -- portions of executable code were

11 installed onto the servers of the ICCE platform as part

12 of, for instance, the upgrade to Informatica Version

13 9.6.1.  It's my understanding that for previous versions,

14 executable code would have had to be on those computers

15 as well and transferred from some other location.

16         There was also the issue of whether executable

17 code was copied into memory during normal execution.  And

18 as we've already discussed, there are portions of

19 executable code that will necessarily be copied into

20 memory so that the processor can execute it.

21     Q.    Do you know what portions of the executable

22 code were actually copied into memory --

23         MR. SCOTT:  Objection.

24     Q.    -- in this case?



1          MR. SCOTT:  Asked and answered.

2     A.    So I think we already talked about that, but I

3   don't have any records of precisely which portions of the

4   executable code were copied into memory, and I'm not sure

5   which specific portions were or were not copied into

6   memory.

7     Q.    Earlier, did you testify that you didn't know

8   about the Informatica use of the threads?

9          MR. SCOTT:  Objection.

10    A.    I think what I said is that I'm not certain

11  how the Informatica software is implemented with respect

12  to whether it creates threads that are -- that use the

13  same address space or memory.

14    Q.    Well, if you're not sure whether or not

15  Informatica software creates threads in the same address

16  space and memory, how can you evaluate the use of the

17  cores?

18         MR. SCOTT:  Objection.

19    A.    Would you repeat that?

20         MR. DOYLE:  Can you repeat that, please.

21         (Question read)

22    A.    So I think you might be getting to one of the

23  primary purposes of my report which was to examine the

24  degree to which RELX benefited from having software



1    installed on machines that had access to cores that were

2    a greater number than the number of cores granted them in

3    the license agreement.  The question of whether specific

4    threads have access to the same address space doesn't

5    seem related to that question to me.

6         Q.   So whether or not threads have access to the

7    same address space has nothing to do with the use of

8    certain cores?

9         A.   Well, it's a -- it's a different question.

10   The use of -- the question of address space is related to

11   whether or not there -- there is going to be more than

12   one version of the software in the memory.  The question

13   of a CPU core execution, that's more related to how much

14   processing they need to do in order to execute the

15   program.

16        Q.   So it doesn't matter whether -- whether or not

17   that the software is creating threads to a same address

18   space or to different address spaces in order for you to

19   determine whether or not the CPUs are being used?

20        A.   So, again, the question that I -- I was trying

21   to focus on in my report was whether RELX benefited from

22   having the software installed on servers that had access

23   to more cores than the 72 that they had through license

24   agreements.  And in order to answer that question, what I



1    looked at was the degree to which the different CPUs were

2    utilized -- or rather, the degree to which the servers

3    that had the CPUs were utilized.

4         The question of -- I feel like you may have a

5    different understanding of use as it relates to that

6    question because my focus was on the utilization.

7         Q.    Can you answer the question I asked?

8         A.    Would you restate it?

9         Q.    Sure.

10        MR. DOYLE:  Can we restate that question.

11        (Question read)

12        A.    Would you clarify what you mean by "the CPUs

13   being used"?  Over what time periods or to what degree?

14        Q.    At any time.

15        A.    Okay.  Would you repeat that one more time?

16        Q.    The entire question?

17        A.    Yes.

18        MR. DOYLE:  Can you repeat it again.  I'm

19   sorry.

20        (Question read)

21        A.    All right.  So I think those two questions are

22   unrelated because one relates to whether or not there

23   are -- there needs to be one copy of a program in memory

24   versus more.  And the question of CPU use, as you have



 1   defined as the degree to which certain CPUs were used at

 2   any point in time, is more related to how much processing

 3   they needed to do.  So I think those two questions are

 4   not related.

 5         Q.    Can you still answer my question, though?

 6               MR. SCOTT:  Objection.

 7         Q.    Whether the two questions are unrelated or

 8   not, can you answer the question that I asked you?

 9         A.    Well, I think those two issues are related so

10   the --

11         Q.    So is the answer "no"?

12         A.    Well, let me finish.

13               I think if you answer one of those questions,

14   you don't get any information related to the other one,

15   so I don't think one depends on the other.

16         Q.    Okay.  I just want to get a clear answer on

17   the record.

18               MR. DOYLE:  Objection.

19         Q.    Okay?  You can say "yes," or you can say "no"

20   to my -- my question.

21               MR. DOYLE:  Would you repeat the question,

22   sorry, one more time.

23               (Question read)

24         A.    So with respect to those two questions, I



1  don't think it matters except maybe if you got some

2  information related to how much processing was done or

3  how much processing would need to be done based on the

4  number of threads, but that doesn't seem to matter with

5  respect to whether or not it was the same address space.

6      Q.    Can you explain how the Informatica software

7  uses CPU cores?

8            MR. SCOTT:  Objection.

9      A.    And by using CPU cores, do you mean, as you

10 stated earlier, that any CPU cores are used at any point

11 in time?

12     Q.    Yeah.

13     A.    Well, I don't know exactly how the Informatica

14 software was executed on certain CPU cores over the

15 entire time period.  I just don't have records for

16 exactly which cores were used to process specifically the

17 Informatica software versus other components of the ICCE

18 platform, for instance.

19     Q.    I didn't ask about the entire time period.

20 I'm just asking how the Informatica software accesses

21 cores.

22           MR. SCOTT:  Objection.

23     A.    Okay.  So help me to understand.  If you're

24 not asking about the entire time period, which time



 1   period are you asking about?

 2        Q.    Any time period.  Do you just have a general

 3   how it works?

 4        A.    I'm unclear in the distinction between any

 5   time period and the entire time period.

 6        Q.    Okay.  Let's start with the entire time

 7   period.

 8        A.    Okay.

 9        Q.    Can you explain how Informatica software uses

10   cores?

11        A.    I don't have any records for -- for the time

12   period about which cores were -- were used by the

13   Informatica software as distinct from the ICCE platform

14   in general.

15        Q.    Okay.  Do you have some information on some

16   time periods?

17        A.    Well, let me go over the information that I do

18   have.  That might help.

19              So as I mentioned in my reports, there is a

20   record of over the time period of a few years for each

21   hour of each day for each server in the ICCE platform,

22   the average utilization across all of the CPU cores in

23   that server for processes that were related to the ICCE

24   platform.



1              So the things that are missing in that data

2    are, for instance, which specific cores were used on the

3    server as opposed to just average CPU utilization in

4    general, as well as what -- what specifically was being

5    executed on those CPU cores, because it could be

6    processes that are Informatica processes in the ICCE

7    platform, or it could be other processes that were

8    executing as part of the ICCE platform.  Those are the

9    two main pieces of information that, as far as I know,

10   there's no record of for the time period relevant to this

11   case.

12        Q.    So you looked at the average utilization, for

13   example, over a bunch of cores in an hour.  And what

14   would that provide you in terms of CPU cores?

15             MR. SCOTT:   Objection.

16        A.    So specifically, it's not just a bunch.

17   It's specifically the CPU cores that a specific server

18   had access to.  That's the level of granularity that I

19   have.

20             And the way I approached the question of

21   whether or not RELX benefited from having Informatica

22   software installed on computers with 104 cores, for

23   instance, versus the 72 that they were licensed for, was

24   to look at what -- what do I think would have had



1   happened if they, instead of having 104 cores available,

2   had 72 or 56 over that specific time period.  And so I

3   looked at a time period towards the end of the relevant

4   time period of this case where RELX did, in fact, have

5   only 56 cores available to the ICCE platform, including

6   the Informatica software part of it, and then compared

7   that to the times that didn't.

8           And even though the granularity in terms of

9   time with respect to the data that was available was an

10  hour, I understand from -- from an e-mail from Mr. Groff

11  that -- that RELX didn't really care about processing

12  anything faster than at least three hours -- and I

13  imagine for other documents, it was -- it may have

14  mattered less in terms of the actual time -- so that, you

15  know, granularity, while -- while it could have been a

16  narrower granularity than an hour, it seemed --

17          (Reporter clarification)

18      A.   -- while -- while the granularity of the data

19  could have been less than an hour, having it at an hour

20  seemed to be sufficient to examine the question of -- of

21  the benefit of having other cores available.

22      Q.   Do you know if there's any information that

23  could have told you which specific cores were used at any

24  particular time?



1        A.    I don't think there's any better information

2    than the information in that spreadsheet that I was

3    referring to in my previous answer.

4        Q.    That's not what I asked.  I said do you know

5    whether or not there's any information that would

6    identify which specific cores were being used.

7              MR. SCOTT:  Objection.  Asked and answered.

8        A.    I think the question is do I know, and I'm

9    unaware of other information that would provide clarity

10   on that -- that question.

11       Q.    Okay.  Again -- and now backing away from

12   that, I'm not asking which -- in this question, I'm not

13   asking which cores were used, just how does it use the

14   cores?

15             MR. SCOTT:  Objection.

16       Q.    I'm not asking for average utilization.  I'm

17   just asking how does the program use the cores --

18             MR. SCOTT:  Objection.

19       Q.    -- to do processing?

20       A.    Well, in general, computer programs use CPU

21   cores to execute instructions in order to execute the

22   program.  And there are some programs that can use more

23   than one core at a time, maybe over different periods of

24   time.



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                        57

1      Q.    Can Informatica use more than one core at a

2   time?

3      A.    Well, the best information I have about this

4   suggests that under certain circumstances, Informatica

5   software can use more than one core at a time.

6      Q.    And what circumstances are those?

7      A.    Well, I'm not sure about all the circumstances

8   under which that would happen.

9      Q.    Can you give me some examples?

10      A.    Well, let me explain where -- where I'm coming

11   from on this.

12      Q.    I'm asking you to answer my question, sir.

13   And the question, I think, is a pretty simple one.

14      A.    Would you repeat it?

15      Q.    Sure.

16           MR. DOYLE:  Can you repeat it, please.

17           (Question read)

18           MR. SCOTT:  Objection.  That's a simple

19   question, Scott?

20           MR. DOYLE:  Can we go up a little bit?

21      Q.    My original question was can Informatica use

22   more than one core at a time?

23      A.    And I think my answer was under

24   certain circumstances, I believe it can use more than



1   one core at a time.

2        Q.    And so have you identified any of those

3   certain circumstances in your analysis?

4        A.    So specifically, there are two sources where

5   I'm getting this information from.  One is from the sort

6   of hourly data that we already talked about.  The second

7   is a test that Ms. Frederiksen-Cross mentions in her

8   initial report where she -- she runs a specific version

9   of the Informatica software on a specific hardware

10  configuration that does not match how Informatica was

11  deployed on the RELX system, where there appeared to be,

12  over a period of ten minutes, certain times during which

13  multiple cores are used at once by the software.

14          So at least in -- in that specific

15  circumstance, which I don't understand all of the

16  characteristics of it, but there seems to be at least

17  that circumstance specifically.

18       Q.    So you mentioned the hourly data.  What does

19  that tell you about Informatica's use of more than one

20  core at a time?

21       A.    Well, it at least suggests that the software

22  was capable of using multiple cores at the time, though I

23  don't have any data about whether or not it used or was

24  executing on multiple cores at a time from that data.



1        Q.    Did you ask for that data?

2        A.    My understanding is that it doesn't exist.  I

3   was trying to find the best data available to see records

4   of the Informatica software executing on the ICCE

5   platform.

6        Q.    Do you think that data would have been helpful

7   to your analysis?

8        A.    Yes, I think so.  The more granular the data,

9   the better.

10       Q.    You mentioned that your second source was the

11  test that Ms. Frederiksen-Cross did; is that correct?

12       A.    That's my recollection, yes.

13       Q.    And is it your understanding from that test

14  that Informatica uses more than one core at a time?

15       A.    Well, the way I would say it is in the

16  specific circumstances of that ten-minute test, it does

17  appear that Informatica software, in that environment,

18  was able to -- to execute on multiple cores at once.

19       Q.    Based on that environment, do you have any

20  reason to believe that Informatica would or would not use

21  more than one core at a time on the RELX platform?

22       A.    Well, there's a lot of differences between the

23  configuration of the test that Ms. Frederiksen-Cross did

24  and the RELX platform.  Specifically, the ones that come



1   to mind are the number of cores on each of the machines

2   in Ms. Frederiksen-Cross's test, as well as the type and

3   number of data and workflows that were executed as part

4   of that test.

5          Those two machines in Ms. Frederiksen-Cross's

6   test had 16 cores on each of the machines, and there were

7   also, I believe, 16 workflows that were configured to run

8   using the Informatica software.  So I'm not sure whether

9   that circumstance ever occurred in the RELX environment,

10  so I'm hesitant to say that -- that that would inform our

11  understanding over a period of years, say, for a test of

12  ten minutes under very specific circumstances.

13     Q.   Well, does it inform you of whether or not the

14  Informatica software uses more than one core at a time?

15          MR. SCOTT:  Objection.  Asked and answered.

16     A.   Well, it helps me understand that it could in

17  very specific circumstances, but I don't know what it

18  would do in general, and I don't know what it would do

19  specifically with respect to the RELX environment.

20     Q.   So you have no idea, as you sit here today, in

21  the RELX environment, whether the Informatica software

22  can use more than one core at a time?

23     A.   Well, I think it might have, but I don't know

24  whether it did.



1      Q.    So you're just speculating?

2      A.    Well, I don't have any data about what

3   actually was executed on which core, at what time, and I

4   don't have data from a configuration that was -- that was

5   similar in -- in certain ways to the RELX environment.

6      Q.    Did you ask for that data?

7            MR. SCOTT:   Objection.   Asked and answered.

8      A.    So I asked for as much data as we could get

9   about what actually executed at what times on the CPUs

10  and CPU cores that were on the ICCE platform, and my

11  understanding is that I received the best data that was

12  available.   And, in fact, the initial data I received

13  only spanned through, I think, 2016 at some point, and so

14  I asked for the data for the last year and some change

15  just to make sure I had complete data through the time

16  where the Informatica software was part of the ICCE

17  platform.

18     Q.    Sir, I'm just, you know, a little bit confused

19  because, you know, how can you provide opinions with

20  respect to the benefit of the Informatica software on the

21  ICCE platform if you don't understand how the cores were

22  used by the Informatica software or when they were used?

23           MR. SCOTT:   Objection.

24     A.    So the way I approached the question of



CHRISTOPHER RUCINSKI                                       June 20, 2018
RELX INC. vs INFORMATICA LLC                                        62

1   benefit is essentially what would have happened if during

2   the time periods where the Informatica software as part

3   of the ICCE platform had access to more cores than the

4   number of cores that RELX was licensed for, what would

5   happen if during those same time periods and for that

6   data, if instead the number of cores available to the

7   ICCE platform were the same number that was available to

8   RELX during -- or available to RELX through license

9   agreements.

10          And so in order to answer that question, I was

11  more concerned with overall utilization and not

12  specifically which cores were executing the Informatica

13  software.  Because the thing that mattered to me is

14  whether the system could -- or would have likely been

15  able to handle that same amount of document processing

16  over that same period of time.  The details of -- of how

17  it would have processed it weren't relevant to that

18  question, as far as I could see.

19      Q.    Did you look at things, for example, like

20  processing speed, delays, things like that associated

21  with the system?

22      A.    So I believe I did inquire at one point about

23  how long it took to process certain documents, but I

24  understand that that data wasn't available for -- for the



 1    time periods in question.  And if -- if it is somewhere,

 2    I'm happy to look at it, because, you know, how long it

 3    takes to process documents does seem like another way to

 4    get insight into the question of the benefit.

 5         Q.    And in terms of processing documents, would it

 6    matter whether the Informatica software could access more

 7    than one core at a time?

 8         A.    Sorry.  Would you repeat that?

 9         Q.    Sure.

10              MR. DOYLE:  Can you read it back, please.

11              (Question read)

12         A.    So because I'm comparing a situation where

13    Informatica software had access to more cores to a

14    situation where it had access to fewer cores, in both of

15    those circumstances, I'm assuming Informatica -- the

16    Informatica software as part of the ICCE platform will

17    process documents in a specific way.  I don't necessarily

18    know the specifics of what that way is, but I can look at

19    the degree to which overall cores were utilized to

20    determine whether there was, you know, a meaningful

21    difference between those two circumstances.  So I don't

22    feel as though I need to know the nitty-gritty details

23    about which cores were utilized and which cores may not

24    have been.



1     Q.    Well, might those details, for example, as to

2   whether Informatica could access one or more cores at any

3   particular time, that -- wouldn't that be relevant to

4   know whether there are processing delays in the system?

5           MR. SCOTT:   Objection.

6     A.    Well, like I said, the Informatica software in

7   one circumstance versus the other is the same software.

8   It's just a question of which -- I'm sorry -- in general,

9   how many cores -- or rather, what is the kind of load

10  on the system in order to process those -- those

11  documents.

12          So, I mean, let's consider two circumstances.

13  Supposing Informatica software only used one core of each

14  machine, just hypothetically --

15    Q.    Uh-huh.

16    A.    -- then we could look at, you know, before and

17  after -- or I'm sorry -- in the two circumstances where

18  the Informatica software had access to more cores or

19  fewer, what -- what the difference was between those two

20  circumstances.

21          And similarly, if the Informatica software was

22  able to use more than one core at a time, you could still

23  look at those two circumstances and come to a conclusion

24  about whether there was a difference in the -- the



1   overall utilization of -- of the -- of the servers and

2   the CPUs.

3        Q.   But wouldn't it matter with respect to

4   processing time and other benefits that you might get

5   from having more cores?

6             MR. SCOTT:  Objection.  Asked and answered.

7        A.   Well, what I'm saying is to the extent the

8   Informatica software was able to take advantage of

9   multiple cores, that will be the same in both

10  circumstances I'm describing: the one where it has access

11  to more cores and the one where it has access to fewer.

12  So that's the thing we're going to look at with respect

13  to whether there was additional benefit.

14       Q.   Well, might it change, though, if you go from

15  like 104 CPU cores down to 56 CPU cores?

16            MR. SCOTT:  Objection.

17       A.   You said wouldn't it change?  I'm not sure

18  what you mean by "it."

19       Q.   I mean "it," the processing time, for example,

20  and whether or not you're using -- whether the

21  Informatica software was accessing one or more cores at a

22  time.

23            MR. SCOTT:  Objection.

24       A.   So the question of whether the processing time



1   would change, like I said, I think processing time would

2   be interesting to look at.  I don't think it's available.

3   But it's the processing time that matters, and

4   understanding exactly why those processing times occurred

5   doesn't necessarily matter.  What matters is what

6   actually happened.  How the Informatica software may have

7   helped the ICCE platform to achieve those processing

8   times, that's probably not -- or rather, that's not the

9   first thing I would look at.

10      Q.    So in your opinion, the thing -- the only

11   thing to look at, or the most important thing to look at,

12   is the utilization data you looked at?

13      A.    Well, I would say that's the best data

14   available to answer this question.  Like I said, looking

15   at processing times would be -- I think would be

16   relevant, and I don't think that data exists.  So in the

17   absence of that, I looked at the best available data that

18   I could get access to and drew my conclusions from that.

19          MR. SCOTT:  Scott, I am sorry.  I've been

20   waiting to see a transition, but I am about to explode.

21   I have to take a break and go to the restroom.  I am so

22   sorry.  Is it okay if we go off the record for a few

23   minutes to use the restroom?

24          MR. DOYLE:  Sure.  Just a quick break?



1              MR. SCOTT:  Yeah, quick.

2              THE VIDEOGRAPHER:  The time is 11:16 a.m.

3    This is the end of Disc 1.  We are off the record.

4              (Recess)

5              THE VIDEOGRAPHER:  The time is 11:33 a.m.

6    This is the beginning of Disc 2.  We are on the record.

7         Q.    Mr. Rucinski, we were talking about processing

8    time before the break.  And when you're referring to

9    processing time, do you mean CPU or the total time to

10   process a document?

11        A.    I think in my answers earlier I was referring

12   to the time it takes to -- for a document to go through

13   the entire processing of the ICCE platform.

14        Q.    Okay.  And it's your understanding that time

15   was not made available to you?

16        A.    My understanding is that that data for

17   processing time for documents is not available.

18        Q.    Okay.  With respect to processing time that

19   you're referring to, what components make up that time?

20             MR. SCOTT:  Objection.

21        A.    Well, I'm defining it as the amount of time it

22   would take for a document to go from being available from

23   a vender, or some other source for the ICCE platform, to

24   begin to process, all the way to that document being



1   available for customers of RELX to access.

2        Q.    And what are the components of that time?

3              MR. SCOTT:  Objection.

4        A.    When you say the "components" of the time, do

5   you mean the components of what would -- do you mean what

6   would happen over the course of that time?

7        Q.    Well, what makes up the processing time?  Does

8   I/O, for example, make up part of the processing time?

9              MR. SCOTT:  Objection.  Compound.

10       A.    Okay.  So are you asking about what components

11  of a computer system would make processing take certain

12  amounts of time?

13       Q.    Sure.

14       A.    Okay.

15       Q.    In this instance.  I mean, you know, in this

16  case and with Informatica software.

17       A.    Sure.  So when -- when a computer accesses a

18  file on a hard disc, there is a time between the

19  processor kind of sending the request for, okay, I want

20  this data at this specific location on the hard disc.

21  There's some translation between the processor doesn't

22  know exactly where it is on the hard disc but it wants,

23  you know, the file associated with this particular

24  identifier, say, and then there's a time that it takes on



1   a hard disc, for instance, for the hard disc head to find

2   the appropriate platter within the hard disc to find

3   exactly where that file is located.  That file might then

4   actually span multiple sections of that platter, and so

5   the head might have to go back and forth in order to read

6   it and then leave it into memory.

7           So yes, the input/output process, which I

8   think is what you're referring to by I/O, would be

9   something that would take some time for any file accessed

10  on a hard disc, which I think the Informatica software

11  would -- would have to do as part of its execution of

12  ICCE platform at certain times.

13       Q.    Is CPU another part of that time?

14             MR. SCOTT:  Objection.

15       A.    So I would say that it does take time for a

16  CPU to execute its instructions, and so that would be

17  another thing that would take time when a document is

18  being processed through the ICCE platform using the

19  Informatica software.

20       Q.    And what about wait time?

21       A.    What --

22             MR. SCOTT:  Objection.

23       A.    -- do you mean by "wait time"?

24       Q.    Have you ever heard the term "wait," w-a-i-t,



1    used with respect to a computer system?

2         A.    Yes.

3         Q.    And what's your understanding of it?

4         A.    My understanding is wait time can sometimes be

5    used to refer to when there is a resource that is

6    required to do something but it's unavailable for some

7    reason.  That resource could be something like -- it

8    could be that another process is using a particular file.

9    Maybe another process is using a different port.  There

10   could be a number of circumstances under which a resource

11   wouldn't be immediately available and therefore a process

12   requesting it would have to wait for some amount time.

13        Q.    And would wait time, as you understand it, be

14   part of the Informatica system as well?

15        MR. SCOTT:  Objection.

16        A.    Wait time's a little broad of a concept but, I

17   mean, probably.  At some point, there were probably some

18   sort of bottleneck on a resource that the Informatica

19   software might need over a period of years.  But I don't

20   have any specific evidence for specific resources that

21   would be unavailable at certain times.

22        Q.    What is the comparative ratio of CPU time to

23   I/O time in the RELX ICCE processing platform?

24        A.    Would you repeat that?



 1            MR. DOYLE:  Would you repeat that, please.

 2            (Question read)

 3      A.    Do you have a particular time period in mind

 4   for that question?

 5      Q.    Pick any time period that you're aware of.

 6      A.    As I sit here right now, I don't know what the

 7   ratio is for CPU time to I/O processing time for the

 8   different versions of the ICCE platform and the

 9   Informatica software within it.  I think that would

10   relate to specific components of the software, but I

11   don't have that information as I sit here right now.

12      Q.    Did you ask for that information?

13      A.    I don't remember asking for it, as I sit here

14   right now.

15      Q.    Did you look at or understand -- do you have

16   an understanding of the comparative ratio of CPU time to

17   wait time in the --

18      A.    I understand --

19      Q.    -- in the -- in the RELX ICCE processing?

20      A.    Well, I understand what it means, but I don't

21   know what that ratio would be for the various

22   implementations of the ICCE platform as well as the

23   various versions of the Informatica software.

24      Q.    Did you ask anyone for that?



1        A.    As I sit here right now, I don't recall asking

2    for that.

3        Q.    Did you ever determine how much wait time

4    there was in the RELX ICCE platform?

5        A.    Do you mean over -- do you mean over a

6    particular period of time or just in general?

7        Q.    In general.

8        A.    I don't remember ever looking into the

9    specific amount of wait time that -- or wait time ratios

10   that would be present in the ICCE platform using

11   Informatica software.

12       Q.    What about queue time?

13       A.    Would you define "queue time"?

14       Q.    What's your understanding of queuing?

15       A.    Well, a queue is a data structure in which you

16   put items into the queue and take them out --

17       Q.    Right.

18       A.    -- in a first-in-first-out such that the first

19   item that you put into the queue is going to be the first

20   one that you remove from it.

21       Q.    Right.  And what do you understand queue time

22   to mean as it relates to a queue?

23            MR. SCOTT:  Objection.  Asked and answered.

24       A.    Well, I'm not -- I'm not exactly sure.  It



1  could be something like the amount of time it takes for

2  an item in the queue to -- to enter and then leave the

3  queue, for instance.

4       Q.   Sure.  And that happens in the Informatica

5  platform, right?

6       A.   I'm not aware of a specific point in a

7  specific component where that might happen, but documents

8  are processed through it, so there -- there could be a

9  queue for the documents, for instance.

10      Q.   Sure.  And did you have any information on

11  that queue time for documents?

12      A.   Well, we're first supposing that there is a

13  queue.  I did ask for the amount of time it takes for

14  documents to be processed through the system, so if

15  that's our definition of queue, then that would be

16  related.

17      Q.   Well, that's not my definition.  I'm going

18  with your definition of queue.  Same answer?

19      A.   Sorry.  Would you repeat that?  Would you

20  repeat the question?

21      Q.   Sure.  I was just asking --

22           MR. DOYLE:  Can we go up?  Down a little bit.

23      Q.   Yeah, my question was:  "And did you have any

24  information on the queue time for documents?"



1      A.    So are we talking about -- well, let me first

2  state, I'm not aware that there is a queue for documents

3  before it enters the system, but supposing that there is,

4  I'm not aware of any information related to that.

5      Q.    And would queue time be related to whether or

6  not the Informatica software could access one or more

7  CPUs at any particular time?

8            MR. SCOTT:  Objection.

9      A.    Could you say that one more time?

10           MR. DOYLE:  Can you repeat that, please.

11           (Question read)

12     A.    I think it's related to whether the software

13  could access multiple CPUs in the amount of time, but it

14  sounds like a question about its capability.

15     Q.    Well, would queue time vary based on whether

16  the software could access one or more CPUs at any one

17  time?

18     A.    Depends how many documents are going through

19  the queue in one.

20     Q.    Is it a factor you looked at?

21           MR. SCOTT:  Objection.

22     A.    Is it a factor I'd look at for -- for what?

23     Q.    An analysis like this analysis that you

24  performed here.



1      A.    Well, I would look at it if it made -- if it

2   was -- it was material to the degree to which an actual

3   benefit were accrued.

4          I mean, like I said, the first thing I'd look

5   at is could the system handle the same documents with

6   fewer CPU cores available.  And then if it seemed like it

7   couldn't for some reason, it might be interesting to

8   determine why and whether that might be related to

9   whether there was a bottleneck with respect to the CPU

10  cores or if there was a bottleneck with respect to

11  something like I/O time or wait time or the amount of

12  memory that was installed or the amount of hard disc

13  space that was available or other factors that would

14  potentially be a bottleneck in the process.

15     Q.    Did you ask for that information?

16          MR. SCOTT:  Objection.

17     A.    I did see information related to hard drives

18  filling up.  But because after looking at the utilization

19  data and looking at whether or not there was a benefit

20  accrued generally, it didn't make sense to me to look at

21  these other factors that might play a role if there

22  was -- if there was a bottleneck.

23     Q.    So you said the -- the hard drive "filling

24  up."  Does that create a queue?



1        A.    Well, let me clarify:  So some of the e-mails

2   that I saw related to specific directories filling up, I

3   think many of them were in a subfolder of tmp.  That's

4   t-m-p; it's a place where an operating system puts

5   temporary files.

6            So your question is would that create a queue

7   for the hard disc.  It might.  If -- generally, if your

8   hard disc is full, your computer will cease to operate

9   very well at all.  There just isn't space to hold data

10  anymore.  So unless you have another place to put it,

11  generally, what you'd have to do is remove some of the

12  data from the hard disc before you could proceed, at

13  least in a functionally operable way.

14       Q.    What about if no CPUs were available?  Would

15  there be a queue time?

16       A.    If no CPUs were available?  Well, if there was

17  a queue that was -- that was present -- so

18  hypothetically, if there were a queue that were present

19  when the system was, for some reason, unable to process a

20  document, then you might fill up a -- or you might add a

21  document to a queue.  But I'm not sure if the system

22  would instead just not access that document from its

23  source, or whether it would do -- or implement some other

24  solution to it.



1        Q.     When you provided that answer, did you provide

2   that answer with respect to Informatica and the ICCE

3   platform?

4        A.     That's the example I had in mind when I was

5   answering the question.

6        Q.     Did you ever investigate that with respect to

7   the Informatica and the ICCE platform?

8        A.     Well, I didn't investigate whether in a

9   hypothetical situation there were no CPU cores available

10  because my understanding is that that was never the case.

11       Q.     Earlier we talked about the comparative

12  ratios.  Do you recall that?

13       A.     Yes.

14       Q.     And would those comparative ratios have been

15  helpful in this case to determine the ability to run

16  conversions in parallel across more cores?

17       A.     Would you my fresh -- would you refresh my

18  memory as to what those ratios were?

19       Q.     Sure.  CPU time to I/O time, for example.  CPU

20  to wait time.

21       A.     Let me think about that for a moment.  Well, I

22  think those ratios might be relevant to -- to why certain

23  circumstances may have arisen in the -- in the data with

24  respect to CPU utilization, but given that I was looking



CHRISTOPHER RUCINSKI                              June 20, 2018
RELX INC. vs INFORMATICA LLC                              78

1   at CPU utilization, and it seemed like the -- or actually

2   more documents were being processed with fewer cores, it

3   didn't really seem like it would influence my opinion in

4   terms of why the data worked out that way.  These ratios

5   seem like something that would come up if there were a

6   different bottleneck that would -- that would affect the

7   degree to which the system was able to process documents.

8        Q.    You know, I had asked you before whether CPU

9   cores -- if you ever identified an instance where CPU

10  cores were not available.  Do you remember that?

11       A.    I don't think you asked specifically if I

12  recalled a time like that.

13       Q.    Okay.  Let me ask it.  Do you recall a time

14  when CPU cores were not available?

15       A.    Well, there were times when there were certain

16  CPU cores that were unavailable because certain servers

17  weren't available.

18       Q.    And so all the CPU cores on that server would

19  be unavailable?

20       A.    The way I'm using the word "unavailable," if

21  the server is unavailable for processing, then yes, the

22  CPU cores are part of the server and they would be

23  unavailable as well.

24       Q.    And so in that instance, a task that had been



 1   assigned to that server would be queued until the next

 2   one became available, correct?

 3        A.    It depends how you implement the queue in this

 4   hypothetical example.  If there were other servers

 5   available that do have CPU cores, I imagine such a system

 6   might send that task to that other server instead.

 7        Q.    Well, when you say "such a system," I'm

 8   talking about the Informatica software as we sit here

 9   today.  Do you have any idea what the Informatica system

10   does when a server becomes unavailable?

11        A.    I don't know specifically what it would do in

12   that circumstance.  I imagine it would -- if it's

13   designed well, it would probably try to take advantage of

14   resources that it did have available.

15        Q.    But you're speculating?

16        A.    Yes.  I didn't look specifically at how it

17   would function in that manner.

18        Q.    Did you ask anybody?

19        A.    On the specific question of whether if a given

20   server were unavailable would it then use a different

21   server under specific circumstances?

22        Q.    Or exactly what it would do.

23        A.    Would you restate that question?  I lost the

24   thread.



1              MR. DOYLE:  Can you please read the question.

2              (Question and answer read)

3              MR. SCOTT:  Objection.

4       A.    So I didn't ask whether under a very

5    specific -- pecif -- excuse me -- a very specific

6    circumstance what the Informatica software might do.

7    There would be a number of different factors to consider;

8    for instance, at what stage in the workflow is the

9    document being processed, how far along is it.

10             I did see some references to, I think, in my

11   conversations with Mr. Groff, he mentioned that there was

12   some ability of the Informatica software to provide

13   information about where certain documents were in the

14   process and whether there were certain errors in certain

15   places.  I imagine one of those errors might -- or could

16   hypothetically be related to a server going offline and

17   not being available any longer.

18       Q.    Did you ask RELX for that information?

19       A.    Information about what Informatica software

20   would do in that circumstance?

21       Q.    Uh-huh.

22       A.    I don't recall ever asking for that specific

23   information.

24       Q.    Did you identify bottlenecks in the



1   Informatica software on the ICCE platform?

2          MR. SCOTT:   Objection.

3       A.    So I looked at the CPU utilization, and that

4   seemed to indicate that the system was able to process

5   similar documents with fewer cores in the same manner

6   that it processed the software with more cores.  If there

7   were a bottleneck that would otherwise prevent the system

8   from processing documents as well, that would seem to be

9   unrelated to the question of how many cores were at issue

10  because I understand that's -- that's what the licenses

11  are tied to.

12          For instance, if there were a different

13  bottleneck that prevented the system from being able to

14  utilize a certain number of cores fully, then it would

15  perform in that same way because of that bottleneck

16  with -- with fewer cores.

17      Q.    You mentioned it's your understanding that's

18  what the licenses related to.  What do you mean by that?

19      A.    Well, my understanding is that the license

20  that RELX obtained from Informatica, for instance,

21  counted -- and I believe the specific language was CPU

22  cores that the -- the license provided for the software

23  to be installed on computers that had that certain number

24  of CPU cores as in the agreement.



1        Q.    And were those limits -- the number of CPU

2   cores limits on the scope of the license?

3              MR. SCOTT:  Objection.  Calls for a legal

4   conclusion.

5        A.    I do think that calls for a legal conclusion.

6        Q.    I'm not asking you as a lawyer.  Are those

7   limits?  Meaning you can't go over that amount that

8   specify the number of CPU cores?

9              MR. SCOTT:  Same objection.

10       A.    Well, it's my understanding that the license

11  allowed for a certain number of cores to be available for

12  the software, and -- and it didn't programatically

13  prevent someone from installing software on servers that

14  had a greater number of CPU cores available.

15       Q.    I didn't ask whether programmatically.  I

16  asked do you understand that to be a limit of the license

17  in terms of how many CPU cores RELX could use.

18             MR. SCOTT:  Objection.

19       A.    So it's my understanding that if -- if RELX

20  had -- if the Informatica software were installed in such

21  a way that it had access to more cores than were

22  specified by the license, that would -- I understand

23  would exceed that -- that number as provided by the

24  license.



1        Q.    Do you have an understanding of the different
2   workload types LexisNexis processed with the Informatica
3   software?
4        A.    Sorry.  Did you say "workload" types?
5        Q.    Yes.
6        A.    I understand the Informatica software had
7   workflows that were processed.  I guess I don't know what
8   you mean by "workload" types.
9        Q.    Yeah, the workflow types.  Do you have an
10  understanding of the different workflow types LexisNexis
11  processed with the Informatica software?
12       A.    I did talk to Mr. Groff about different
13  workflows that -- that were part of the overall process
14  in the ICCE platform.
15       Q.    Other than Mr. Groff, did you receive any
16  information on the different workflows?
17       A.    There was a document that -- that I received
18  that sort of summarized the -- the different workflows
19  that -- that were part of the process.
20       Q.    What's that document?
21       A.    There are excerpts in it in my report that
22  shows the different implementations for certain types of
23  workflows.  Some were data transformation for
24  Informatica, like we talked about, and others were Java



1    and Perl implementations from RELX.

2         Q.    What content was carried by those workflows?

3         A.    I think in general they were all related to

4    processing individual documents that would, at the end of

5    the process, be made available to RELX customers on

6    either Lexis.com or Lexis Advance.

7         Q.    But I'm talking about the specific type of

8    content.  What type of content?

9         A.    Are you asking about the specific types of

10   documents that are processed?

11        Q.    Yeah.

12        A.    So I understand that -- I understand that

13   there were certain types of documents that were processed

14   by the -- excuse me.  I understand that there were

15   certain types of documents that were processed by the

16   ICCE platform and certain other types that weren't, at

17   least with respect to their content.  So it's my

18   recollection that mostly the documents that were

19   processed had to do with legal cases in some way, and

20   that there were other documents that were eventually made

21   available on Lexis.com and Lexis Advance that didn't go

22   through the ICCE platform and -- and were outside the

23   scope of that category of document.

24        Q.    What types of legal content went through the



CHRISTOPHER RUCINSKI                                        June 20, 2018
RELX INC. vs INFORMATICA LLC                                         85

1   Informatica portion of the ICCE platform?

2        A.    Well, I'm not sure if all of it did, but some

3   examples of content that would have gone through, I

4   believe, were things like documents related to different

5   legal cases that were in progress, different statutes

6   that -- that were made available.  I believe there were

7   others, but those are the ones I recall as I sit here

8   right now.

9        Q.    Is it your understanding that's generally

10  public information?

11             MR. SCOTT:  Objection.

12       A.    My understanding is that at least statutes are

13  generally public information.  I think sometimes you may

14  need to pay a small fee to access certain other court

15  documents.  At least that's been my experience.

16       Q.    So going back to workflows, what were the

17  primary workflows?

18       A.    Let me see.  So I discussed this in some

19  detail in my report.  As I sit here right now, my

20  recollection is they were workflows related to acquiring

21  the document from the vendor that -- or whatever source

22  the document came from.  Then there were workflows

23  related to extracting the text from those documents and

24  formatting it in a way that was consistent with other



 1  documents that were processed by the system.  And then

 2  there were also workflows related to storing that textual

 3  information in a manner that was, again, consistent with

 4  other documents that were processed and so could

 5  therefore be made available to customers of RELX.

 6       Q.    And what was the desired processing time for

 7  each of those workloads -- or workflows?

 8             MR. SCOTT:  Objection.

 9       A.    I'm not sure what the specific objective or

10  ideal processing time for specific workflows were.  My

11  conversation, I think in that e-mail in my report from

12  Mr. Groff, he mentioned that times around three hours

13  were kind of less than what they -- what they cared about

14  in terms of processing time.

15       Q.    So for each of those workflows, your

16  understanding is that the desired processing time was

17  less than three hours?

18             MR. SCOTT:  Objection.

19       A.    That's not my understanding.  I think -- I

20  don't know what the exact processing time for individual

21  workflows would have been.

22       Q.    Did he ask for that?

23       A.    Did Mr. Groff ask for that?

24       Q.    No.  Did you ask anybody for that information?



1       A.     I did not ask about the specific processing

2  times for the different workflows.

3       Q.     So for the different workflows, how long did

4  it take to process the workflows before the cores were

5  reduced from 104 to 56?

6       A.     You're asking for a specific time period or

7  dates or --

8       Q.     Answer any way you can.  I mean, I'm just

9  asking you how long did it take to process each of the

10  workflows, you know, at full 104 cores and then after

11  when you went to 56 CPU cores?

12          MR. SCOTT:  Objection.

13       A.     Well, it would probably depend on how you

14  measured it.  I mean, I don't know if -- if a workflow

15  has an error, would you discard that or not.  My

16  understanding is that over time, the platform changed

17  quite a bit to use less Informatica software than it did

18  at the beginning, but I haven't seen any data with

19  respect to exactly how much time it took for documents to

20  go through the ICCE platform either in general or through

21  specific workflows.

22       Q.     When you say the exact time, did you see some

23  documents or any other information received that provided

24  how long it took to process each of the workflows?



1     A.     There may have been some discussion I saw in

2   passing, but I don't recall it, as I sit here right now.

3     Q.     Did you do a comparison between the time it

4   took to process the workflows both before the core

5   reduction and after the core reduction?

6     A.     Well, I asked for information on how long it

7   took to process documents through the system, and the

8   workflows are part of that system.  So I don't remember

9   seeing any information related to how long it took to get

10  through the system, and so that wasn't part of my

11  analysis.

12    Q.     So you say that Mr. Groff told you that --

13  well, that let me -- let me back up.  You mentioned three

14  hours.  What was three hours related to?

15    A.     Well, I was asking, I think -- and this would

16  be clearer in the actual e-mail -- but I was asking with

17  respect to the granularity of the utilization data that

18  we had on a per server basis and whether or not it would

19  matter if there were, you know, a small spike in

20  utilization within that hour because we only had --

21  because we only had the average.

22         So my understanding is that in response to the

23  question of, well, did it -- does it matter that we only

24  have granularity of -- of an hour for these CPU



 1 | utilizations, Mr. Groff's response was, well, we only --
 2 | we only really care about granularities of three hours,
 3 | and so granularities of one hour is -- is enough to look
 4 | at that data.
 5 |     Q.    What does it mean a granularity of three
 6 | hours?
 7 |     A.    So the data that was produced, when I say it
 8 | has a granularity of one hour, what I mean is that it
 9 | provided the average CPU utilization for a server
10 | coveraged over across one hour, you could imagine
11 | different time periods over which that might be averaged
12 | such as two hours or three hours; you could imagine
13 | granularities that are smaller than that; you could
14 | imagine an instantaneous, you know, measure if you
15 | wanted, although that would -- I'm not sure how useful
16 | instantaneous would be.
17 |     Q.    And Mr. Groff said that he was only concerned
18 | about average CP -- or that RELX was only concerned about
19 | average CPU over three hours?
20 |     A.    That's my recollection.  If I look at the --
21 | the e-mail, I'll be able to answer that better.
22 |     Q.    Did you ask if it was ever over three hours
23 | difference between 104 cores and 56 core implementation?
24 |         MR. SCOTT:   Objection.



1       A.    I'm not sure what you mean by "if it was over

2   three hours."

3       Q.    Meaning did it take longer than three hours.

4             MR. SCOTT:  Objection.

5       A.    I'm not sure what you mean by "it."

6       Q.    Did he look at four hours or five hours?

7             MR. SCOTT:  Objection.

8       A.    For what?  I'm not sure what the context is.

9       Q.    The utilization.

10      A.    Well, so if you have granularity of the data

11  on an hour-by-hour basis averaged over those hours, you

12  could then take three of those instances and take the

13  average, and now you have the average for three hours.

14      Q.    Okay.  Did you ask Mr. Groff if the big peak

15  or the big spike would matter in the operation on the

16  system?

17      A.    Which big spike are you talking about?

18      Q.    The big one you referred to in your answer.

19      A.    I referred to hypothetical spikes.

20      Q.    Oh, you never saw a pike in any of the data

21  you looked at?

22      A.    Is that a question?

23      Q.    Yeah.

24      A.    Well, so spike is referring to -- or



1   hypothetical spikes I was referring to in my previous

2   answer were on the order of a time period less than an

3   hour.  What I'm saying is that over the course of an

4   hour, because I only had the average, I couldn't tell

5   whether there were periods of time over the course of

6   that hour where a CPU -- or rather -- let me be

7   precise -- whether individual CPUs or cores on the server

8   would have been utilized by more or less than an average,

9   which could be something like zero for certain periods of

10  time, or it could be more like 100 at certain periods of

11  time.

12       Q.   Oh, so the utilization data you looked at

13  doesn't tell you anything about spikes?

14       A.   I wouldn't say it doesn't tell me anything,

15  but it doesn't identify how much utilization was -- let

16  me rephrase that.

17            It didn't show how -- how CPUs or CPU cores

18  were being utilized for periods of time that were less

19  than the hour-by-hour average that we do have.

20       Q.   So it doesn't tell you how it reacted when

21  there was a big spike?

22            MR. SCOTT:  Objection.

23       A.   Well, it tells me over the course of an hour.

24       Q.   Yeah, but not for a short period of time.  If



 1   the spike was over a shorter period of time, you have no

 2   information on that when you're just looking at

 3   utilization of an hour?

 4       A.    I wouldn't say --

 5             MR. SCOTT:  Objection.

 6       A.    I wouldn't say I have no information about it.

 7   That spike that we're hypothetically talking about on a

 8   period of time less than an hour is reflected in the

 9   average for that hour.

10       Q.    Oh, sure.  But you don't know whether it

11   actually occurred or not and when it occurred, correct?

12       A.    I could probably put limits on it, but I

13   wouldn't know the exact details of when it occurred

14   within that hour.

15       Q.    When you say you could "probably put limits on

16   it," wouldn't that be speculating?

17       A.    No.  Let me explain.  What I mean by that is

18   if you have the average CPU utilization for a server over

19   an hour at, say, 50 percent, then it follows that you

20   couldn't have all of the CPU or CPU cores of that server

21   utilized for 100 percent utilization for more than half

22   of that time.  For instance, if you had the CPU or CPU

23   cores utilized for 100 percent of the time for a half

24   hour and then zero percent for the rest, then you'd have

1    your 50 percent average.  But as soon as you have them

2    hypothetically utilized for 100 percent for more than 30

3    minutes, your average would be over 50 percent which

4    would be inconsistent with the average hourly data

5    that we do have.

6         Q.    So did you actually analyze any of the big

7    spikes that occurred?

8             MR. SCOTT:  Objection.

9         A.    Well, the question I was trying to answer was

10   whether -- or to what degree RELX benefited from having

11   the Informatica software deployed on servers that have

12   access to -- to cores that were a greater number than the

13   number of cores that they were licensed for.

14            So the spikes of -- that hypothetically could

15   have existed over periods of time for less than an hour

16   didn't matter to the analysis, as Mr. Groff said in his

17   e-mail, with respect to CPU utilization, certainly

18   anything less than three hours wouldn't -- wouldn't

19   really affect anything, and so it didn't affect my

20   analysis.  And also, the data for granularities less than

21   one hour doesn't -- doesn't exist, as far as I know.

22        Q.    Did you ever ask if obtaining more granular

23   information about big spikes would matter to RELX?

24        A.    Well, I think that question was incapsulated



1   in my question to Mr. Groff about the time periods over

2   which CPU utilization matter.  I'm happy to look at the

3   e-mail if it would help to get more clarity on that

4   question.

5        Q.    Did he provide you with any information about

6   spikes or when they might occur?

7        A.    Well, we're still talking about spikes on the

8   order of less than an hour.  As far as I know, there was

9   no data on a granularity less than one hour, and I don't

10  have any data related to that.

11       Q.    Okay.  If the CPU average was 100 percent for

12  an entire hour, would that mean that all cores were busy

13  in that hour?

14       A.    If it was exactly 100 percent for an hour?  I

15  can't think of a circumstance under which you would have

16  a full 100 percent utilization for a server that had

17  multiple cores where you didn't have some of those

18  cores -- or rather, you didn't have all of the cores

19  active for some of that time at least.

20       Q.    That's not the question I asked you.

21       A.    Would you repeat the question?

22       Q.    If CPU average was 100 percent for an entire

23  hour, would that mean all cores were busy in that hour?

24            MR. SCOTT:  Objection.



1       A.      When you say "busy," do you mean utilized?

2       Q.      Busy.

3               MR. SCOTT:  Objection.

4       A.      What do you mean by "busy"?

5       Q.      Unable to process more data.

6       A.      Well, there are certain instances where CPUs

7    can report utilization higher than 100 percent.  It

8    doesn't happen often but it does happen sometimes.  So if

9    the question is if CPUs on average were reporting 100

10   percent utilization over the course of an hour, could

11   they have processed more data, I think the answer might

12   be yes.  It depends on the circumstances.

13      Q.      If it's over 100 percent, does that mean

14   all the cores used, and each core used, is at 100

15   percent?

16              MR. SCOTT:  Objection.

17      A.      Do you mean that they were at 100 percent for

18   the entirety of the hour?

19      Q.      If you -- you get a thing that says over the

20   hour it's 100 percent, right, for a server.  And I'm just

21   asking you does that mean all the cores used in that

22   server were, for each of those cores, was it at 100

23   percent?

24              MR. SCOTT:  Objection.



1     A.    Well, like I said, sometimes CPU cores can be

2  slightly over 100 percent for periods of time, so it

3  could be the case that maybe half of the cores were at 99

4  percent and the other half were at 101 percent which

5  would average to 100 for the hour.

6     Q.    But it's also the case they could be 100

7  percent, right?

8     A.    It could be the case that if your average

9  shows that all the CPU cores on average for an hour were

10  100 percent, it is possible that all of them were at

11  exactly 100 percent for the entirety of that hour.

12     Q.    Do you know what a desired processing window

13  is?

14     A.    I have the definition in my head of what that

15  could mean.

16     Q.    And what is that?

17     A.    Well, it sounds like an amount of time during

18  which you would like to process something.

19     Q.    And did you have or receive any information

20  about the desired processing window or service level for

21  each of the workload types?

22     A.    Well, like I said earlier, I did ask for

23  information about how long it would take to process a

24  document through the system, and I understand that that



 1  information wasn't available, or at least I didn't see

 2  it.

 3        Q.    Who did you ask?

 4        A.    I believe I asked -- it was either Mr. Groff,

 5  or I think Julie, who is sitting right here, or both.

 6        Q.    And you didn't receive any information?

 7        A.    No, I didn't receive any information about how

 8  long it would take to -- or how long it did take

 9  historically to process documents through the system.

10            MR. DOYLE:  Okay.  Could we get the expert

11  report.

12            MR. SCOTT:  It might be a record, Scott.  It's

13  12:17.  We're marking our first exhibit.

14            MR. DOYLE:  Yeah.  And this is going to be

15  Rucinski 1, and it is a copy of Mr. Rucinski's original

16  expert report from May of this year, 2018.

17            (Exhibit No. 1, Rucinski expert report marked

18            for identification)

19            MR. SCOTT:  This one has no highlights.

20            MR. DOYLE:  What's that?

21            MR. SCOTT:  This one has no highlights.

22            MR. DOYLE:  Okay.  Thank you.

23        Q.    Can I direct your attention to Exhibit 6 --

24  I'm sorry -- Exhibit H, please.



1        A.    Okay.  I'm there.

2        Q.    Okay.  What do you understand this to be?

3        A.    This appears to be Exhibit H to my expert

4   report.

5        Q.    And what is it?

6        A.    It is an e-mail from Julie to me that

7   documents responses that Mr. Groff provided to questions

8   that I provided him through counsel.

9        Q.    Okay.  Can you turn to page 5, please.

10       A.    Okay.

11       Q.    If you go to what's been -- what's 5, you see

12   where it says "Questions not based on documents already

13   produced"?

14       A.    Yes.

15       Q.    Can we go to No. 2.

16       A.    Okay.

17       Q.    Do you see where you asked -- I believe that's

18   your question, right? -- where you say:  "What was the

19   general time frame that LexisNexis wanted documents

20   processed through Informatica's B2B Data Exchange

21   software to be completed?"

22       A.    Yes, that is the question I posed in this

23   e-mail.

24       Q.    And what was the answer provided?



1      A.    The answer provided was from Mr. Groff:   "The

2   expected time frame varied across the content streams as

3   well as the number of files in a given batch.   The

4   performance and reliability of the ICCE Informatica grid

5   was very poor when Informatica originally implemented the

6   ICCE 1.0 platform.   The Informatica grid would crash

7   frequently, and some of the DT services would run for

8   days or sometimes corrupt, in quotes.   DT services would

9   corrupt the entire DT service to fail and stop all DT

10   processing.   Due to these issues, LexisNexis was unable

11   to determine valid expectations for content processing in

12   the ICCE 1.0 platform.

13          "With a lot of re-engineering of the

14   Informatica PowerCenter maps and DT service calls by the

15   CCP RELX team, we were able to get the platform

16   considerably more stable and increased overall

17   performance with the ICCE 2.0 release.   ICCE 2.0 was

18   implemented in production on June 2014, but only some of

19   the content streams were migrated from ICCE 1.0 to ICCE

20   2.0 due to time and budget considerations."

21      Q.    So looking up at the top, do you see where it

22   says "the expected time frame varied across the content

23   streams as well as number of files in a given batch"?

24      A.    I do see that.



1      Q.    Don't you presume from that answer he has some

2   information that relates to time frames?

3      A.    Well, he answered my question with more than

4   just that number -- or rather -- sorry -- more than just

5   that sentence, so given that I asked the question and

6   this was his response, I assume this is what he had to

7   provide for an answer.

8      Q.    But he knows that the expected time frames

9   varied across the content streams, right?

10          MR. SCOTT:  Objection.  Calls for speculation.

11     A.    Well, I don't know what he knew.  I know what

12   he wrote back to me in response to this question.

13     Q.    Did you follow up and seek the information

14   that he was referring to: that the expected time frames

15   varied across against the content streams?

16     A.    Well, I took his answer to the question posed

17   to be a complete one here, and he didn't provide what

18   those expectations may have been.

19     Q.    Did you ask about the differences between

20   content streams in terms of expected time frames?

21     A.    I didn't follow up on this question.

22     Q.    Does it appear that RELX had some information

23   as it related to expected time frames for content

24   streams --



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                      101

```
1              MR. SCOTT:  Objection.

2      Q.    -- that was available to RELX?

3              MR. SCOTT:  Objection.  Calls for speculation.

4      A.    I don't know what information RELX had.

5      Q.    Well, did you ask him?

6      A.    Well, I asked Mr. Groff in his e-mail.

7      Q.    Yeah.  But did you follow up and ask him about

8  expected time frames?

9              MR. SCOTT:  Objection.  Asked and answered.

10     A.    I already said I didn't follow up on this

11 specific question because I had an answer on it already.

12     Q.    Would that have been helpful to get some

13 information on the expected time frames in terms of

14 forming part of your opinion?

15     A.    Well, the thing that I wanted to see was

16 records of how long it took for files to get through the

17 system.  So expected time frames are somewhat

18 interesting, I suppose, but to the question of how -- how

19 might have the time it took for documents to actually

20 make it through the system, that's not a question about

21 expectations.  That's a question about what actually

22 happened historically.

23     Q.    Sure.  But wouldn't it be -- wouldn't it be

24 helpful to know the actual expected time frames from RELX
```



1  for these various content streams so you could compare

2  how long it actually took to get across the system and

3  compare it to the expected time frames?

4      A.    Well, if I don't know what the actual data was

5  for how long the files took, I don't have anything to

6  compare it against.

7      Q.    Okay.  So what you're saying is because you

8  had no information about how long it took for the data to

9  actually get through the system, you didn't need to know

10 any other information about expected time frames?

11     A.    Yeah.  I think I would say because I didn't

12 have the information about how long it actually took for

13 documents to get through the system, I did not have

14 anything to compare it to with respect to expectations.

15     Q.    And you never got any records or documents

16 about how long it took to actually get through the

17 system, right?

18     A.    My recollection is I did not get documents

19 that showed how long it took documents to get through the

20 system.

21     Q.    Okay.  Are you aware if there was any

22 evidence that expected time frames were not met after

23 the reduction in cores from 104 CPU cores to 56 CPU

24 cores?



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                    103

1       A.    I don't remember seeing anything like that.

2   What comes to mind right now is just what's in the e-mail

3   here and Mr. Groff's response.  But I think that was

4   related to processes crashing with the ICCE 1.0 platform,

5   which, in general, I think was earlier than the time

6   period at which the number of cores in Informatica's

7   system was reduced.

8       Q.    So you had no time for processing document

9   types for the system when it had 104 CPU cores?

10      A.    I don't remember seeing documents for the

11  amount of time it took to process documents through the

12  ICCE platform for any period of time.

13      Q.    Did you have any information that disclosed

14  processing times through the platform when it was 56 CPU

15  cores?

16      A.    Well, like I said, I don't recall seeing any

17  documents that -- that showed how long it took documents

18  to get through the system for either of the -- either the

19  time before or after the reduction in the number of CPU

20  cores that were part of the ICCE platform.

21      Q.    Did you ask for that information?

22      A.    Again, I asked, in general, for -- if there's

23  information or documents about how long it actually took

24  documents to get through the system, then that would be



1  information I would like to have in forming these

2  opinions.

3       Q.    And what was the response?

4       A.    I never got any documents that showed that,

5  and my understanding is that those records don't exist.

6       Q.    And who told you those records don't exist?

7       A.    I don't remember exactly.  I remember asking

8  for it and never getting it, whereas I asked for

9  increased -- or I'm sorry -- the utilization data for

10  different time periods and did get that information, and

11  so I don't remember exactly how it transpired, but my

12  assumption was that because I asked for it and didn't get

13  it, it must not be there.

14       Q.    Who did you ask?  Counsel?

15       A.    I believe I -- I believe I asked counsel, and

16  I think I asked Mr. Groff as well at some point.

17       Q.    Do you recall there was a period in time when

18  the parties signed an amendment that retired 16 CPU

19  cores?

20       A.    My recollection is that there was a time when

21  the CPU core license, whereas before it covered 72 cores,

22  after the new agreement, it covered 56, if that's the one

23  you're talking about.

24       Q.    Okay.  And what was the reason why RELX



1   retired those 16 CPU core licenses?

2         MR. SCOTT:   Objection.   Calls for speculation.

3   A.    I don't know why RELX would have made that

4   decision.

5   Q.    Did you ask anyone?

6   A.    No, I don't think I did.

7   Q.    Is it relevant to your analysis and your

8   opinions?

9   A.    Well, the question of why parties acted the

10  way they did seems outside the scope of computer science

11  opinions in general, but also, I was looking at

12  specifically what evidence there was for a benefit

13  that was accrued, if any, to RELX when they had more

14  cores versus fewer cores on the system, and for that

15  purpose, I looked at the data for utilization that was

16  available.

17  Q.    But doesn't the actions of RELX -- the actual

18  factual actions of RELX have any bearing on that when

19  they actually reduced or they signed an agreement to

20  reduce the number of CPU cores?

21        MR. SCOTT:   Objection.

22  A.    Well, I don't know why they did that.

23  Q.    Did you ask?

24        MR. SCOTT:   Objection.



1        A.    I didn't ask them why they -- why RELX did

2   that.

3        Q.    Well, did you ask him why they didn't actually

4   reduce the number of CPU cores after signing that

5   agreement?

6              MR. SCOTT:  Objection.

7        A.    I don't recall asking RELX why -- why they

8   made certain decisions because I was more focused on the

9   actual data of what transpired and not the reasons for --

10  not the reasons for it happening the way it did.

11       Q.    So it doesn't matter to you that somebody

12  signs an agreement to actually get rid of a number of CPU

13  cores and then they actually continue using the CPU

14  cores?  That has no relevance as to whether or not they

15  needed to continue using the full amount of CPU cores?

16             MR. SCOTT:  Objection.

17       A.    I wasn't looking to the question of need.  And

18  it's relevant insofar as it is -- what -- insofar as

19  those agreements define the amount of licensed cores that

20  were available at certain times.

21       Q.    Why did they stay at 72 CPU cores if they had

22  signed an agreement that they would go down to 56 CPU

23  cores?

24             MR. SCOTT:  Objection.  Calls for speculation.



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                      107

1      A.    I don't know why RELX would or would not do

2   the things that they did or contemplated doing.

3      Q.    Well, isn't it your opinion they only needed

4   56 or fewer cores?

5      A.    Well, in order to process the similar data

6   over the different time spans for which they had

7   different amounts of cores, you know, my opinion is

8   that they could have processed the same data just as well

9   with -- with the smaller of the two amounts of cores

10  available to them.

11     Q.    Sure.  So did you ask him why they stayed at

12  72 CPU cores and didn't drop down to 56 CPU cores?

13          MR. SCOTT:  Objection.  Asked and answered.

14     A.    I didn't ask RELX why they made the decisions

15  that RELX made.

16     Q.    Why not?

17     A.    It didn't seem relevant to the opinions

18  because I was focused on what actually transpired and not

19  the reasons why certain decisions were made.

20     Q.    Couldn't there have been performance issues?

21  They wanted to stay at 72 CPU cores because they needed

22  to because of performance issues?

23          MR. SCOTT:  Objection.

24     A.    Many things are possible.  I don't know why



1   they decided to do the things that they did.

2       Q.    Shouldn't you have asked them?

3             MR. SCOTT:  Objection.

4       A.    Like I said, I was looking at whether they

5   actually accrued a benefit, and so to answer that

6   question, I looked at the actual data as it existed.  It

7   could, for instance, have been the case that they thought

8   certain things that were untrue, and so that's why I

9   looked at the data.

10      Q.    Did you look at processing times between 72

11  CPU cores and a 56 CPU core system?

12      A.    Well, I did ask, for instance, if there were

13  data related to how long it took documents to process

14  through the system, but --

15      Q.    You didn't get it, did you?

16      A.    I didn't see any documents that had that level

17  of data in them.

18      Q.    So it's possible they remained at 72 CPU cores

19  because they needed to due to certain performance issues

20  that you didn't investigate, correct?

21            MR. SCOTT:  Objection.

22      A.    I don't know why RELX did the things that they

23  decided to do, so --

24      Q.    But it's possible they could have, right?



1              MR. SCOTT:  Objection.

2        Q.    Due to performance issues, correct?

3        A.    It's possible they could have acted in a

4    number of different ways for a number of different

5    reasons.  Other --

6        Q.    But they could have due -- they could have

7    done it due to performance issues, correct?

8              MR. SCOTT:  Objection.

9        A.    They could have done it for a lot of reasons,

10   and that is a reason, so...

11       Q.    Do you know if the failure to actually

12   continue to -- I mean, do you know if the failure to

13   reduce the number of cores by 16 related in any way to

14   critical workflows?

15             MR. SCOTT:  Objection.

16       A.    Are we still talking about the change from 72

17   cores to 56 cores?

18       Q.    Yes, we are.

19       A.    Would you repeat the question?

20       Q.    Yeah.  Was the -- do you know if the failure

21   to reduce the cores was related in any way to critical

22   workflows?

23       A.    Well, I didn't ask RELX why they -- why the

24   number of cores that they had deployed -- or -- I'm



1   sorry.  I didn't ask RELX why they chose to act in ways

2   or not act in certain ways with respect to the number of

3   CPU cores as part of the system, so I don't know whether

4   that would have had an effect.

5        Q.   So you don't know whether it was -- the

6   failure was related in any way to critical workflows,

7   right?

8             MR. SCOTT:  Objection.

9        A.   Well, I don't know if I'd kind of characterize

10  it as a failure, but, again, I was looking more at the

11  actual data of the -- that was in the utilization for its

12  servers, and I wanted to look at that as opposed to

13  impressions that different companies or parties of

14  companies had because the data is the actual record of

15  what transpired.

16       Q.   You've spoken with a number of members of the

17  RELX IT staff; is that correct?

18       A.   I've spoken with two of them.

19       Q.   And who are they?

20       A.   One is Dwight Groff.

21       Q.   Okay.

22       A.   And the other is Jeff Hoffman, I believe his

23  name is.

24       Q.   Anybody else?



1        A.     Those are the only two employees of RELX that

2    I spoke with.

3        Q.     Do you know if Dright -- Dwight Groff and Jeff

4    Hoffman were at RELX at the time of the amendment that

5    reduced the licensed CPU cores from 72 to 56?

6        A.     Sorry.  I didn't hear that.  Would you say

7    that one more time?

8               MR. DOYLE:  Can you read it back, please.

9               (Question read)

10       A.     I'm not sure if they were.  The reason I spoke

11   to Mr. Groff in particular was because he was provided as

12   the person from RELX who was most knowledgeable about the

13   sort of technical implementation of the ICCE platform and

14   the time periods during which the Informatica software

15   was implemented as part of it.

16       Q.     Do you think they're competent in their

17   knowledge of the RELX system?

18              MR. SCOTT:  Objection.

19       A.     Well, I'm not here to offer opinions about

20   competency, but they were provided as the best available

21   employees from RELX to answer technical questions.

22       Q.     And do you believe they did a good job

23   answering your technical questions?

24       A.     Overall, yeah.  I mean, they did answer the



 1  questions that I asked them, and I found no reason to

 2  doubt their responses.

 3      Q.    Do you think Groff and Hoffman knew why

 4  RELX failed to reduce the number of cores after the

 5  amendment --

 6          MR. SCOTT:  Objection.

 7      Q.    -- that required the reduction of 16 CPU

 8  cores?

 9          MR. SCOTT:  Objection.

10      A.    Well, I don't know what -- what they know.

11  Only they would be able to tell you what they know.

12      Q.    Based on your experience and expertise, what

13  is the most likely reason RELX did not reduce from 72 CPU

14  cores to 56 CPU cores?

15          MR. SCOTT:  Objection.  Calls for speculation.

16  Assumes facts not in evidence.

17      A.    Well, there are a number of reasons that they

18  might have done that, and as far as my computer science

19  expertise, I mean, I think a lot of those reasons would

20  fall outside the scope of that expertise, so I'm not sure

21  why they would -- why they would have made certain

22  choices.

23      Q.    But, again, you didn't ask anybody?

24      A.    Well, I didn't ask why RELX made certain



1   choices because I was focused on the data of what

2   actually transpired and not the reasons for certain

3   choices being made.

4        Q.   Did you ask counsel?

5        A.   Counsel is a member of the group of people

6   that I might ask this question, and I didn't ask the

7   question in general.

8        Q.   Do you know if LexisNexis still met all of its

9   service targets and performance targets after the number

10  of cores were reduced to 56?

11       A.   I don't know what service targets they were --

12  were measuring against for -- for those time periods.

13       Q.   You didn't ask?

14            MR. SCOTT:  Objection.

15       A.   As far as I knew, the best data that was

16  available was the actual CPU utilization data, and so

17  that's the data that I focused on.

18       Q.   But you didn't ask them if they had service

19  targets?

20       A.   Well, again, I asked for how long it took

21  documents to process through the system, and because I

22  didn't have the information, I had nothing to compare it

23  against.  That probably would have been the next question

24  in that case.



1    Q.    Earlier Groff had stated that the expected

2  time frame for processing varied across the content

3  streams.  Do you remember that?

4    A.    He said the expected time frame varied across

5  the content streams as well as the number of files in a

6  given batch.

7    Q.    Okay.  So given that, do you know if RELX was

8  still able to keep the expectation times for the

9  workflows -- I'm sorry.  Do you know if the actual times

10  for processing were underneath the expectation values, or

11  were the expectation values after the reduction on the 16

12  cores?

13    A.    Well, I didn't see data for how long it took

14  for the documents to actually get through the system, and

15  so I had nothing to compare expectations against, and so

16  I didn't perform the comparison.

17    Q.    Overall, wouldn't it have been important to

18  know that in relation to coming to a conclusion that the

19  Informatica software provided no benefit?

20    A.    When you say "that," what do you mean?

21    Q.    Knowing processing times.

22    A.    Okay.  Could you repeat it all at once?

23  Sorry.

24    Q.    Sure.  Wouldn't it be important to know



1   processing times and how they compared to expected

2   processing times before coming to a conclusion that there

3   was no benefit due to the Informatica software?

4        A.    Well, I would want to know how long it would

5   take documents to get through the entire system.  After

6   I -- which I didn't see.  After getting that, it might be

7   useful to compare against either previous -- previous

8   implementations that -- for which there was data for the

9   amount of time it took documents to get through the

10  system.

11            The expectations, I think, would be relevant.

12  It would probably also depend, though, on how the

13  expectations were formed.  You might -- there could be a

14  circumstance, for instance, where an expectation was --

15  was maybe too aggressive and maybe the company didn't

16  actually benefit from getting to that expectation or not.

17  But that would be something I would have to look at in

18  more detail in an actual situation.

19        Q.    Sir, did you have a conversation with

20  Dr. Vellturo in this case?

21        A.    I did.

22        Q.    And Dr. Vellturo has been hired as a damages

23  expert in this case?

24        A.    That is my understanding as well.



1    Q.    Did you tell Vellturo that the Informatica

2  software provided no value?

3    A.    I think what we discussed was the degree to

4  which RELX benefited from having the ICCE platform have

5  access to more cores than the number of licensed cores

6  that were available to them over certain time periods.

7  My opinions are not related to the general benefit that

8  RELX may have accrued from Informatica -- from the

9  Informatica software.  It was directed specifically

10  towards any difference that may have happened with

11  respect to a different number of cores being available to

12  the ICCE platform.

13    Q.    Did you provide him any information relating

14  to the benefits or disadvantages of Informatica software

15  in general?

16    A.    That is not something I had planned about

17  in my report, so I don't think I provided that to

18  Dr. Vellturo in the phone call.

19    Q.    So what exactly did you tell Vellturo?

20    A.    One thing we talked about was, I think, the

21  different options that RELX had for how to implement its

22  ICCE platform and some of the different avenues they

23  could have taken in terms of performing that

24  implementation.



1          So one avenue that I previously discussed with

2    Mr. Groff was using a, you know, expansion of the Java

3    and Perl scripts that they had previously been using in

4    the new system and that Informatica was a third-party

5    solution for at least part of the ICCE platform.  And I

6    understand they considered other options, but those were

7    the ones that we talked about.

8          Q.    But you told Dr. Vellturo Informatica provided

9    no value when going from a hundred -- I'm sorry.  Strike

10   that.

11         Did you tell Dr. Vellturo there was no value

12   or benefit when RELX was using 104 CPU cores as opposed

13   to 56 CPU cores?

14         A.    Well, generally, my opinion is that there was

15   no benefit accrued with respect to more cores being

16   available to the Informatica program as part of the ICCE

17   platform over the certain time periods for which there

18   were more cores as part of the system versus the number

19   of cores that were available because of the license

20   agreement.

21         Q.    And what was the number of cores that you

22   thought that you could adequately run the system with?

23         A.    I don't think I ever came to a determination

24   about what that specific number would be.  I was



1    concerned only with whether there was a difference in the

2    benefit between the number of cores that were available

3    through a license agreement and the number of cores that

4    were actually on the ICCE platform that the Informatica

5    software, as part of that ICCE platform, had access to.

6        Q.    Did you tell him that the ICCE platform using

7    Informatica only required 56 or fewer cores?

8        A.    I don't remember the exact conversation, but

9    probably the way I phrased it is that there was no

10   benefit in having more than 56 cores on the system

11   because, as I explain in my report, there was actually a

12   time during which 56 cores were both part of the ICCE

13   platform as well as number of cores that were licensed,

14   and there were more files processed through the system

15   over that time period than over the previous time periods

16   where there were more cores available to the Informatica

17   software as part of the ICCE platform.

18       Q.    So how did you come to that conclusion if you

19   had no information relating to processing times or

20   expected workflow times?

21       A.    Well, as I explained in my report, I looked at

22   the utilization data for the servers that were part of

23   the ICCE platform over various time periods.  I also

24   looked at the number of files that were processed through



 1   the system on a daily basis.

 2        Q.    And you think that that's sufficient to come

 3   to that conclusion?

 4        A.    I do.

 5        Q.    So processing times aren't important?  Is that

 6   what you're saying?

 7              MR. SCOTT:   Objection.

 8        A.    I wouldn't say they're unimportant, but I

 9   don't think they're necessary to come to the conclusion

10   that I did.

11        Q.    In Footnote 31, you say -- of your report --

12   it's on page 32 -- you state:  "Across all seven ICCE

13   servers, more than 99 percent of hours have data reported

14   over the approximately three-year time frame covered by

15   the ICCE server utilization report."

16              Do you see that?

17        A.    I see Footnote 31 which reads:  "Across all

18   seven ICCE servers, more than 99 percent of hours have

19   data reported over the approximately three-year time

20   frame covered by the ICCE server utilization report."

21        Q.    What does that mean?

22        A.    Well, give me a moment.  So there were certain

23   hours that had no data reported in the -- in the data

24   that I was looking at.  I understand that some of that



1   was related to servers actually not being online during

2   those times.

3       Q.    Okay.  So it just means the data that was

4   available to you covered 99 percent of the time?

5       A.    I think it was somewhat more than 99 percent,

6   but I said 99 percent to be safe.

7       Q.    And how did you obtain that information?

8       A.    Well, I manually reviewed the data that was

9   available in the spreadsheet and took note of any gaps.

10  And there were at least two types of gaps identified: one

11  where there was an actual entry for the hour but then no

12  data reported; and there were a handful of instances

13  where there were hours that just weren't in the

14  spreadsheet, there wasn't a row for them, and so I made

15  sure to include those days -- I'm sorry -- those hours

16  with no data for them.

17           So in summary, I looked through the

18  spreadsheet.  I also did some programatic verification

19  just to make sure that there were the correct number of

20  rows versus the time frame that was -- that was in the

21  data.

22      Q.    Sir, did you author your entire report?

23      A.    Give me a moment.  Don't worry.  I won't flip

24  through the whole thing.



```
 1              I wrote it all except there were two sentences
 2     suggested by counsel which, in this report, are at the
 3     end of paragraph 2.  They read:  "This report contains
 4     confidential information including information contained
 5     in documents identified by Bates numbers that were
 6     produced by the parties to this litigation during
 7     discovery.  This report is subject to the protective
 8     order agreed to by Informatica and RELX on May 26, 2017."
 9              Counsel suggested that I include these two
10     sentences to help protect the confidentiality of this
11     report.
12        Q.    So what sections?
13              MR. SCOTT:  Objection.  Asked and answer.
14        Q.    I think you referred to two sections suggested
15     by counsel.
16        A.    In my previous answer, I was referring to the
17     two final sentences at the end of paragraph 2 in this
18     report.
19        Q.    Paragraph 2?
20        A.    Yes.  It's on page 1.
21        Q.    And what did counsel provide to you?
22        A.    They provided the suggested language which I
23     modified slightly.  The language, again, is those two
24     final sentences beginning with "this report contains
```



 1  confidential information," and ending with "agreed to by

 2  Informatica and RELX on May 26, 2017."

 3      Q.    Anything else that counsel provided to you?

 4      A.    I wrote the rest of my report myself.

 5      Q.    Okay.  Do you have a bunch of opinions in here

 6  with respect to your analysis about copyright

 7  registration; is that correct?

 8            MR. SCOTT:  Objection.

 9      A.    I do have opinions that relate to copyright

10  registration.

11      Q.    What page is that?

12      A.    Give me a moment.

13            Could we also break in the next 10, 15

14  minutes?

15      Q.    Sure.  We'll break for lunch.

16      A.    All right.

17            So I think those opinions begin around page

18  42, Section Roman numeral IX.

19      Q.    And that section goes through, let's see, page

20  46?

21      A.    I believe it goes through page 48.  The next

22  top level section is 10, so that's on page 48.

23      Q.    Okay.  Did counsel write you to ask you to

24  write this section?

1        A.    Counsel asked me to offer opinions about

2   what -- well, among other things, what type of -- or to

3   characterize the software that was included in the

4   Informatica copyright registrations.

5        Q.    Are you a copyright law expert?

6              MR. SCOTT:   Objection.

7        A.    Well, the opinions I'm offering are not in the

8   area of law.   They're in the area of computer science.

9        Q.    Well, we'll get into your opinions in a

10  minute.

11             MR. DOYLE:   Why don't we go ahead and take our

12  break now, and we'll come back.   About an hour, since

13  we're on a tight schedule?   So it's one o'clock now.   Two

14  o'clock?

15             MR. SCOTT:   Okay.   Do you want to fill me in

16  on if there's something on the backside?   Does somebody

17  have a flight or something?

18             MR. DOYLE:   There are flights at 7, yeah.

19             THE VIDEOGRAPHER:   The time is 12:55 p.m.

20  This is the end of Disc 2.   We are off the record.

21             (Recess)

22             THE VIDEOGRAPHER:   The time is 2:06 p.m.   This

23  is the beginning of Disc 3.   We are on the record.

24             MR. DOYLE:   I'd like to ask the court reporter



 1   to mark as Rucinski Exhibit No. 2 the presentation called

 2   "Unlock the Potential of External and Hierarchical Data."

 3            (Exhibit No. 2, "Unlock the Potential of

 4            External and Hierarchical Data" marked for

 5            identification)

 6        Q.    Have you seen this document before?

 7        A.    Let me flip through it for a moment.  Well,

 8   I'm not sure if I've seen this particular document

 9   before, but it does look familiar.

10        Q.    Do you know who Brian Wisvari and Xinwei Li

11   are?

12        A.    I believe they're two employees of RELX.  Go

13   ahead.

14        Q.    And do you know what their roles were with

15   respect to the ICCE platform?

16        A.    To sit here right now, I don't recall

17   specifically how that you were involved with ICCE.

18        Q.    Did you have any conversations with them?

19        A.    I didn't have conversations with either Brian

20   Wisvari or Xinwei Li.

21        Q.    Did you read their -- Brian Wisvari's

22   deposition transcript?

23        A.    I did read through it quickly, yes.

24        Q.    Okay.  Do you see that this is a presentation



1  provide -- given by Brian Wisvari and Xinwei Li?

2       A.    Well, their names are on the title slide.  As

3  I sit here right now, I don't know whether they presented

4  it, but their names are here.

5       Q.    Okay.  Do you see the date June 5, 2013?

6       A.    That date is on the first page of this

7  document, yes.

8       Q.    Okay.  Unfortunately, the pages aren't

9  numbered, so could you go to the top of the page.  It

10  says "Products to Solve Problems."

11       A.    Okay.  I think I'm on that page, yes.

12       Q.    Okay.  Do you see the Informatica B2B Data

13  Exchange?

14       A.    Yes.  The first bullet reads "Informatica B2B

15  Data Exchange 9.5.0."

16       Q.    Sure.  And do you understand the Informatica

17  B2B Data Exchange to comprise PowerCenter, data exchange,

18  and data transformation?

19       A.    That sounds correct, it's my understanding.

20  That's also what's on this document.

21       Q.    What's PowerCenter?

22       A.    So my understanding is that PowerCenter -- and

23  I think I go through this in more detail in my reports --

24  but my understanding is that PowerCenter is kind of the



1   main part of the Informatica software where you can see

2   what's going on in various other parts and kind of -- I

3   don't know, the center of the software from a monitoring

4   perspective.

5        Q.   So it monitors.  What else does it do?

6        A.   As I sit here right now, my recollection is

7   that it -- it's kind of the -- it's the part of the

8   software that organizes or -- and keeps track of the

9   other portions of it, so data exchange and data

10  transformation being the two other parts, for instance.

11       Q.   Does it control the data exchange and data

12  transformation?

13       A.   I'm not sure whether it controls it, but it

14  is -- my understanding is it's sort of a higher -- it's

15  at a higher level in the software than those other two

16  components, so kind of overseeing the other two.

17       Q.   What's data exchange?

18       A.   My understanding is that data exchange is the

19  component of the Informatica software that is related to

20  actually acquiring documents for processing, and so it

21  will be the component of the software that monitors for

22  when certain documents are available for processing and

23  plays a role in orchestrating how those documents enter

24  the system.



1     Q.    Okay.  And what is data transformation?

2     A.    My understanding is that data transformation

3  is, I would say, at the lowest level in the software

4  hierarchy of these three.  It is the portion of the

5  Informatica software that is responsible for actually

6  performing, well, as its name suggests, data

7  transformation from, for instance, the original document

8  to a text form that is more suitable for ingestion into

9  the larger, in this case, ICCE platform, for instance.

10    Q.    And what is the text form that you're

11 referring to?

12    A.    I think in general the way the ICCE platform

13 worked with Informatica is that data was stored in an X

14 amount in order to break out the different components of

15 documents in a way that was more easily consumable for

16 computer programs to display later.

17    Q.    And what's the parser?

18    A.    Well, the parser -- in general, a parser would

19 be something that takes a particular stream of data and

20 then extracts the portions of it that have a particular

21 meaning based on their -- their placement in the data

22 stream, for instance.

23    Q.    And the mapper?

24    A.    As I sit here right now, I'm not certain what



1   the mapper portion does, but given the -- my

2   understanding of the other components, my best guess

3   would be that it -- it sort of relates the data that is

4   parsed out to a more particular format that the rest of

5   the ICCE platform and Informatica software would use

6   to -- to store that data.

7        Q.    And what's your understanding of the

8   serializer?

9        A.    Well, my best guess, as I sit here right now,

10  is that the serializer would be related to actually

11  outputting some of the data that the mapper had

12  transformed into a particular format.  That's my best

13  guess given the name of serializer and the way that it

14  appears as the last sub-portion of data transformation.

15       Q.    Have you seen any documents that talk about

16  the mapper or the serializer?

17       A.    I probably have, but I don't recall any right

18  now.  This is one such document, for instance.

19       Q.    So you have no recollection as to what these

20  two components do?

21       A.    Well, I gave you my best understanding, as I

22  sit here right now, but I didn't focus on the specifics

23  of how these components worked.

24       Q.    You call those your best understanding or best



CHRISTOPHER RUCINSKI                              June 20, 2018
RELX INC. vs INFORMATICA LLC                                 129

1    guess.  Was it a guess, or is it based on information

2    that you reviewed in this case?

3         A.    Well, it's based on their review in this case.

4    As I sit here right now, without other documents in front

5    of me, that's what I can recall.

6         Q.    But you don't remember what documents you

7    learned that from?

8         A.    I don't remember which specific documents.

9         Q.    And did you get that information from somebody

10   at RELX?

11        A.    When you say this -- I'm sorry.  Which

12   information are you talking about?

13        Q.    About the mapper and serializer.

14        A.    I'm trying to remember conversations I had

15   with Mr. Groff.  I don't think -- I don't think we talked

16   about these two components in detail.  They might refer

17   to other things that Mr. Groff and I spoke about.  They

18   could have been called different things in those

19   conversations.  But I think for mapper and serializer,

20   those were -- my recollection right now is that those

21   were words that were more used in certain documents and

22   not that I discussed with Mr. Groff.

23        Q.    And what's managed file transfer?

24        A.    As I sit here right now, my best guess is that



1  this is related to actually transferring the files to the

2  Lexis.com and Lexis Advance portions, at least as

3  implemented in the ICCE platform, but I don't -- I don't

4  have a specific recollection of what the managed file

5  transfer process would be in this circumstance.

6      Q.   Could we move to the page called "Our

7  Solution," the second one called "Our Solution."  Just a

8  few -- two pages beyond.  Not that one.  The next one.

9  There you go.

10     A.   Two pages after the last one.

11     Q.   Right.  If you look at the "Business

12 Requirements" highlight, do you see that?

13     A.   I do see that box.

14     Q.   Is that your understanding of the business

15 requirements behind the Informatica and ICCE platform?

16     A.   Let me read it.  Well, it doesn't seem

17 inconsistent with my understanding of sort of the goals

18 of the ICCE platform and Informatica as a part of that

19 platform for certain time periods.

20     Q.   Do you have an understanding as to whether the

21 Informatica software met those goals?

22     A.   Well, maybe we should go through them one by

23 one.  Let's see.

24          So the first goal is "huge amount of sources



1  of disparate formats."  That seems like a business

2  requirement that reflects more of the sources of data and

3  not the processing, so I don't think Informatica software

4  would have a bearing on that.

5      Q.   Well, wouldn't it have a bearing in the sense

6  that it could actually process a huge amount of sources

7  with disparate formats and do a conversion to a

8  particular format?

9      A.   Right.  So for this particular one, I would

10 say that the -- certainly the ICCE platform using the

11 Informatica software was able to process documents for

12 certain time periods that -- that did have different

13 formats, so sure, for this -- this specific goal as

14 stated, there were disparate formats that were processed

15 through the system.

16     Q.   You keep saying "certain time periods."  What

17 time periods are you referring to?

18     A.   Well, I'm referring to the time period where

19 Informatica software was a part of the ICCE platform --

20     Q.   Okay.

21     A.   -- and the ICCE platform was processing

22 documents.

23     Q.   Okay.  And what about was -- was the

24 Informatica software able to handle huge data volume



 1  individually or that's put together?

 2          MR. SCOTT:  Objection.

 3      A.    So with this bullet and the last -- and the

 4  previous one -- well, just first point out that "huge" is

 5  a bit vague.  I suppose "huge data volume individually"

 6  might mean for individual files, but I'm not really sure

 7  as written what that is supposed to mean here.  And "or

 8  putting together," I suppose that could be for the files

 9  in general.  But I'm also not sure what is specifically

10  meant by this.

11      Q.    Okay.  What about "fast growth on source types

12  and volumes"?  Does the Informatica software handle that?

13      A.    Well, the "fast" is also fairly imprecise

14  here.  For "source types," I suppose that means the

15  origin of the files, perhaps.  I'm not sure how that's

16  distinct from volumes.  "Volumes" could mean like a

17  storage volume, but I suppose it could also mean amount

18  of data.

19      Q.    So you don't know?

20      A.    Yeah, I think it would depend on -- on what

21  these words actually are intended to mean.  There were a

22  lot of -- well, there were a number of files processed

23  through the ICCE platform using Informatica software.  I

24  don't know if the -- for instance, the fast growth here



CHRISTOPHER RUCINSKI                             June 20, 2018
RELX INC. vs INFORMATICA LLC                              133

1    reflects that or it kind of matches the definition

2    intended by whoever wrote this slide.

3        Q.    Well, you understand that they were LexisNexis

4    employees that gave this presentation, right?

5        A.    Well, their names are on the front of the

6    slide, but I don't know whether they gave a presentation.

7    I don't know whether they authored the slide.  The slide

8    has Informatica at the bottom of it.

9        Q.    What about the business requirements of

10   "intricate business process requirements and online

11   on-time goals"?  Do you know if the Informatica software

12   met that requirement?

13       A.    I don't know what the requirements are.  In

14   this specific goal, it says, "intricate business process

15   requirements and online on-time goals," but it does not

16   state what those intricate business process requirements

17   are or what those online on-time goals are.

18       Q.    Okay.  What about the next one, "complex

19   transformation rules and target content models"?  Was the

20   Informatica platform able to meet that requirement?

21       A.    So I guess for this particular bullet,

22   "complex" could modify "transformation rules" as well as

23   "target content models."  I don't know to what degree

24   complex is supposed to -- well, how do you measure



 1   complexity I guess is my question.

 2        Q.    Uh-huh.

 3        A.    It's just that these goals as stated are not

 4   very precise, so it's hard to say whether or not they

 5   were met.

 6        Q.    So then the last one, "large user and

 7   operational" -- "operation community," do you know if the

 8   Informatica software was able to meet that requirement?

 9        A.    Well, I don't know what "large" is intended to

10   mean in this context.  And I suppose "large" is modifying

11   only "user," but it could be modifying "operation

12   community" in this phrase as well.

13        Q.    Now, given this was a presentation given by

14   two of the people that were heavily involved with the

15   ICCE platform in 2013, do you have your own understanding

16   of what the business requirements were in that time frame

17   for the ICCE platform using Informatica software?

18              MR. SCOTT:  Objection.

19        A.    Well, I don't know if -- I don't know who gave

20   this presentation or whether it was given.  Would you

21   repeat that question?

22              MR. DOYLE:  Can you repeat it, please.

23              (Question read)

24        A.    So in general, my understanding was the -- and



1   this is mostly from talking with Mr. Groff -- was that

2   the ICCE platform was intended to be a way for RELX to

3   organize its document processing in -- well, in a more

4   organized way.  And their goal was to, over time, process

5   more documents through the platform.  And they slowly

6   increased the number of -- or percentage of documents

7   that were going through the platform over time.

8           In terms of the specific goals with respect to

9   maybe how -- well, I don't know to what extent they had

10  milestones for, for instance, we want to process a

11  certain percentage of documents through ICCE versus not,

12  or how quickly to process them through ICCE at certain

13  periods of time.  But overall, my understanding was that,

14  in summary, they wanted to use the ICCE platform to

15  process as many documents as they could, but they were

16  going to do it kind of slowly and to make sure things

17  were working as they were going.

18      Q.    And that information came from Dwight Groff?

19      A.    Yes.  That's mostly from my conversations with

20  Mr. Groff.

21      Q.    Anywhere else?  Can you recall any other

22  documents or conversations that allowed you to make that

23  statement?

24      A.    Well, there was one document in my report that



 1  related to the percentage of documents that were

 2  processed through the ICCE platform over time.  And in

 3  that document, the percentage increased over time to

 4  about 15 percent, I think sometime in 2016, if I'm not

 5  mistaken, but I'd have to go back and look.

 6      Q.   But you didn't know about these business

 7  requirements in this exhibit marked 2 that we just went

 8  through?

 9      A.   Well, I think I've seen this document before,

10  but like I said, these requirements listed here are --

11  are fairly vague.

12      Q.   Okay.  Let's go to the next page.  See the

13  third bullet point?

14      A.   Yes.

15      Q.   Can you read it, please.

16      A.   The third bullet point reads:  "At a glance,

17  dashboard for monitoring progress of content and

18  adherence to service level agreements."

19      Q.   What is your understanding of the service

20  level agreements?

21      A.   I'm not exactly sure, as I sit here right now,

22  what they refer to, but my guess would be that they refer

23  to a level of service that RELX would provide to its

24  customers.



CHRISTOPHER RUCINSKI                                June 20, 2018
RELX INC. vs INFORMATICA LLC                                   137

1        Q.    Measured by what?

2        A.    I'm not sure.

3        Q.    Okay.  If we could go all the way to the

4   "Summary" section.

5        A.    About how many pages is that?

6        Q.    It's about four or five I think.  It's after

7   the "Our Solution."

8        A.    With "Summary" at the top?

9        Q.    Yep.

10       A.    Okay.

11       Q.    Do you see the "Business Benefits"?

12       A.    Yeah.  The first bullet reads "Business

13   Benefit."

14       Q.    And do you understand those to be benefits of

15   the Informatica software on the ICCE platform?

16       A.    Well, these seem to me to be goals.  We just

17   went through some previous goals on previous slides, and

18   this, I think, is a summary of them.

19       Q.    Does it say "goals"?

20       A.    Well, it says "requirements" earlier.

21       Q.    And then on the summary it says "Business

22   Benefit," right?

23       A.    Right.  It's unclear to me if that is an

24   aspirational benefit or not.



1      Q.    Do you see the first one, "improve content

2   accuracy, completeness, and timeliness"?

3      A.    That's what that bullet says.

4      Q.    Do you know if the Informatica software in the

5   use by RELX improved the content, accuracy, completeness,

6   and timeliness?

7      A.    I'm not sure if it did or did not.  That would

8   have to be considered in the context of it operating

9   within the ICCE platform as a whole as well.

10      Q.    So you don't know?

11      A.    I'm not sure, as I sit here right now.

12      Q.    What about the next benefit?  Do you know if

13   the Informatica software on the ICCE platform reduced

14   development and operational support costs?

15      A.    I'm not sure what this would be compared to.

16   If you're reducing something, it would be compared to

17   something else.  And the same for operational support

18   costs.

19      Q.    So you don't know?

20      A.    Well, I'm not sure what -- what this bullet is

21   even trying to say.

22      Q.    Okay.  Do you know what operational support

23   is?

24      A.    My understanding is that operational support



 1   is related to when you have software that is installed

 2   and you would like support from perhaps the vendor from

 3   whom you bought it to help with its maintenance or

 4   administration.

 5        Q.    And so what's your understanding of reduced

 6   operational support costs?

 7        A.    Right.  In general, that would just mean that

 8   you're spending less money or time or something else that

 9   you would consider to be a cost with one implementation

10   versus another, say.

11        Q.    Okay.  But you don't know whether or not the

12   Informatica software on the ICCE platform reduced

13   development and operational support costs?

14        A.    Well, I'm -- I'm just not sure what this is

15   compared to.  So, for instance, are you comparing it

16   to how the ICCE platform was -- or I'm sorry -- how

17   RELX was processing documents before, or are you

18   comparing it to what RELX might have done an the ICCE

19   platform if they still created the ICCE platform but

20   didn't use Informatica, or are you comparing it to

21   another third-party solution like Informatica but not

22   Informatica itself.  So that's -- that's why I'm unclear

23   as to --

24        Q.    Wouldn't this be important to know as



CHRISTOPHER RUCINSKI                                  June 20, 2018
RELX INC. vs INFORMATICA LLC                               140

```
 1   part of your analysis?
 2        A.    So my analysis was primarily with respect to
 3   the degree to which RELX benefited from having the ICCE
 4   platform with Informatica software as part of it, have
 5   access to, for instance, 104 cores versus something like
 6   72 or 56.
 7        Q.    So benefits are irrelevant to your analysis?
 8        A.    That's not what I said.
 9        Q.    How do you take into account benefits in your
10   analysis?
11        A.    So, again, my primary -- one of my primary
12   opinions is the degree to which RELX might have benefited
13   from having the ICCE platform with access to Informatica
14   software have access to more cores than they may have
15   been licensed for at different times, but that opinion --
16   or that -- that idea is distinct from the degree to which
17   RELX benefited at all from having access to the
18   Informatica software.
19        Q.    Did you ever study how RELX benefited at all
20   from having access to the Informatica software?
21        A.    So in general, that wasn't relevant to my
22   opinions because my opinion was focused on the difference
23   in the two circumstances where RELX would have had the
24   ICCE platform have access to Informatica software with
```



CHRISTOPHER RUCINSKI                                June 20, 2018
RELX INC. vs INFORMATICA LLC                              141

1  different numbers of cores.

2      Q.    So you didn't -- you didn't study that?

3      A.    Does -- does my previous answer not answer

4  that?

5      Q.    Did you study the benefits of the Informatica

6  software to the RELX platform?

7           MR. SCOTT:  Objection.  Asked and answered.

8      A.    So what I studied is the -- is whether there

9  was a difference between the benefit accrued to RELX in

10  the circumstance where the Informatica software was

11  operating as part of the ICCE platform with different

12  numbers of cores, but I didn't look into the specific

13  question of whether RELX benefited in general from the

14  Informatica software.

15     Q.    And in your opinion, you didn't need to know

16  that in order to do your analysis of the benefits between

17  104 CPU cores and 56 CPU cores?

18     A.    So because I was looking at the difference

19  between what actually happened during two time periods

20  where there were different numbers of cores available for

21  the ICCE platform that included some of the Informatica

22  software, I focused on the data as the record of

23  what happened, and not, for instance, potentially

24  aspirational benefits that were mentioned in a



1    presentation at some point previous.

2         Q.    You keep saying "aspirational benefits."  How

3    do you know it's aspirational?

4         A.    I don't know if they're aspirational or not.

5         Q.    Then why did you just say "aspirational

6    benefits"?

7         A.    Because they may have been aspirational.

8         Q.    They may not have been, right?

9         A.    The benefits listed on this page may or may

10   not have been aspirational.

11        Q.    May or may not, right?

12        A.    The benefits on this page may or may not have

13   been aspirational.

14        Q.    Okay.  Good.  Go to the next page.  Do you see

15   this?

16        A.    I see a page in front of me with the title of

17   "LexisNexis B2B Solution Milestones, May 2013."

18        Q.    Do you know whether this shows that RELX

19   planned growth on the ICCE platform in 2013?

20             MR. SCOTT:  Objection.  Calls for speculation.

21        A.    Okay.  So I've reviewed the page.  Would you

22   repeat the question one more time?

23             MR. DOYLE:  Could you read it back to him,

24   please.



1        Q.     My question is -- well, I'll go ahead and ask

2    it again.

3               Does this page depict to you that RELX planned

4    growth in 2013 on the ICCE platform?

5               MR. SCOTT:  Objection.  Calls for speculation.

6        A.     What do you mean by "growth"?

7        Q.     Do you know what "growth" means?

8        A.     In general, I do --

9        Q.     Okay.

10       A.     -- but I'm asking how you're using it in this

11   question so that I can better answer the question.

12       Q.     How do you use it?

13       A.     Well, I would say growth refers to when

14   something increases in size or some other characteristic.

15       Q.     Okay.  Looking at this page, can you determine

16   whether or not anything was increasing in size in 2013

17   for RELX?

18               MR. SCOTT:  Objection.  Calls for speculation.

19       A.     Looking at this page, I am not sure.

20       Q.     Throughout the process from 2010 up until

21   November 2018, did you ever study the -- the growth on

22   the platform and the requirements on the platform in

23   terms of, you know, uploading new content, how fast to

24   upload that new content, what software or machines needed



1    to be added to manage that content?

2              MR. SCOTT:  Objection.  Compound.  Confusing.

3        A.    Would you clarify that time range, again?  Did

4    you mean 2018 or 2017 at the outset?

5        Q.    2018.  You're right.  Thank you.

6        A.    Sorry.  Did you mean 2017 instead?  I'm

7    confused.

8        Q.    It's 2010 up until November 2017.

9        A.    Okay.  Could you repeat the whole question

10   again?

11       Q.    Of course you're going to ask that.

12             MR. SCOTT:  Would you do it, please.

13             (Question read)

14       A.    So in terms of growth, I did see an increase

15   in the number of documents that were processed on a daily

16   basis through the platform.  That was one aspect I agree

17   with that I saw; that was between 2012 and 2017.

18       Q.    Anything else?

19       A.    Let's see.  You mentioned -- you mentioned the

20   number of servers or changes in the number of servers

21   that were available for the ICCE platform to access.

22       Q.    All right.  Let's move on.  Could you go to

23   the -- there's a slide called "Benefits of the LexisNexis

24   Platform Approach."



1      A.    Okay.  I'm on the slide that says "Benefits of

2  LexisNexis Platform Approach."

3      Q.    Okay.  Do you see down at the bottom where it

4  says "Performance and Scaling"?

5      A.    There is a bullet that says that, yes.

6      Q.    And do you see where it says "minimal

7  always-on workflows"?

8      A.    Yes, where "always-on" is in quotation marks.

9      Q.    Yeah.  Do you understand that to be a benefit

10 of the ICCE platform using Informatica?

11            MR. SCOTT:  Objection.

12     A.    Let me review the slide.  So this appears to

13 be similar to what we looked at earlier in this same

14 deck.  I'm not sure if this is aspirational or not, but

15 this does appear to be about the ICCE platform with

16 Informatica software incorporated given that there's

17 "Informatica" at the bottom of each of these pages.

18     Q.    What does it mean to be always-on?

19     A.    Well, it's in quotes here, so I'm not sure

20 what the author of this document intended it to mean.

21     Q.    Okay.  Did you know that a benefit of the ICCE

22 platform with Informatica was to dynamically create

23 unlimited processing workflows?

24            MR. SCOTT:  Objection.



CHRISTOPHER RUCINSKI                              June 20, 2018
RELX INC. vs INFORMATICA LLC                              146

1        A.    Well, the next bullet here does say

2   "dynamically create unlimited processing workflows," but

3   like the other elements of this presentation, I'm not

4   sure if that is aspirational or not.  And it also seems a

5   little vague.  I'm not sure what "dynamically" means.  It

6   could have a number of different meanings.

7        Q.    So you've pointed out a lot in this

8   presentation that's vague to you; is that right?

9        A.    Yes, I'd say there's a number of words here

10  that are not very precise.

11       Q.    Did you ever request to speak to Brian Wisvari

12  or Xin Li who are both the technical -- lead technical

13  engineers for the ICCE platform?

14       A.    I don't recall ever requesting to speak to

15  them directly because I had access to Mr. Groff.

16       Q.    And you think Mr. Groff had all the

17  information associated with the ICCE platform that you

18  needed to know?

19       A.    Well, he seemed -- he seemed able to answer my

20  questions competently or, if not, find a document that

21  did answer them.

22       Q.    Don't you think it's important to verify what

23  Mr. Groff told you?

24       A.    Well, sure.  There were a number of things



CHRISTOPHER RUCINSKI                                June 20, 2018
RELX INC. vs INFORMATICA LLC                                    147

1    Mr. Groff told me that were evident in the documents as

2    well.

3          Q.    But you didn't think it was -- could be

4    valuable to speak to Mr. Wisvari or Mr. Li who actually

5    were designing the system --

6                MR. SCOTT:   Objection.

7          Q.    -- and the technical leads on the system?

8                MR. SCOTT:   Objection.

9          A.    Well, Mr. Groff was made available to me as

10   someone who was knowledgeable about the system, and the

11   things he told me were reflected in the documents, so I

12   didn't find a need to talk to anyone about the topics I

13   asked about.

14         Q.    Did -- did that include benefits?

15         A.    Well, like I said earlier, the primary opinion

16   in my report was with respect to the difference in

17   potential benefit of the ICCE platform incorporating

18   Informatica software with different numbers of cores

19   available.  I wasn't looking at overall benefit to RELX

20   that it potentially got from installing the Informatica

21   software in general.

22         Q.    Did Mr. Groff tell you how the Informatica

23   software works?

24         A.    He did provide me with an overview of how the



1    Informatica software integrates with the ICCE platform.

2         Q.    Did he give you information on how the

3    Informatica software works?

4               MR. SCOTT:  Objection.  Asked and answered.

5         A.    I do think I just answered that.  Is there --

6         Q.    No.  You asked -- you answered, sir, "He did

7    provide me with an overview of how the Informatica

8    software integrates with the ICCE platform."  I keep

9    asking you did he tell you how the Informatica software

10   works.

11              MR. SCOTT:  Same objection.

12        Q.    Different question.

13        A.    Okay.  So in my conversations with Mr. Groff,

14   he explained to me how the Informatica software works

15   within the ICCE platform.  My understanding is that the

16   Informatica software did not operate on its own and was

17   instead incorporated into the ICCE platform, which is why

18   I didn't specify that.

19        Q.    How did the Informatica software work?

20              MR. SCOTT:  Objection.

21        A.    Well, we've discussed parts of it already.

22   But in general -- let's see -- the ICCE platform provides

23   a workflow of framework for different components of -- of

24   the ICCE platform.  It also provides the data



1   transformation implementation that is used for some of

2   those workflows, and then there are other implementations

3   that RELX made to operate within that same workflow of

4   framework.

5       Q.   Okay.  That's the ICCE platform.  What is the

6   Informatica software?  How does the Informatica software

7   work?

8            MR. SCOTT:  Objection.  Asked and answered.

9       A.   Okay.  I'll try to answer the same question

10  again.  The Informatica software operates within the ICCE

11  platform.  In particular, it provides a workflow of

12  framework for different workflows to operate in the

13  context of processing documents.  And then, in

14  particular, there's the data transformation

15  implementation which implements certain of those

16  workflows, and certain other workflows are implemented by

17  custom RELX software.

18      Q.   What's the design of the software?

19           MR. SCOTT:  Objection.

20      A.   Which software?

21      Q.   Informatica software.

22      A.   Which aspect of design are you asking about?

23  I don't --

24      Q.   Any aspect of design.



1        A.    Okay.  Well, I don't have access to the

2   Informatica source code, so I can't offer any opinions

3   about how it's designed from a software engineering

4   perspective.  In terms of how it operates, my

5   understanding is that it provides a framework for

6   workflows that are utilized by the ICCE platform, at

7   least when the Informatica software was a part of the

8   ICCE platform.  And then, for instance, the data

9   transformation component of Informatica implements some

10  of those workflows, and then certain other workflows are

11  implemented by custom RELX software.

12       Q.    Did you read any documents or ask for any

13  documents that would tell you how -- tell you about the

14  design of the Informatica software or how it works?

15       A.    There was one such document that particular I

16  mention in my report, this is the one that was produced

17  through Mr. Groff, and it illustrates different workflows

18  that are -- that are in the system and which workflows

19  had, for instance, the data transformation implementation

20  and which had a Java or Perl implementation from RELX.

21       Q.    Did you read any documents that showed the

22  functional design and components of the Informatica

23  software?

24            MR. SCOTT:  Objection.



1          A.    Well, the document I just mentioned I would

2     say was a functional description of various components,

3     so yes, that was one such document.

4          Q.    And what document's that?

5          A.    It's the one that's in my first report.

6     There's four different -- I forget if I labeled them as

7     figures or not.  Well, I guess I can just look at it.

8          Q.    Can you identify it, please.

9          A.    Paragraph 33 of my expert report submitted in

10    May of this year, there was a discussion of a document

11    produced as Expert Discovery 18.  That's the Bates

12    number.  And then in the subsequent pages of my report,

13    on pages 12 and 13, there are figures that illustrate

14    different pages from that document.

15         Q.    I'm sorry.  What page are you on?

16         A.    Page 12 of my report submitted in May.

17         Q.    Okay.

18         A.    11, the previous page, has a bit of a

19    description; and then pages 12 and 13 have excerpts from

20    the document that I discuss.

21         Q.    And what are those showing?

22         A.    Are you referring to the figures here?

23         Q.    Yeah.

24         A.    Okay.  So Figures 1 and 2 relate to ICCE



1  Platform Version 1.  And Figures 3 and 4 relate to ICCE

2  Platform Version 2.0.  And Figures 1 and 3 relate to the

3  various workflows that were a part of the ICCE platform.

4  Those were workflows that the framework for which was

5  provided as part of the Informatica software.

6         And then in Figures 2 and 4, there's a

7  depiction of which of those workflows in the preceding

8  figure were implemented for different types of documents

9  and whether they were implemented by the data

10  transformation implementation as indicated by DT stage,

11  and then a box filled in with DT; or whether they were

12  implemented with a Java or Perl implementation as

13  indicated by a J or a P in those boxes.  And those Java

14  and Perl implementations were RELX custom software.

15     Q.    And were all these stages identified in Figure

16  1, 2, 3, 4, were they all handled by Informatica

17  software?

18         MR. SCOTT:  Objection.  Asked and answer.

19     A.    Well, the implementations are in Figures 2 and

20  3 -- I'm sorry -- 2 and 4, so we could go through them

21  one by one, I suppose.

22         So for Informatica -- I'm sorry.  For the ICCE

23  platform Version 1, Figure 2 --

24     Q.    I'm just -- I'm just asking if all of them



1  were done by, and performed by, the Informatica software.

2      A.    No.

3      Q.    Is there any more information that you had

4  with respect to the design of the Informatica software

5  other than these figures?

6      A.    Well, this is discussed in my report in

7  paragraphs 28 through 33.  We talked about 33, but the

8  preceding paragraphs give some additional color as well.

9      Q.    Okay.  When I look at -- let's start with page

10  A.

11      A.    Okay.

12      Q.    It says under A, "The Informatica software is

13  only one component of a complex system that provides

14  functionality of RELX's Lexis Advance and Lexis.com

15  products."

16          Do you see that?

17      A.    I do see that, yes.

18      Q.    Okay.  So on page -- on this page, what does

19  Lexis -- I mean what does the Informatica software do as

20  indicated on this page?

21          MR. SCOTT:  Objection.

22      A.    Well, to summarize, paragraph 29 provides a

23  pretty concise overview of where Informatica software is

24  used in the overall process of getting documents from a



 1  document provider to the Lexis Advance and Lexis.com

 2  customers.  And as you can see, there are five different

 3  steps there.  This goes onto page 9.  And it is Step 2

 4  where RELX converts the data into a generic data format

 5  that takes advantage of the ICCE platform and, for

 6  certain time periods at least, the Informatica software

 7  that was part of that platform.

 8      Q.    Does that tell you how the Informatica

 9  software works?

10      A.    Well, I mean, it provides context for the way

11  in which the Informatica software works.

12      Q.    Well, it tells you what it does, right?

13      A.     In my mind, that's -- that's relevant to

14  answering how it works, what it does is its input and

15  output.

16      Q.    So that -- in your opinion, that tells you how

17  the Informatica software works?

18      A.    Can you clarify what you mean by "that" in

19  your question, please?

20      Q.    What you just identified here, under 29, these

21  steps.

22      A.    Well, I'd say it's relevant to how the

23  Informatica software works.  I'm not going to sit here

24  and tell you that, you know, a few bullet points are the



CHRISTOPHER RUCINSKI                                June 20, 2018
RELX INC. vs INFORMATICA LLC                                  155

 1   entirety of detail that one would potentially write down

 2   in terms of how the Informatica software works.

 3        Q.    Is that your entire understanding of how the

 4   Informatica software works in these bullet points?

 5        A.    No.

 6        Q.    Well, what's the rest of it?  How does it

 7   work?

 8            MR. SCOTT:  Objection.

 9        A.    Well, we can talk about the other paragraphs

10   here that are in my report.  I also probably have an

11   understanding that is not explicitly written in this

12   report.  I tried to write down the things that were most

13   relevant in this report to providing context for a reader

14   to understand the other portions of it.

15            I can go through these paragraphs, if you

16   like.

17        Q.    No.  I'm just asking you again how does the

18   Informatica software work?

19            MR. SCOTT:  Objection.

20        A.    So I think I've already provided a summary of

21   how the Informatica software works.  Would you like more

22   detail on that, or -- I'm just not sure what your

23   question is at this point.

24        Q.    Other than the summary you provided, can you



1    tell me anything more about how the Informatica software

2    actually works?

3         A.    Sure.  I can go into more detail on Figures 2

4    and 4, for instance.  We talked about a number of

5    workflows that are -- that are present.  And just

6    referring to these figures, that's Figures 1 through 4 on

7    pages 12 and 13, there are a number of different stages

8    listed in Figures 1 and 3.  And the sum subset of these

9    stages are used to process each of the -- the files that

10   go through the ICCE platform.  And then some of those

11   stages are -- or workflows are implemented with, for

12   instance, data transformation software from Informatica.

13        Q.    And how is that identified?

14        A.    In these figures?  Well, there are a number of

15   stages listed in Figures 2 and 4, and those stages that

16   are implemented with data transformation software have a

17   label of DT --

18        Q.    Okay.

19        A.    -- which in the key refers to the data

20   transformation stage.  Those workflows are also described

21   in Figures 1 and 3 in terms of what they actually do in

22   each of those stages.

23        Q.    Okay.  Outside of these figures and what

24   you've already testified, do you have any other



 1   understanding as to how the Informatica software works?

 2          MR. SCOTT:  Objection.

 3      A.    So I have the other paragraphs here in my

 4   report in paragraphs 28 through 33 that describe how the

 5   Informatica software works.  As I sit here right now, I

 6   think this is a pretty good summary of it.

 7      Q.    Where?

 8      A.    Spanning paragraphs 28 through 33.

 9      Q.    Do you have any other understanding as to how

10   the Informatica software works?

11          MR. SCOTT:  Objection.

12      A.    I think I probably do given my conversations

13   with Mr. Groff, but as I sit here right now, that's all I

14   can think of at the moment.

15      Q.    Okay.  So one of the things you said that you

16   were tasked with was determining whether or not there was

17   any benefit from adding cores up to 104 CPU cores; is

18   that correct?

19          MR. SCOTT:  Objection.  Mischaracterization of

20   prior testimony.

21      A.    I don't know if I'd phrase it that way.  It is

22   more the extent to which there was a potential benefit

23   for having more cores accessible by the ICCE platform

24   that included Informatica software versus having fewer



 1  cores.  I don't think over those time periods that cores

 2  were added, for instance.

 3       Q.    And in trial, are you going to limit your

 4  testimony to that?

 5       A.    Well, I have other opinions in my report, so

 6  certainly, I'll reserve the right to express those

 7  opinions at trial.

 8       Q.    And can you summarize what those opinions are?

 9       A.    Well, the best summary is the report and the

10  table of contents.  I will note that this is only my

11  first of two reports and so there are other opinions in

12  that second report.

13       Q.    Sure.

14       A.    I don't know if it's productive for me to read

15  through the table of contents or to read through the

16  summary of my opinions which are listed at paragraph 9.

17  But that is a pretty good summary --

18       Q.    Okay.

19       A.    -- of the opinions expressed in this report.

20       Q.    What I'd like to do is just go through and

21  talk about what actually happened here between the

22  parties of RELX and Informatica and get your

23  understanding of those.

24            So you're aware that on May 28, 2010, the



1    parties signed a master service license agreement?

2        A.    I believe there was a such agreement signed in

3    May 2010.  I don't recall the specific date.

4        Q.    Okay.  And are you aware that the number of

5    CPU cores licensed was limited to 16?

6        A.    That matches my recollection as I sit here

7    right now, though I think that was also before processing

8    had actually begun on the production ICCE platform.

9        Q.    And do you know how it was determined by RELX

10   why they needed to license 16 cores at that time?

11            MR. SCOTT:  Objection.

12       A.    I don't know why RELX decided to license 16

13   cores.

14       Q.    Okay.  In December 20, 2011, were you aware

15   that RELX added four cores to the license?

16       A.    That matches my recollection.  I'm not sure of

17   the date of that agreement.

18       Q.    Why did they add four cores?

19            MR. SCOTT:  Objection.

20       A.    I'm not sure why RELX decided to add those

21   cores.

22       Q.    Okay.  Are you aware there was a 2012

23   amendment dated June 29, 2012, and during that amendment,

24   52 new cores were licensed?  Are you aware of that?



CHRISTOPHER RUCINSKI                              June 20, 2018
RELX INC. vs INFORMATICA LLC                              160

1        A.    My recollection is there was an agreement like

2    that.  I -- I'm not sure whether the parties dispute the

3    number of cores that were available at that time, but I

4    do recall that there was an agreement that increased the

5    number of cores.

6        Q.    And after that agreement, the aggregate cores

7    license was 72?  Do you recall that?

8        A.    I believe that number might be in dispute, but

9    I understand that's -- that's one way that document could

10   be read.

11       Q.    Okay.  Why did RELX license 52 new cores in

12   the 2012 amendment?

13            MR. SCOTT:  Objection.

14       A.    I don't know why --

15            MR. SCOTT:  Speculation.

16       A.    I don't know --

17       Q.    Why would they do that?

18       A.    I don't know why RELX decided to license more

19   cores at that time.

20       Q.    Did you ask anybody?

21       A.    I don't recall that I did.

22       Q.    Did you look for that information in any

23   documents?

24       A.    Well, the focus of my analysis was on what



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                     161

 1    actually transpired with respect to how many cores were

 2    available at different time periods, so --

 3         Q.    Did you look for that information in any

 4    documents?

 5         A.    I did not look for why RELX made certain

 6    decisions that they made.

 7         Q.    Okay.  Are you aware that as of March 31,

 8    2013, RELX was actually using 104 CPU cores?

 9              MR. SCOTT:  Objection.

10         A.    My understanding is that around that time

11    period -- and I don't recall the specific date, but

12    around that time period, there were 104 cores that were

13    in the ICCE platform on servers that were accessible by

14    the ICCE platform including Informatica software.  I

15    didn't know -- there is no data that indicates that

16    individual cores were used at certain time periods or

17    not.

18         Q.    Do you know why RELX deployed Informatica

19    software on 104 CPU cores?

20              MR. SCOTT:  Objection.  Assumes facts not in

21    evidence.

22         A.    I think there's a dispute about how the

23    Informatica software was actually deployed at certain

24    times.



```
 1        Q.    I'm not asking that.

 2        A.    Would you repeat the question, then?

 3        Q.    Yeah.  I'm asking you do you know why RELX

 4   used 104 CPU cores --

 5              MR. SCOTT:  Same objection.

 6        Q.    -- with the Informatica software installed on

 7   it?

 8              MR. SCOTT:  Same objection.

 9        A.    So I don't know why RELX did certain things.

10   But, again, I don't think there is any data to show that

11   all 104 cores were used at certain times or not.  My

12   understanding is that around that time period, there were

13   104 cores available for the ICCE platform that

14   incorporated Informatica software, but I don't know

15   exactly which cores were used by the software at what

16   times.

17        Q.    But why did they -- why did they add cores to

18   get up to 104 CPU cores?

19              MR. SCOTT:  Objection.  Calls for speculation.

20   Asked and answered.

21        A.    I don't know why RELX made the decisions that

22   they made.

23        Q.    Did you ask anybody about that?

24        A.    Since I was focused on the data related to
```



1  utilization of the -- of the servers at those times, I

2  didn't focus on -- on why RELX made certain decisions.

3      Q.    Do you think they received a benefit from

4  going from 32 CPU cores up to 104 CPU cores?  Might that

5  be the reason why they spent a lot of money and added all

6  those cores?

7           MR. SCOTT:   Objection.  Calls for speculation.

8  Asked and answered.

9      A.    So I didn't look at that specific question of

10 that increase of cores that were available to the ICCE

11 platform.

12     Q.    You didn't think that was relevant, right?

13     A.    Well, the question I was focused on is

14 whether -- for a later time period, whether -- or I'm

15 sorry -- for the time period during which there were a

16 number of cores that were available to the ICCE platform

17 that was greater than the number of cores that were

18 licensed, whether or not there was a benefit accrued

19 there.

20          And could I also request a break some time

21 soon?

22     Q.    Sure.  I've just got a few more questions on

23 this sheet.

24          So you're aware, I think we talked about this



1   earlier, that in February 11, 2015, notwithstanding the

2   fact that RELX had Informatica software on 104 CPU cores,

3   they went and negotiated to retire 16 CPU core licenses.

4   Do you recall that?

5          MR. SCOTT:  Objection.

6      A.   Well, I wouldn't -- I think you said the

7   Informatica software was installed on CPU cores?

8      Q.   I didn't say that.

9      A.   Well, could you --

10         MR. DOYLE:  Do you want to read it back to

11  him.

12         (Question read)

13     A.   Okay.  So in terms of Informatica software on

14  cores, I'd say it was installed on the servers.  But

15  disregarding that -- that point, I don't know why RELX

16  decided to decrease the number of licenses that they --

17  that they had with Informatica during that time.

18     Q.   Do you know whether they wanted to get some

19  money back?

20         MR. SCOTT:  Objection.  Calls for speculation.

21  Asked and answered.

22     A.   I don't know why RELX would have made that

23  decision.

24     Q.   Do you think that they told Informatica they



 1  didn't need 72 CPU cores to process the information and

 2  all they needed was 56?

 3           MR. SCOTT:  Same objection.

 4      A.    I don't know why RELX decided to make that

 5  decision one way or another.

 6      Q.    Well, isn't that similar to what your opinions

 7  are in this case: that RELX only needed 56 or fewer cores

 8  to process the Informatica software?

 9           MR. SCOTT:  Objection.

10      A.    Well, the question of why they made a decision

11  I think is distinct from whether or not they actually

12  needed a certain number of cores.

13      Q.    Well, there could be relevance, though, in

14  terms of why they made certain actions by adding or

15  decreasing cores.  That would have impact on your

16  analysis, sir.  Wouldn't you agree?

17           MR. SCOTT:  Objection.

18      A.    Well, what RELX decided -- I mean, they --

19  they may have had imperfect information or imperfect

20  reasoning, so for the purposes of my opinion, I was

21  focused on the actual data that reflected what actually

22  transpired during those time periods.

23      Q.    So you say they may have had imperfect

24  reasoning.  And what makes you to believe that they



 1  had imperfect reasoning?

 2          MR. SCOTT:  Objection.  Mischaracterization of

 3  testimony.

 4      A.   I think I said they might have had

 5  misinformation or have reasoned in various ways, but I

 6  don't know one way or another why they made certain

 7  decisions.

 8      Q.   Well, is there anything that makes you believe

 9  that they had imperfect reasoning when they kept 104 CPU

10  cores installed with Informatica software but yet

11  negotiated to decrease the license amount from 72 to 56?

12          MR. SCOTT:  Objection.  Compound.  Misleading.

13      A.   Like I said, I don't know why they would have

14  made certain choices.  If that doesn't answer the

15  question, could you repeat it?  I'm sorry.  It's a bit

16  long.

17      Q.   Did you ask Dwight Groff, who it seems like

18  you got a lot of information in this case -- did you ask

19  him why they negotiated to remove 16 CPU core licenses?

20      A.   Since I focused on the data in this case, I

21  didn't ask about why RELX made certain decisions.

22      Q.   Did you ask Mr. Groff or anybody else why,

23  from approximately March 31, 2013, all the way up until

24  mid -- to May 2016, why they continued to operate with



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                       167

1   Informatica software on 104 CPU cores?

2          MR. SCOTT:  Objection.

3      A.   Well, assuming those dates are correct, I

4   don't recall the specific dates, but, again, I was

5   focused on the data and what the data actually reflected

6   in terms of what transpired, so I didn't ask questions

7   with respect to why RELX made certain decisions.

8      Q.   Do you know whether they did that in order to

9   achieve better performance --

10         MR. SCOTT:  Objection.  Asked and --

11     Q.   -- on the platform than merely using 72 or 56

12  CPU cores?

13         MR. SCOTT:  Objection.  Asked and answered.

14     A.   Like I said, I don't know why they made that

15  decision one way or another.

16     Q.   Could that have been one of the reasons?

17         MR. SCOTT:  Objection.  Calls for speculation.

18     A.   Would you repeat that?  Sorry.

19         MR. DOYLE:  Can you repeat the --

20     Q.   Well, here, I'll just go -- I was asking you

21  whether or not the reason why they continued to use 104

22  CPU cores when they were only licensed for either 72 or

23  56, that the reason they continued to use those is

24  because of certain performance factors.



1           MR. SCOTT:  Objection.  Calls for speculation.

2      Q.    Could that be the case?

3           MR. SCOTT:  Same objection.

4      A.    I don't know why they decided to do the things

5  that they did.  There could be reasons related to

6  perceptions about the performance, I suppose, but like I

7  said, I don't know why they made choices one way or

8  another.

9      Q.    Why didn't you ask them to see -- to see?

10  Wouldn't that make your job easier?

11           MR. SCOTT:  Objection.  Asked and answered.

12      A.    Well, like I said, I was focusing on the data

13  because that's the actual record of what transpired.

14  Perceptions notwithstanding, that's --

15      Q.    Well -- well, yeah, you focused on the data,

16  the data -- one of the data being CPU utilization, right?

17      A.    That is some of the data that I looked at,

18  yes.

19      Q.    Do you know if RELX employees actually had

20  access to CPU utilization charts going all the way back

21  to the beginning of this in May 2010?

22      A.    My understanding, and I addressed this in my

23  report, is that the first time that RELX pulled records

24  for CPU -- CPU utilization, they only had records going



1   back two years because that data was overwritten after

2   two years.  And so initially, they provided two years

3   prior to the first time that they looked into it, and

4   after I requested the data for after that time period,

5   they also provided that data as well.

6       Q.    And what was the two years that they had

7   access to?

8       A.    I'll have to look back in my report.  I think

9   it was -- it was approximately -- let's see.  So the data

10  afterwards was approximately November 2017 to, I think,

11  something like June 2016, and so I believe it was two

12  years prior to that, so let's say approximately mid-2014

13  to mid-2016.

14      Q.    So it's your understanding that prior to

15  mid-2014, they did not have access to CPU utilization

16  data?

17      A.    Let me clarify one thing and then answer that

18  question.  One moment.  Okay.  So in terms of what data

19  was available with respect to utilization data, my

20  understanding is that the earliest time period at which

21  data exists begins December 9, 2014.

22          And to answer your question specifically with

23  respect to whether data prior to that existed, it's my

24  understanding that that data did exist at one point in



1   time, but at the time at which the data was requested

2   because of this litigation, at the time that data was

3   requested in late 2016, the data prior to December 9,

4   2014, had already been overwritten and was no longer

5   available.

6        Q.    So there was data prior to December 9, 2014,

7   on CPU utilization; is that right?

8        A.    My understanding is that at some point that

9   data existed, but at the time this litigation began, the

10  data no longer existed.

11       Q.    What happened to it?

12       A.    My understanding is that RELX's policy was to

13  retain CPU utilization data for two years, and then after

14  two years, it would roll over, and so they would always

15  have the most recent two years but not data prior to

16  that.

17       Q.    And when was that data destroyed?

18            MR. SCOTT:  Objection.

19       A.    Well, I'd say it was overwritten.  And the way

20  I understand it would work is -- so on every day, there

21  is data recorded for -- for that day, and then the day

22  that is two years and one day prior would be overwritten

23  by the previous day's data.

24       Q.    Okay.  So the data up to December 9, 2014,



1   would have been overwritten when?

2        A.    It would have -- my understanding is it would

3   have been overwritten, I guess, just on or around

4   December 9, 2016.  The idea being that they always have

5   the most recent two years of utilization data, but they

6   don't store it beyond two years.

7        Q.    So prior to December 9, 2014, they did have in

8   existence CPU utilization data?

9              MR. SCOTT:  Objection.  Asked and answered.

10       A.    I'll just remind that I'd like a break soon.

11             But with respect to data, so it's my

12  understanding that data prior to December 9, 2014, did

13  exist at one point in time, but as of around December 9,

14  2016, that data no longer existed.

15       Q.    Okay.  And so let's go all the way back to

16  December 2014.  Is it your understanding that there was

17  CPU utilization data in existence at that point?

18             MR. SCOTT:  Objection.  Asked and answered.

19       A.    It's my understanding that given the way the

20  data was retained at RELX, that at any point in time,

21  there were two years of data available that is the most

22  recent two years of data on a particular date.

23             So, for instance, supposing it was December 5,

24  2014.  At that point in time -- I'm sorry -- December 5,



1  2014, is what I meant to say -- there would have been

2  data for the previous two years available, so that would

3  be December -- approximately December 5, 2012, to the

4  current date at the time which is December 5, 2014.

5       Q.   Okay.  And it would also be your understanding

6  that prior to December 5 -- or December 2012, there also

7  would have been CPU utilization data that was available

8  to RELX, right?

9            MR. SCOTT:   Objection.

10      A.   I'd say I'm probably a little bit less

11 confident about that because that was further in the

12 past.  I don't know exactly when they started retaining

13 CPU utilization data in the way that they did in the 2014

14 to the 2016 time frame.

15      Q.   Okay.  So from this time period from 2010,

16 let's say, up until -- well, up until 2016, do you know

17 whether RELX was looking and using the CPU utilization

18 data?

19      A.   It's my understanding from talking with

20 Mr. Groff that RELX employees would occasionally look at

21 it, but generally, only if there were some problem with

22 the operation of the software to help diagnose the

23 problem.

24      Q.   Do you have any other means other than



1    Mr. Groff who told you this?

2        A.    As I sit here right now, I can't think of any

3    other -- any other conversations about that topic.

4        Q.    And when did Mr. Groff start employment with

5    the company -- or when did he start being a consultant to

6    the company?

7            MR. SCOTT:   Objection.

8        Q.    What's the first date?

9        A.    I don't recall the exact date where he started

10   working for RELX.

11       Q.    Well, was he at RELX in 2013?

12       A.    Like I said, I don't recall the exact date.

13       Q.    2014?

14       A.    Like I said, I don't recall the exact date.

15       Q.    Well -- okay.  So you said --

16           MR. SCOTT:   Let's take a break.

17           MR. DOYLE:   Yeah, one -- I'm going to finish

18   this.  I've got two questions.

19       Q.    So Mr. Groff -- you said that Mr. Groff told

20   you that employees at RELX would look at the data but

21   only if there was a problem.  What time period was he

22   referring to?

23       A.    Well, I don't know if he limited it that

24   strictly.  My recollection is that he said generally they



1    don't look at the data but they usually look at it if

2    there's a problem.  And then -- sorry.  What was the

3    question?

4         Q.    Over what time period?

5         A.    Is your question over what time period they

6    would look at the CPU utilization data?

7         Q.    Yeah.

8         A.    I don't think his answer was limited by time.

9    I think he was just talking about the utilization data in

10   general, so for the time periods during which it existed,

11   I imagine.

12        Q.    So even before his employment or association

13   with RELX?

14             MR. SCOTT:  Objection.

15        A.    I'd be speculating here because I don't recall

16   exactly what he said, but my understanding of the

17   conversation is that he was talking about in general how

18   RELX employees typically looked at the utilization data,

19   and so it wouldn't surprise me, for instance, if they

20   were looking at it for all time periods during which it

21   existed if those time periods preceded Groff's employment

22   there or not.

23        Q.    And do you know whether or not they looked at

24   CPU utilization data when they made these decisions to



1   add more licenses?  For example, when they went from 20

2   CPU licenses up to 72 CPU licenses, do you know whether

3   or not they considered CPU utilization data?

4           MR. SCOTT:  Objection.

5       A.   I don't know whether or not RELX considered

6   utilization data when coming to that conclusion, or any

7   other data coming to that conclusion.

8           MR. DOYLE:  Okay.  Take a break.

9           THE VIDEOGRAPHER:  The time is 3:19 p.m.  We

10  are off the record.

11          (Recess)

12          THE VIDEOGRAPHER:  The time is 3:43 p.m.  This

13  is the beginning of Disc 4.  We are on the record.

14      Q.   Sir, do you know that when RELX added CPU

15  licenses to go up to 72 CPU cores, do you know whether or

16  not that that -- those additional CPU cores were added

17  based on CPU utilization charts?

18      A.   So I don't know why RELX made that decision.

19  I don't know if it was based on CPU utilization charts or

20  other information.

21      Q.   But it could have been based on CPU

22  utilization charts, right?

23          MR. SCOTT:  Objection.  Calls for speculation.

24      A.   It could have been based on any number of



1   things, I suppose.  CPU utilization data could have been

2   one of those things, but I don't know one way or another.

3       Q.    And when actually RELX used the Informatica

4   software on 104 CPU cores, that decision may have been

5   based on CPU utilization charts, right?

6             MR. SCOTT:  Objection.

7       A.    So I don't know whether the Informatica

8   software was used on any specific cores at any particular

9   time.  My understanding is that the Informatica software

10  was -- was installed on servers that had available to

11  them 104 cores as part of the ICCE platform processing.

12  The decisions about whether to reduce or increase

13  licensed cores, that's something I don't know why RELX

14  would have made those decisions.

15      Q.    But they may have made those decisions, at

16  least in part, looking at CPU utilization charts, right?

17            MR. SCOTT:  Objection.  Calls for speculation.

18  Asked and answered.

19      A.    So I don't know why RELX made certain

20  decisions.  It could have been based on a number of

21  factors.  One of those factors could have been CPU

22  utilization charts for certain time periods.

23      Q.    Okay.

24            MR. DOYLE:  I'd like to introduce to -- have



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                      177

1   the court report mark as Rucinski Exhibit 3 a series of

2   Excel spreadsheet screenshots that were part of Expert

3   Discovery 000008.

4              (Exhibit No. 3, Expert Discovery 000008 Excel

5              spreadsheet marked for identification)

6        Q.    Mr. Rucinski, are you familiar with these --

7   this Excel spreadsheet and the information that's

8   depicted on these pages?

9        A.    Having looked through this, this appears to be

10  the spreadsheet produced in this case as Expert Discovery

11  8; and yes, I have reviewed this document before.

12       Q.    And so is this -- let's look at the top one

13  first, if we could.  Is this a chart that's in your

14  expert discovery?

15             MR. SCOTT:  Objection.

16       A.    You're asking whether this chart appears in my

17  report?

18       Q.    Yeah.

19       A.    No, this chart does not appear in my report.

20       Q.    Did you base any information on this chart?

21       A.    On this specific chart, no.

22       Q.    Did you use charts that were similar to this?

23       A.    Well, there were charts in my report that were

24  based on data that was present in Expert Discovery 8,



1  data present in tabs that are not, for instance,

2  aggregate graph as depicted on this first page.

3      Q.    Okay.  Now, looking at the first page -- now,

4  is this based on the same data, if you look at this page,

5  that was used in the charts in your report for Figure 12

6  and 13?

7           MR. SCOTT:   Objection.

8      A.    So the way I would phrase it is that the chart

9  in Exhibit 3, which I have been handed, the chart on that

10 first page I believe was created, in part, based on other

11 data in Expert Discovery 08, and I used some of the same

12 data in generating Figures 12 and 13 in my report.

13          I just wanted to add also that I didn't

14 scrutinize the -- the chart at the top on the first

15 page of Exhibit 3 that you've handed me because I

16 wanted to use the underlying data directly instead of

17 relying on charts that were produced as part of Expert

18 Discovery 8.

19     Q.    So what data did you explicitly use?

20     A.    Well, there was data in the tabs for each

21 of these seven servers, so that would be -- some of

22 them are cut off here -- but that would be psc3813,

23 psc3814, psc3815, psc3816, psc33817, psc33841, and

24 psc33842.



1     Q.    Okay.  And the date -- the data shown in this

2  particular chart is from the Aggregate Data tab; is that

3  right?

4     A.    I'm not sure about that.  Like I said, I

5  didn't look at this chart in detail.  I don't see the

6  source in this exhibit, but maybe it's on one of the

7  other pages, if you could point to it.

8     Q.    Well, before we go there, did you use data

9  that's from the Aggregate Data charts or from individual

10 servers?

11    A.    No, I used the data that was specifically from

12 the tabs for the individual servers.

13    Q.    Okay.  Can you turn the page, please, sir.

14          So I'm just trying to figure out how this

15 works.  So if you look at this particular Excel

16 spreadsheet, in the top, sort of near the top, is this

17 information -- if you look here, it says 33 -- psc33841.

18 Do you see that?

19    A.    I do.

20    Q.    And does that show that data that specified --

21 you can see there's actually a bar around it.  It looks

22 like somebody selected it in Column I, comes from the tab

23 psc33841 at Column F2?

24    A.    My understanding is that that data in Column I



1  in this chart would come based on -- what's in this text

2  box would come from Cell F2 in the chart psc33814 in that

3  tab.

4      Q.   Okay.  So when it says -- when you go over

5  there and it says "psc33841 cores," and it's highlighted

6  "2.4256," what does that refer to?

7      A.   If I'm reading this printout correctly, that

8  should be the same number that appears in Cell F2 of the

9  Tab psc33841.

10     Q.   Is that an amount of data or what is that?

11     A.   Sorry.  Would you repeat that?  I didn't hear

12  it.

13     Q.   Well, I just -- I'm trying to figure out what

14  that indicates, the 2.4256?

15     A.   So what quantity is that, you're asking me?

16     Q.   Yes, what is that?

17     A.   Well, I'd have to look back at that cell in

18  psc33841.  Is it on the next page?

19     Q.   Well, I've got to see if that's the same day.

20  That's a different day.

21          So you don't -- you don't know what that

22  2.4256 represents?

23     A.   Well, I'd want to look back at that specific

24  cell from the Tab psc33841.



1      Q.    Okay.  Let's go to the next page.  Have you

2  seen this document before?

3      A.    Yes.  This appears to be the Tab psc33841 in

4  the spreadsheet Expert Discovery 8, specifically the sum

5  of the rows related to June 15 and 16.

6      Q.    Okay.  And let's see.  Do you see where it's,

7  I guess, the psc33841 is identified, right?

8      A.    Yes, that tab is selected at the bottom, so I

9  presume that the table here is from that tab.

10     Q.    Okay.  And so when you look at that, the

11  highlighted portion, let's just say we're looking at the

12  first two items in 6/15, does that refer to seven and

13  eight o'clock in the morning, or the seventh hour and the

14  eighth hour of the day?

15     A.    I think more accurately it describes the

16  eighth and ninth hour.  The reason for that is because

17  the hours start counting at zero, and so you can see --

18     Q.    Okay.

19     A.    -- that penultimate row for June 16, 2017,

20  there's a zero there.

21     Q.    Now, let's look to the right of that.  Do you

22  see an E?  It says 104.29 for the first entry, and then

23  the second one in that row is 10 -- I'm sorry -- column

24  is 106.72.  Do you see that?



1        A.      In Column E, the first two cells are 104.29

2    and 106.72.

3        Q.      And what do -- what do those indicate?

4        A.      Well, there's no heading for the column here,

5    but my recollection is that this -- the numbers in this

6    column indicate the -- well, let me flip for a moment.

7    My recollection is that those refer to the average CPU

8    utilization across all the CPUs for this specific server

9    psc33841 for the two hours here, but I would -- I'd

10   prefer to see the column heading which isn't here.

11       Q.      Okay.  Well, if that was the capacity, does

12   that show that they're over 100 percent at what's been

13   indicated as the eighth and ninth hour, that that server

14   was over 100 percent?

15       A.      So the way I'd phrase it is for those two

16   hours, the eighth and ninth hour of June 15, 2017, for

17   the eighth hour, on average, the CPU cores for the server

18   were at 100 for approximately 104 percent utilized and

19   106 percent utilized for those two hours respectively.

20       Q.      So does that mean for that server that all 32

21   cores used were near maximum capacity?

22              MR. SCOTT:  Objection.

23       A.      I guess it depends on what you mean by "near."

24   But I do think it's the case that for these two specific



1    hours, given that the average utilization of all of the

2    cores for the server exceeded by a small margin 100

3    percent, I'd say that the cores in that server were at

4    least close to fully utilized for -- for those two hours.

5        Q.    Okay.   Could we go to the next page, please.

6    Have you seen this page before?   And it seems to relate

7    to the previous page, does it not?

8        A.    It relates in that this is a different tab of

9    Expert Discovery 08.   This tab is -- is called "Raw

10   Data."   And when we compare it with the previous page, it

11   appears that this has the same data as on the previous

12   page.   This time there is a column present that says CPU

13   percentage, and this does appear to be the same data from

14   the previous page of Exhibit 3.

15       Q.    And, again, it shows for the same two hours,

16   you're over 100 percent; is that right -- with respect to

17   psc -- pcs -- I'm sorry -- psc33841?

18       A.    So I'd say for those two hours, this indicates

19   that, on average, the CPU cores of that server were more

20   than 100 percent utilized.

21       Q.    And doesn't that mean so all the 32 cores were

22   used or near maximum capacity or at maximum capacity?

23       A.    Just like with the previous page, given that

24   this is the same data, it does seem that because the



1   average CPU utilization for -- for the cores in this

2   machine for these two hours is above 100 percent, I would

3   say that probably the cores of that machine, the 32 of

4   them, were at least near full capacity for those two

5   hours, though, I don't know what else was going on on the

6   other machines during this -- during these two hours,

7   given this page in front of me.

8        Q.    So if we go to the next page, I believe the

9   next page is the Aggregate Data tab, is it not?

10       A.    The next page does appear to be an excerpt

11  from the Aggregate Data tab, the Expert Discovery 8.

12       Q.    Okay.  If you look at the same two hours that

13  were specified on the two previous as being seven and

14  eight, do you see that?

15       A.    Yes, I do see that.

16       Q.    Okay.  And do you see for the psc33841 cores,

17  it shows 3.1072 and 10.1056?  Do you see that?

18       A.    I do see that.

19       Q.    So in terms of the total cores that are used

20  here, why are the cores here less than 32?

21       A.    Give me a moment.  So for this particular

22  page, there's -- well, let's talk about these one at a

23  time.

24              So there's a cell that appears to be



1   highlighted with a value of 3.1072.  The calculation for

2   that cell, as depicted on this page, indicates that it

3   was -- that this value seems to be taken from the Tab

4   psc33841 in the Cell F22038.  So the next thing I would

5   do to determine the origin of this number is look at that

6   cell in Tab psc33841.  In this exhibit, I don't think I

7   have access to that cell as labeled.  Two pages prior,

8   there's an excerpt but -- for Column F, but I don't see

9   the row numbers on this page.

10       Q.    Why -- why are the cores depicted as only

11  3.1072 and 10.1 --

12            MR. SCOTT:  Objection.  Asked and --

13       Q.    -- for 33841 here?

14       A.    I'm sorry.  Did you say 33841?

15       Q.    Yeah.

16       A.    Where are you looking at?

17       Q.    On the last page.  If you go over to I, see

18  where the -- Column I?

19       A.    Did you say Column I?

20       Q.    Yeah.

21       A.    33841?

22       Q.    Yeah.  Do you see ps -- at the top psc --

23       A.    Oh.

24       Q.    -- 33841, right?  Do you see that?



1        A.    Sorry.  I thought that was the number in the
2    cell, not the --
3        Q.    And that's the same server we've been looking
4    at for hour seven and hour eight on June 15, 2017, right?
5        A.    Yes, those are the same hours, so I don't know
6    why these numbers are different.  I would have to look at
7    that particular cell indicated here at Cell F2238 --
8        Q.    Why are the cores -- why are the cores here
9    less than 32?
10       A.    Let me finish.  I'll just note again that I
11   didn't rely on the aggregate data in coming up with the
12   charts that are in my reports.  And -- sorry.  Would you
13   repeat that question again?
14       Q.    Yeah.  Why would -- why -- why does it have
15   3.1 and 10.1 instead of 32?
16           MR. SCOTT:  Objection.  Asked and answered.
17       A.    I'm not sure.  I would want to look at Cell
18   F22038 on the Tab psc33841 in order to determine that.
19       Q.    Did RELX rely on aggregate data at all?
20           MR. SCOTT:  Objection.  Calls for speculation.
21       A.    I don't know whether RELX relied on this
22   particular Expert Discovery 8 that was produced in this
23   litigation.  I don't know whether they relied on it for
24   anything.



CHRISTOPHER RUCINSKI                                      June 20, 2018
RELX INC. vs INFORMATICA LLC                                       187

1        Q.    Who produced these charts?

2        A.    I believe RELX did.

3        Q.    Did they develop these charts for the

4    litigation?

5              MR. SCOTT:  Objection.  Calls for speculation.

6        A.    By "charts," do you mean the tables that we're

7    looking at here?

8        Q.    Yeah, the spreadsheets.

9        A.    So my understanding is that these specific

10   spreadsheets were produced for this litigation but that

11   the data existed in their ordinary course of business.

12       Q.    But they weren't specified in spreadsheets

13   like this?  The data wasn't?

14       A.    I don't know exactly how it was specified in

15   the ordinary course of business.

16       Q.    Could it have been in these spreadsheets?

17             MR. SCOTT:  Objection.

18       A.    Well, I don't know, but I doubt that it would

19   be in a spreadsheet that was labeled with a Bates number

20   for this litigation.

21       Q.    And what do you mean by the "Bates number"?

22       A.    I'm referring to Expert Discovery 8 --

23       Q.    Okay.

24       A.    -- which is the file name for this document.



CHRISTOPHER RUCINSKI                              June 20, 2018
RELX INC. vs INFORMATICA LLC                              188

1       Q.    Who provided you these charts -- or the

2    spreadsheet?

3       A.    I got them directly from counsel.

4       Q.    And what was the data they used to prepare

5    these spreadsheets?

6             MR. SCOTT:  Objection.

7       A.    It's my understanding that this data came from

8    records that RELX had about the average CPU utilization

9    for servers on an hourly basis as reported by the

10   operating system for those servers.

11      Q.    Do you know who generated these spreadsheets?

12      A.    My recollection is that it may have been some

13   combination of Dwight Groff and Jeff Hoffman, but I don't

14   know the exact way they were generated.

15      Q.    You don't know the exact what?  I'm sorry.

16      A.    The exact way that they were generated.

17      Q.    Well, I'm not asking the way right now.  I'm

18   just asking who generated the charts.

19      A.    As far as I understand, Dwight Groff and Jeff

20   Hoffman had some involvement in generating them.  There

21   may have been other people as well.  I'm not sure.

22      Q.    Did you look at the original data?

23      A.    When you say the "original data" --

24      Q.    That populates these charts.



CHRISTOPHER RUCINSKI                                      June 20, 2018
RELX INC. vs INFORMATICA LLC                                        189

1          A.    My understanding is that that data is present

2     in these charts, and so I looked at that data here in

3     these charts.

4          Q.    Did you look at the data -- the original data

5     prior to it getting into these charts?

6          A.    Well, there was some data that was produced as

7     another document with a different Bates number.  That

8     would -- that was the -- the utilization data through

9     2016, I think December 2016.  So I looked at that data

10    before looking at the data in this more complete chart

11    which had data through November 2017.

12         Q.    And did you satisfy yourself that that

13    particular data, the origin data, was properly input into

14    these charts?

15         A.    Well, my understanding is that it was the best

16    data available, and I didn't see any material

17    discrepancies with respect to anything else I had

18    available to me, so this data seemed relatively complete,

19    and I had no reason to doubt it.

20         Q.    No.  What I'm asking you is actually the

21    source of data, the source documents for the data that

22    somebody used to take the data and then included in these

23    charts.  Did you review the source data in whatever

24    format it was in?



1            MR. SCOTT:  Objection.

2       A.   Well, I reviewed that data as it appeared in

3  these -- in these charts.  I didn't review the data in a

4  form other than the two charts that I mentioned that was

5  produced in this litigation.

6       Q.   How did you satisfy yourself that it was

7  correct and accurate?

8       A.   Well, having reviewed it manually, and having

9  noted some of the omissions in the data, I felt confident

10  that there was enough of it here.  And given Mr. Groff's

11  statements about how this was the best data that they

12  had, it seemed like data that was -- that was complete

13  enough in order to do my analysis.

14       Q.   So, again, you're relying on Mr. Groff?

15            MR. SCOTT:  Objection.

16       A.   It's my understanding -- well, from speaking

17  to him, that this is the best data available, and, you

18  know, he claimed that this was the best they could do,

19  and this came from the operating systems as the operating

20  systems directly reported the average CPU utilization,

21  and that story made sense to me.  I had no reason to

22  doubt it.

23       Q.   Did you do anything to verify the data in this

24  spreadsheet on your own?



1      A.    Well, I looked through it myself, and as I

2    mentioned earlier, I did some -- some analysis in Excel

3    just to make sure -- or at least account for the places

4    that there was no CPU utilization data reported.  So I

5    did scrutinize it to make sure it made sense and, you

6    know, make sure that I accounted for any -- any

7    omissions.

8      Q.    So we had discussed how, for this particular

9    server, at the hour of seven and eight, it appeared to

10   be, you know, at over 100 percent capacity, which you had

11   testified that each of the cores would be at least

12   somewhat near capacity.  But when we look on this last

13   sheet, why does it show such low number of cores --

14           MR. SCOTT:  Objection.  Asked and --

15     Q.    -- being used?

16           MR. SCOTT:   -- answered multiple times.

17     A.    So for the sheet, what I'd want to do is look

18   at the origin of the data here which, for this particular

19   cell that's highlighted, appears to be Cell F22038 on Tab

20   psc33841.

21           As I sit here right now, I don't know why that

22   number appears in that cell, but the next thing I would

23   do would be to look at the cell that it's indicated that

24   it originated from on this printout.



1     Q.    So you would -- what would you do?  Click on

2   3.1072 and see what that provides you?

3     A.    Well, in this table, I think that's already

4   been done.  So that cell is highlighted, and, then, in

5   the text box at the top, it indicates the cell that this

6   data is coming from, and so my next step would be to look

7   at that specific cell that is the Cell F22038 in Tab

8   psc33841.

9     Q.    Do you have an opinion as to the data that

10  we're looking at right now with respect to that server

11  whether it's correct or not?

12          MR. SCOTT:  Objection.

13    A.    Well, the data we're looking at right now, I

14  would say is the data on the Aggregate Data tab.  Like I

15  said earlier, I didn't rely on the data in this tab.  I

16  relied on the data for the specific servers.  So I didn't

17  scrutinize the data on this tab.  I'd tried to get to the

18  most direct and original source of the data in my

19  analysis.

20    Q.    Sir, could you please go to paragraph 55 of

21  your report.

22    A.    Okay.  I'm at paragraph 55.

23    Q.    Now, if you look at Footnote 28 --

24    A.    Yes.



1    Q.    -- is that the math you used for your sizing

2    estimate?

3        A.    Let me review for a moment.  So in Footnotes

4    28 and 29, I was explaining the math that I used to come

5    to the number of 3.2 gigabytes per hour for this

6    particular set of data that I inputted into the sizing

7    model for RELX as discussed in paragraph 55 of my report.

8        Q.    Okay.  So looking at Footnote 28, for example,

9    did you take the total number of files and divide it by

10   the total days and multiply by 150 kilobits per file?  Is

11   that the right way to read it?

12       A.    That's true except it's kilobytes and not

13   kilobits.

14       Q.    Okay.  And is it true that that math would

15   give you 533,212 files per day?

16       A.    I'm sorry.  Did you say "files per day"?

17       Q.    Yeah.

18       A.    Well --

19       Q.    Or would it give you kilobytes per day?

20       A.    So that whole expression in Footnote 28 -- let

21   me look at it for one moment -- that would give you

22   kilobytes per day.

23       Q.    And would that be 533,212?  Do you know?

24       A.    I believe it would be, as is in my report,



1    79,981,929 kilobytes of data processed per day.

2          Q.    If you divide 974,179,899 files by 1,827 days,

3    do you end up with 533,212 files per day?

4          A.    I'm happy to do long division for you.

5          Q.    Sure.

6          A.    Okay.

7          Q.    Do you have a calculator by chance?

8          A.    I don't.  I left my phone elsewhere.  Can I

9    have a pen as well?

10         Q.    Sorry to make you do that.

11         A.    I don't remember the last time I did long

12   division by hand.  Okay.

13               MR. SCOTT:  This is comical.  Here's a

14   calculator.

15               THE WITNESS:  Oh, thank you.

16               MR. DOYLE:  I'm not sure I trust the

17   calculator, Counsel, but I'll let you do it this time.

18               MR. SCOTT:  You can double check it, Scott.

19   Since I'm not operating it, you got a much higher

20   accountability that it's going to be right.

21               MR. DOYLE:  Well, maybe that's been the

22   problem the whole time: your calculator's off, though.

23   Not you, the calculator.

24               MR. SCOTT:  The calculator is fine; the



1   "calculat-or" is bad.

2        A.    Okay.  So if I inputted that correctly,

3   974,179,899 divided by 1,827 gives us approximately

4   533,213.

5        Q.    Okay.  So 533,213 files per day; is that

6   right?

7        A.    I believe that's correct, yes.

8        Q.    Okay.  Thank you.  And then you multiply that

9   by 150 kilobits -- kilobytes per file; is that right?

10       A.    Yes, that's the calculation in Footnote 28.

11       Q.    And did you always use 150 kilobytes per file

12   in your calculations?

13       A.    Well, I used it in this calculation.

14       Q.    Did you use it in others?  Do you know?

15       A.    As I sit here right now, I think it was only

16   in this paragraph that I used that number.  Though, I'll

17   note that because that 150 kilobytes per file shows up in

18   the Footnote 28, and then that result is used in Footnote

19   29, that number also affects the result of Footnote 29.

20       Q.    What does 150 kilobit -- kilobytes per file

21   represent here?

22       A.    So this represents -- in the e-mail from

23   Mr. Groff, which we looked at earlier today, he mentioned

24   that across all of the files that were processed by the



 1  ICCE platform, his best guess for the average size of

 2  those files was 150 kilobytes.

 3       Q.   So did you use 150 kilobytes per file in your

 4  calculations?

 5       A.   Well, I did use 150 kilobytes per file in

 6  Footnote 28, for instance.

 7       Q.   Did you use it in other calculations?

 8       A.   Are you asking did I use it or did Mr. Groff

 9  use it?

10       Q.   Did you use it?  I mean, who did the math

11  here?  Is this your math or Groff's math?

12       A.   No.  I did this math.

13       Q.   Okay.  Did you use it in other calculations?

14       A.   Well, as I sit here right now, I think it's --

15  I think it's just the math that's in this paragraph, so

16  that includes Footnote 28 and 29.

17       Q.   Does that represent an average file size?

18       A.   It does represent an average file size, yes.

19       Q.   Over what period of time?

20       A.   My recollection is that it's for the entirety

21  of the files that were processed through the ICCE

22  platform.

23       Q.   For the entirety of the files processed

24  through the ICCE platform?



1      A.     That's my recollection, yes.

2      Q.     Over what period of time?

3      A.     Well, my recollection is that the files were

4  processed through ICCE platform starting November 2012

5  and ending in November 2017.

6      Q.     And so my -- I'm going to ask my question

7  again.  Do you know if this 150 kilobytes per file, did

8  you use that in other calculations other than the one you

9  have in 28?

10          MR. SCOTT:  Objection.  Asked and answered.

11      A.     As I sit here right now, I don't remember

12  other calculations besides Footnote 28 and 29 that would

13  have relied on that number.

14      Q.     Is this the only number that you ever used for

15  the average file size?

16      A.     There was at least one other instance in my

17  report where there was -- there were other estimates of

18  files.  Well, hold on.  Let me think about that for a

19  moment.  The instance I'm thinking of was related to the

20  average amount of data that was processed through the

21  ICCE platform on an hourly basis, so it's not exactly an

22  average file size, but it would be related to it.

23      Q.     And where was that?

24      A.     One moment.  So, for instance, in paragraph 54



1    of this first report of mine just back a few pages, I

2    discuss information I got from Mr. Groff that I used to

3    populate one version of the document I refer to as

4    Informatica Sizing Model for RELX, and those values are

5    depicted in Figures 8 and 9 on the subsequent page.

6          Q.    Can you point me to where those figures are?

7          A.    They're on page 29.

8          Q.    Okay.  Where in the charts are they?

9          A.    So the number I'm thinking of in particular is

10   0.8, and that is in Figure 8 next to the label number of

11   gigabytes per hour.

12         Q.    Okay.  And what does that represent?

13         A.    So the context of this is I had asked

14   Mr. Groff to provide me with his best estimates for the

15   number of gigabytes that were processed by the ICCE

16   platform on an hour-by-hour basis over the time period

17   that the ICCE platform was processing files.  And I also

18   asked him to break that down by different time frames

19   within that overall time frame if -- if that estimate

20   would change for different times.

21         Q.    So --

22         A.    So -- well, let me finish.  So for the

23   specific number, this was the highest average gigabytes

24   per hour that Mr. Groff specified.



1      Q.    And what time frame did this cover?

2      A.    I would have to look back at Exhibit H.  One

3 moment.  So referring to Exhibit H in this report of mine

4 that I submitted in May, there are -- the first six pages

5 of Exhibit H are the contents of the e-mail, and then

6 after, as part of the exhibit, are three tabs of a

7 spreadsheet which Mr. Groff returned to me as an

8 attachment to this e-mail.  The second of those tabs is

9 labeled March 2013 through March 2015, and this is the

10 spreadsheet where he indicates a number of gigabytes per

11 hour of 0.8.

12     Q.    Okay.  And what did you do to verify that

13 those numbers by Groff were actually accurate?

14     A.    Well, I wasn't sure how accurate they were, so

15 in performing this part of the analysis in my report --

16 let me just get the paragraph numbers.  So this is

17 Section 8 of my report.  It's spanning paragraphs 49

18 through -- well, let's say it's spanning Section 8

19 point -- or 8 and then Subsection A.  So that's spanning

20 paragraphs 49 through 55.

21          So what I did here is I was looking at the

22 document I referred to as Informatica Sizing Model for

23 RELX, which is a document produced by Informatica that

24 appears to estimate the number of CPU cores that



1  installation might require.  And I approached this by

2  gathering data from different sources that could be used

3  to populate this document that would calculate the number

4  of cores, and I tried to find, as best I could, whatever

5  reasonable estimates would provide that the largest

6  estimate out -- the largest calculation out of this

7  document, which I found to be 12 after going through a

8  few different ways of populating the document data.  So

9  requesting this information from Mr. Groff was one of

10 those ways.

11     Q.    And what sources did he gather from?

12     A.    I'm not sure what sources he used in order to

13 reply to my e-mail.

14     Q.    Okay.  Let's go back to your e-mail, if we

15 can.

16     A.    Okay.  I'm at Exhibit H.

17     Q.    Okay.  So if you go to the page 2 of Exhibit

18 H, is that your question, No. 3, that says:  "What is

19 your best estimate for the average mean size and bytes

20 for the documents that are listed in this document as

21 having been processed?"

22     A.    That is my question there in No. 3 at the top,

23 yes.

24     Q.    Okay.  And below that, is that Dwight Groff's



1   answer where he says:  "There is no way to identify the

2   mean doc size for documents processed during this time

3   since the file size was not something that was tracked in

4   our reporting model.  We also think that this would

5   provide very little value since documents can vary in

6   size from less than 1 kilobyte -- or 1k to 20m."

7           Do you see that?

8       A.   Yes.  And that is Mr. Groff's response to my

9   question.

10      Q.   So Mr. Groff is saying there is no average

11  mean size, right?

12      A.   Well, he's saying there's no way to identify

13  it, and I understood this to mean to identify based on

14  actual data records.  So I understood his response in the

15  spreadsheets to be his best guess as to what -- what that

16  average would be.

17      Q.   So all of your calculations and graphs are

18  based on Groff's best guess?

19          MR. SCOTT:  Objection.

20      A.   I would not say that.

21      Q.   Well, you just said it's his best guess,

22  right?

23          MR. SCOTT:  Objection.

24      A.   Well, your statement was related to all of the



1  charts in my report, and that is not the case.

2       Q.    No.  The charts that we've been talking about

3  that relate -- that use the average mean size.

4       A.    Let me refer back to my report to make sure I

5  get the charts right.  So we're talking about paragraph

6  55 in my report earlier where we mentioned Footnotes 28

7  and 29.  Those calculations ultimately resulted in a

8  number of 3.2 gigabytes per hour which then appears in

9  Figure 10 of my report on page 31.  And I believe it is

10 only Figures 10 and 11 that depend upon that estimate of

11 150 kilobytes per hour.

12          With respect to -- and then with respect to

13 Groff's -- Mr. Groff's other estimates, that is discussed

14 in the previous paragraph, which is paragraph 54.  And,

15 for instance, we talked about 0.8 gigabytes per hour.

16 That number is present in Figure 8, and Figure 9 depends

17 upon that figure, page 29 in my report.

18      Q.    And does that number also dependent upon what

19 Groff says about average mean size?

20      A.    Well, I only used it in Figure 8 and 9.  I

21 only used the values that were provided in the attachment

22 to the e-mail from Mr. Groff that we had been discussing.

23      Q.    What about the .8?  Where'd that come from?

24      A.    One moment.



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                        203

1        Q.    It's Figure 8.

2        A.    Right.  I see .8 there.  Let me get the origin

3   of it.  So if you refer to Exhibit H to my report, there

4   are -- the first six pages comprise Mr. Groff's response

5   via e-mail; the subsequent three pages are the tabs of a

6   spreadsheet that Mr. Groff attached in his reply; and the

7   second of those tabs labeled March 2013 through March

8   2015, there is a value of 0.8 gigabytes per hour that

9   Mr. Groff provided.

10       Q.    And does that particular value also refer to

11  average mean size -- the documents processed?

12       A.    Well, I'd say it's related to it.

13       Q.    How is it not the same thing?

14       A.    Well, they're different quantities.  One is

15  the number of gigabytes processed per hour, and the other

16  is the average file size.  The average file size is

17  measured in kilobytes, megabits, or gigabytes perhaps.

18  And the value here is measured in gigabytes per hour.

19  They're different types of number.

20       Q.    They're different types of numbers, but don't

21  the same qualifications apply where Groff says there's no

22  way to identify the mean doc size for documents processed

23  during this time since the file size was not something

24  that was tracked in our reporting model?



1      A.    Well, I agree that, you know, I interpret his

2  response here to mean that there was no record of the

3  sizes of the files that were processed through the ICCE

4  platform.

5      Q.    Well, do you also interpret his response when

6  he says:  "We also think that this would provide very

7  little value."  Do you agree with that?

8           MR. SCOTT:  Objection.

9      A.    Well, I wouldn't say I agree with it

10 because -- because I wanted the answer to the question.

11 Mr. Groff's impression of the value wasn't really

12 something that -- that I cared about.  I wanted to know

13 what his best guess was for the average file size.

14     Q.    So even though he says it provides very little

15 value, you still think that, you know, the information

16 that you came up with and the calculations you did and

17 you present in your report are still good notwithstanding

18 his qualifications on the values he's giving you?

19     A.    Would you repeat that question?

20           MR. DOYLE:  Could you repeat that, please.

21           (Question read)

22     A.    Okay.  So the word "value" is used in two

23 different ways in that question, so I just want to

24 clarify.  I'm confident in the calculations in my report,



1  and Groff's -- Mr. Groff's comments about providing very

2  little value were immaterial to me because I was just

3  trying to come up with the best estimates that I could

4  for the average file size.

5          Whether or not Mr. Groff thinks those values

6  provide -- well, let's put it this way:  Whether

7  Mr. Groff thinks those quantities provide very little

8  value, as he states here, to me is immaterial for my

9  purposes.  I don't understand what his internal valuation

10 process is, but I -- I imagine it might be different from

11 mine.

12      Q.   But you used the numbers he provided you,

13 correct?

14      A.   I did use numbers that he provided me.

15      Q.   And he's saying they have very little value,

16 but you disagree with him?

17          MR. SCOTT:  Objection.  Asked and answered.

18      A.   So Mr. Groff, I understand from this e-mail --

19 well, he makes a statement about the -- about the value

20 of those quanties in terms of -- well, I don't know

21 exactly what his determination of their value is, but I

22 was using these numbers for a specific purpose.  And for

23 my needs, they -- they suited what I was looking for

24 which is an estimate for the average file size.



1      Q.    Okay.  Isn't that estimate going to be flawed,

2  though, if you're using numbers on average mean doc but

3  the guy who's giving it to you says they're flawed and

4  have little value?

5            MR. SCOTT:  Objection.

6      A.    Would you point me to where Mr. Groff uses the

7  word "flawed" in this e-mail.

8      Q.    Oh, you're right, he doesn't.  He doesn't say

9  "flawed."  Let's go back and see what he says.  He says:

10  "There's no way to identify the mean doc size."  Okay.

11  We'll start with that.  No way to identify it.

12            He then goes on to say:  "The documents

13  processed during this time, since the file size was not

14  something that was tracked in our reporting model."

15  That's the first thing he says about it.  So they didn't

16  track it.

17            Then he also says:  "We also think that this

18  would provide very little value since documents can vary

19  in size from less than 1k to 20m."  And your testimony is

20  you don't really care?

21            MR. SCOTT:  Objection.

22      A.    So I don't know what Mr. Groff thought when he

23  wrote this, but my impression is that when he says

24  "provide very little value," I think he may be talking



1    about value to RELX's reporting model, and that's why it

2    wouldn't provide value to them.  As he mentions, the

3    documents can vary in size, which I'm interpreting this

4    to be less than 1 kilobyte in size to 20 megabytes.

5         Q.    Well, he also says they weren't keeping track

6    of this, right?  But any file size, since the file size

7    was not something that was tracked in our reporting

8    model, right?

9         A.    So I agree that RELX wasn't tracking file

10   size, and my understanding is that Mr. Groff may have

11   been trying to justify why they don't track it, because

12   to them, it wouldn't provide them with -- or it would

13   provide only very little value to them.

14        Q.    But this is in response to your question what

15   is your best estimate for the average mean size in files

16   that are listed in this document as having been

17   processed, right?

18        A.    Well, Mr. Groff is replying to my question,

19   but I think he's providing additional color here.

20        Q.    What color is that that's additional?

21        A.    Well, his initial response is essentially,

22   well, we don't track this in our reporting model, so I

23   can't tell you based on any data what this number would

24   be.  And in case you were wondering, the reason why we



1   don't track it -- and, you know, I'm speculating here as

2   to what he thought -- but I think Mr. Groff may have been

3   thinking let me also explain why we may not track this:

4   Because the file size varies a lot and it wouldn't be

5   useful for our reporting model.

6        Q.    So you're adding all that in?

7        A.    Well, I don't know exactly what Mr. Groff was

8   thinking, but that's a potential explanation.

9        Q.    Well, don't you think he might have been

10  thinking we also think -- and this is his own words -- we

11  also think that this would provide very little value.

12  And by "this," he means the average mean size, right?

13            MR. SCOTT:   Objection.

14       A.    Well, you raise an interesting point.  I think

15  that may be why he uses the word "we" here.  I think he

16  may be referring to RELX in this case.  That only makes

17  me think more that he's referring to Informatica's -- I'm

18  sorry -- RELX's opinion about why this would have value

19  or no value or something in between for the reporting

20  model.

21       Q.    Well, doesn't he also follow that up with

22  "since documents can vary in size from less than 1

23  kilobyte to 20 megabytes"?  Meaning there's a wide range

24  of documents, right, and they don't track the size of



1  documents on their system.  Isn't that what he's saying?

2      A.   I do think he's saying that they don't track

3  the file size of documents processed.  And he's also

4  saying that -- I think he may be speculating a little

5  bit, but he's saying that the documents can vary in size

6  from less than 1 kilobyte to 20 megabytes which is --

7      Q.   Well, what information do you have to believe

8  that he's speculating?

9      A.   Well, perhaps he isn't.  Perhaps he was

10  looking at something here, but he doesn't cite why he

11  thinks this.

12      Q.   Okay.  But yet you still use the values he

13  provided you on averages -- average file sizes, right,

14  notwithstanding this information, correct?

15      A.   Well, like I said earlier, I was looking for a

16  number of different ways to populate the information in

17  that core calculation document from Informatica, and this

18  was one of the ways in which I sought to do that.

19      Q.   You had no concerns about it?

20      A.   Well, I'm not saying that Mr. Groff's

21  estimates are definitely correct.  I was just looking for

22  a variety of ways to populate the document, and then

23  picked the ways that were the most favorable to

24  Informatica, and found that even in that case, at most,



CHRISTOPHER RUCINSKI                                   June 20, 2018
RELX INC. vs INFORMATICA LLC                                      210

1  this document calculated 12 cores.

2      Q.    That was nice of you.  So when you used his

3  average means sizes, you used them because that was most

4  favorable to Informatica?

5      A.    Well, I'm talking about all of the information

6  that went into the --

7      Q.    I'm not asking about that.  I'm asking about

8  the average mean doc size.

9      A.    Well, it sounds like you were asking about the

10  manner in which I provided information which was the most

11  favorable to Informatica.  And that information is the

12  sum of information that was included in -- in the -- hold

13  on one moment -- in the Informatica Sizing Model for

14  RELX.

15      Q.    Okay.  Let's look at the next question.  You

16  asked:  "To your knowledge, were there any periods of

17  time between May 2010 to November 2017 where LexisNexis

18  was processing documents with an average size

19  nontrivially larger than the mean you estimated above?"

20           Answer:  "No.  See Item 3 above.  Throughout

21  all processing in the platform since it went live, the

22  document sizes vary vastly across multiple content

23  streams on a daily basis."  Do you see that?

24      A.    I do see that in this document.



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                     211

1          Q.     But yet notwithstanding that, in the next --

2     in the next -- his next answer, he gives a best guess

3     estimate of 150 kilobytes, right?

4          A.     Yes.

5          Q.     And you used that -- that number, correct?

6          A.     In one of the tables that we talked about

7     earlier, yes, I did use the 150 kilobyte number.

8          Q.     Was it one or two?

9          A.     Let me refer back.  So the 150 kilobyte number

10    was used in paragraph 55 to determine the value of 3.2

11    gigabytes per hour, and then that was inputted into the

12    Informatica Sizing Model for RELX as depicted in Figure

13    10 in my report, and then that resulted in the output for

14    that document in Figure 11 in my report.

15         Q.     Do you see where Mr. Groff says:  "My best

16    guess estimate would be an average file size of 150k, but

17    I have no way to verify this"?  Do you see that?

18         A.     I do see that.

19         Q.     Did you ever try to verify it?

20         A.     Well, according to Mr. Groff, there is no data

21    to verify it, and he states here that there's no way to

22    verify.  It seemed like there wasn't any way to verify

23    it, so I didn't pursue that particular avenue.

24         Q.     And then he follows with:  "With this document



1   mean size assumption, we would have processed," and then

2   there's -- I can't -- what is that number there?  I can't

3   even figure out what that is?

4        A.   I think it's trillion to start.

5        Q.   -- "trillions of bytes of data from 11/2012 to

6   11/2017."

7             Did you ever use that number, the total bytes

8   of data that were processed -- or the guesstimate, I

9   should say, on the total bytes of data that was processed

10  from 11/2012 to 11/2017?

11       A.   Well, I don't think I used that specific

12  number, but I imagine you could probably come up with

13  that number through some of the arithmetic in Footnotes

14  20 and 29 if you wanted to.

15       Q.   Did you ever use that number for anything

16  else?  Any other charts?  Analysis?

17       A.   The 146 trillion number?

18       Q.   Yeah.

19       A.   I mean, I don't think I used it anywhere.

20       Q.   Did you produce the spreadsheets used to

21  create Figures 12, 13, 14, and 15?

22       A.   I don't think these were produced, not the raw

23  data that was used to make these.

24             MR. DOYLE:  All right, Counsel, we request



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                      213

1   that be produced immediately.

2            MR. SCOTT:  Before or after you send me the

3   stuff I requested last week?

4            MR. DOYLE:  And we'll keep this deposition

5   open too.  What we need is the underlying data for all

6   these figures --

7            MR. SCOTT:  This deposition is not going to

8   remain --

9            MR. DOYLE:  -- as well as the formula used for

10  waiting in Figures 14 and 15.

11           MR. SCOTT:  I ask that you put your requests

12  in writing, Scott.

13           MR. DOYLE:  I will do that too, but I'm

14  putting it on the record.

15           MR. SCOTT:  That's fine.

16           MR. DOYLE:  We also want to ask for the actual

17  spreadsheets that the witness used to create Figures 12,

18  13, 14, and 15.

19           MR. SCOTT:  I'll give you the same answer you

20  gave me last week:  We'll see if that becomes necessary.

21  Is that what you told me last week when I asked you for

22  the same information?

23           MR. DOYLE:  You know what?  I'm going back to

24  questions.



1      Q.    Sir, did you do any independent analysis to

2    determine file size?

3      A.    When you say "file size," do you mean --

4      Q.    The average -- the average file size.  The

5    same thing we've been talking about for 20 minutes.

6      A.    I think with respect to average file size, I

7    asked Mr. Groff if there was data available for that, he

8    said there wasn't, so I used his estimate in a couple of

9    the paragraphs in my report that we've been discussing

10   previously.

11     Q.    Did you ask anyone else to -- information

12   about what the average file size would be?

13     A.    Well, I don't know if he did or not, but he

14   doesn't mention anything like that in his responses to me

15   in this e-mail.

16     Q.    Well, did you?

17     A.    No.  I only asked Mr. Groff whether or not

18   there was data, and then I asked for his own estimates.

19     Q.    Why not?

20     A.    Well, Mr. Groff was provided to me as someone

21   who was knowledgeable about the Informatica system as it

22   was used in the ICCE platform, and so I figured his

23   estimate was probably a decent one.  And like I said

24   earlier, I was trying to find various ways to populate



1  this calculation document for calculating the number of

2  cores that might have been appropriate for RELX's system.

3       Q.    So the file size number you used is pure

4  speculation, not based on science.  It's not scientific

5  at all, is it?

6            MR. SCOTT:  Objection.

7       A.    Well, Mr. Groff says it's his best guess

8  estimate.  And this is only one of the numbers that I

9  used in order to populate that document.  Some of the

10 other numbers -- well, another number was the number that

11 was actually in the document as produced.  I was trying

12 to, like I said, come up with a number of different ways

13 in order to populate this document and then come to a

14 conclusion based on those inputs that provided the

15 highest number of CPU cores that the document would

16 calculate.  And, in fact, the estimates from Mr. Groff

17 resulted in a higher number of CPU cores calculated than

18 the data as originally populated in the spreadsheet.

19      Q.    What is your background in capacity planning?

20      A.    Can you define "capacity planning"?

21      Q.    Have you ever heard of "capacity planning" in

22 terms of developing in computer software?

23      A.    I have heard the term "capacity planning."

24      Q.    And what's your understanding of it?



CHRISTOPHER RUCINSKI                                June 20, 2018
RELX INC. vs INFORMATICA LLC                                    216

1        A.     In general, my understanding of capacity

2    planning is it's -- it's the way you might plan for how

3    many resources you would need in a system in order to

4    execute certain software that was doing certain tasks.

5        Q.     And did you do that?  Do you have a background

6    in doing that?

7        A.     I specifically haven't been hired by any

8    company to do their planning capacity.

9        Q.     Do you have any other background in capacity

10   planning?

11       A.     Well, I do have a background in computer

12   science, but specifically for the question of capacity

13   planning, I don't think I've been retained, with the

14   exception of this case, to examine issues related to

15   capacity planning.

16       Q.     Well, do you know when you're doing capacity

17   planning that you need to determine and consider peak

18   loads as well as the average loads?

19       A.     I think depending on the system, that would

20   probably make sense in certain circumstances.

21       Q.     Did you consider peak loads in your analysis

22   here of the Informatica software on the ICCE platform?

23       A.     Well --

24              MR. SCOTT:   Objection.



1      A.    -- in this particular case, I was using the

2   document produced by Informatica that was -- that

3   appeared to be related to planning for the number of

4   cores that a system like the RELX system would be using.

5      Q.    Did you ever look at actual data relating to

6   peak loads?

7      A.    Well, by peak loads, if we're talking about

8   CPU utilization, that was present in Expert Discovery 8

9   where it had average CPU utilization for individual

10  servers for every hour of the time frame at issue.

11     Q.    Other than average utilization, did you look

12  at anything else to consider peak loads?

13     A.    Well, in the context of capacity planning, I

14  was looking specifically at the document produced by

15  Informatica that seemed to calculate the number of cores

16  that would be appropriate for a system.  It would make

17  sense to me that such a document would take into account

18  various issues related to capacity planning, and peak

19  load may have been one of them.

20     Q.    Is that your understanding: that looking at

21  average utilization is the same as looking at peak loads?

22     A.    I wouldn't say it's the same.  It's one way to

23  get some information about certain resources, in this

24  case, CPU cores that might be utilized more or less



1  heavily at certain times.  There are probably other

2  things you might consider when looking for peak loads for

3  a different definition of "load."

4      Q.    Are there any better metrics to use?

5      A.    Well, I think better in this context depends

6  on the question you're trying to answer.  You might think

7  that, for instance, if peak loads means, well, we're

8  using a lot of the memory of our computers during peak

9  loads, maybe we'd want to look at memory capacity;

10  or maybe it means the number of tmp files I created

11  when there's a lot of processing going on, so maybe

12  we'd want to look at that.  Maybe it's network

13  bandwidth.  There are a number of different things we

14  could look at.

15          In this particular case, CPU utilization

16  seemed to be one of the most relevant ones because the

17  licenses are distributed on the basis of cores and not

18  other resources that the computer system would have at

19  its disposal.

20      Q.    What about peak number of documents?

21      A.    If documents are the way you're defining peak

22  load, you could look at the -- you know, when certain

23  numbers of documents were being processed that were

24  higher than others.



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                        219

1        Q.    And did you look at that in this case?

2        A.    Well, specifically the opinions I was

3   offering -- well, one of them was related to the degree

4   to which RELX may have benefited from having its ICCE

5   platform have access to more cores rather than fewer.  So

6   I was focused on the actual processing of the documents

7   as reflected in the CPU utilization.

8        Q.    So you never looked at the peak number of

9   documents or peak workloads?

10       A.    Well, I did look at number of documents

11  processed over time.  I don't think I specifically looked

12  for instances where the numbers of documents processed on

13  a certain day might be higher or lower except with

14  respect to increasing number of documents that were

15  processed by the system over time.

16            MR. DOYLE:  Why don't we take a five-minute

17  break?

18            MR. SCOTT:  Sure, Scott.

19            THE VIDEOGRAPHER:  The time is 4:53 p.m.  We

20  are off the record.

21            (Recess)

22            THE VIDEOGRAPHER:  The time is 5:12 p.m.  We

23  are on the record.

24       Q.    Mr. Rucinski, before we broke, we were talking



1    about capacity planning.  Do you have any training in

2    capacity planning?

3          A.    Specifically with respect to capacity

4    planning, I don't have any training besides, generally,

5    the computer science degree that I have.

6          Q.    Thank you.

7                MR. DOYLE:  Okay.  I'd like to mark as

8    Exhibit -- what are we on now?

9                (Exhibit No. 4, Expert Discovery 000002 Excel

10               spreadsheet marked for identification)

11         Q.    Now, on paragraph 68 of your report, you

12   discuss ICCE files process report; is that right?

13         A.    Give me one moment.  Yes.  In paragraph 68, I

14   do see my discussion about the ICCE files process report.

15         Q.    Okay.  So if you look at Exhibit 4, and

16   the first page of Exhibit 4, is this Expert Discovery

17   000002?

18         A.    This does appear to be an excerpt from that

19   document, yes.

20         Q.    And this shows the number of documents that

21   are processed by ICCE?

22         A.    This, I believe, does show the number of

23   documents processed by the ICCE platform over time.

24         Q.    And does it show it on a per day basis?



CHRISTOPHER RUCINSKI
RELX INC. vs INFORMATICA LLC

June 20, 2018
221

1      A.    This -- yes, this does appear to show the

2  number of documents processed each day.

3      Q.    Who prepared this spreadsheet?

4      A.    The spreadsheet was produced by RELX.  I don't

5  know exactly who prepared it specifically.

6      Q.    Did Mr. Groff prepare it?

7      A.    He very well may have, but I don't know

8  specifically whether he did.

9      Q.    Was it -- was this document prepared for this

10  litigation?

11      A.    I believe it was since it appears the Bates

12  number's Expert Discovery 2.

13      Q.    And do you know if it was prepared

14  specifically for your report?

15      A.    I don't know why it was produced.  I did use

16  it in my report.

17      Q.    You didn't use it in your report?

18      A.    No, I did use it in my report, but I don't

19  know if was produced specifically for that purpose.

20      Q.    Okay.  Did you ask for this data?

21      A.    I did want to see the total number of files

22  processed through the ICCE platform on certain days, and

23  this document seemed to show that.

24      Q.    Okay.  So if we go to the next page, do you



1   see where it says, "On the date of April 10, 2015"?

2        A.    I do.

3        Q.    Okay.  And the highlighted line shows the --

4   that ICCE processed a total of 2,025,684 documents?

5        A.    Yes, I do see that line.

6        Q.    And so you're familiar with this particular

7   sheet of the spreadsheet?

8        A.    I am familiar with this tab of the

9   spreadsheet, yes.

10        Q.    And do you believe this data is accurate?

11        A.    This was the data provided for me to this

12   topic, so I do believe this data is accurate.

13        Q.    And did you perform any independent analysis

14   to determine its accuracy?

15        A.    Not that I recall.  I think I was wondering

16   about how many documents went through the system, and

17   this was a document that seemed to provide that.

18        Q.    Why didn't you?

19        A.    Well, like the other documents that were

20   provided, this seemed to answer the question, and so I

21   had no reason to doubt its accuracy.

22        Q.    Did you ask how it was created?

23        A.    I believe in conversations with Mr. Groff,

24   well, he essentially said they had records to show that,



CHRISTOPHER RUCINSKI                                June 20, 2018
RELX INC. vs INFORMATICA LLC                                    223

1    I think, and my understanding is that these were those

2    records.

3        Q.    Mr. Groff said what?  They had records to show

4    what?

5        A.    To show the number of files that went through

6    the ICCE platform on various days.

7        Q.    Did you ask how it was created?

8        A.    I wasn't sure exactly how this chart was

9    created.  It was provided to me by RELX.

10       Q.    How was the data for the spreadsheet

11   collected?

12       A.    Well, I don't know exactly how it was

13   collected, but it seemed like RELX had records of the

14   number of files that went through the platform on various

15   days, and this is what those records showed.

16       Q.    Where did it come from, the data?

17       A.    Well, it came from RELX's records, but I don't

18   know specifically where it came from from RELX.

19       Q.    Was it filtered in any way?

20       A.    I believe it may have been filtered based on

21   uniqueness.

22       Q.    Based on what?  I'm sorry.

23       A.    The uniqueness of files.

24             This is something I wasn't aware of as I was



CHRISTOPHER RUCINSKI                          June 20, 2018
RELX INC. vs INFORMATICA LLC                           224

 1  writing the report, but my understanding now is that I

 2  believe this document -- I'd want to verify this

 3  elsewhere -- but my understanding is that this document

 4  may include only unique files that were processed through

 5  the system and not just the total number.

 6      Q.    And what do you mean by "unique files"?

 7      A.    Well, if you have two separate collections of

 8  data comprising a file, you could say that you have two

 9  separate files, but if the data is the same, then they

10  are in some sense duplicates, and so if you wanted to

11  count the number of files that had unique data, then

12  those two files that are the same would count as only one

13  file.

14      Q.    So in this chart that we're looking at, does

15  this show the number of unique files or the number of

16  total files which would include non-unique files or

17  duplicates?

18      A.    I think -- this is something I'd want to

19  verify, but I think this might show unique files.  I'm

20  not sure whether it's unique or just total files in

21  general.

22      Q.    So you don't know?

23      A.    I'm not sure, as I sit here right now.

24      Q.    Have you asked anybody from RELX?



1    A.    Well, I discussed -- I was only made aware of

2    the potential for some of this data being filtered for

3    unique files as of this morning, so I didn't have an

4    opportunity to talk to RELX about it.

5    Q.    Who told you this morning that it may be

6    filtered -- did you say only for unique files?

7    A.    Well, I think what I said is that this may --

8    well, only -- if I said only by unique files, what I mean

9    is that this may include only account of unique files

10   rather than total files, but I'm not certain about that.

11   And that information came from counsel.

12   Q.    Did you talk to Mr. Groff this morning?

13   A.    No, I didn't.

14   Q.    Did you talk to Mr. Groff yesterday?

15   A.    I did for ten minutes, like I mentioned

16   earlier.

17   Q.    Did he refer to this issue?

18   A.    He did not mention it.

19   Q.    So you learned about this from counsel?

20   A.    I did.

21   Q.    What did counsel tell you?

22   A.    Counsel said there may be a discrepancy in

23   the number of files that were reported as passing

24   through the ICCE platform with respect to total



1  files versus unique files.

2      Q.    What would you like to depend on, unique files

3  or total files, for your analysis and opinions?

4      A.    Well, there's a couple of different questions

5  I want to answer.  Let me think for a moment.  So

6  regarding the question of how many files that ended up on

7  the Lexis Advance or Lexis.com products versus the number

8  of files that went through the ICCE platform, I think

9  what I'd want there is unique files, because in that

10 case, what we care about is the percentage of files that

11 were actually provided to RELX customers versus -- or

12 rather, the percentage of files provided to RELX

13 customers that went through the ICCE platform.

14         So whether or not there were duplicates of

15 those files on the platform I don't think really matters

16 because we're counting based on what a customer would

17 actually see, and they don't see duplicates.

18         With respect to the question of benefit, I do

19 use file totals through the -- or total number of files

20 processed through the ICCE platform to look backwards for

21 time periods during which there is no utilization data

22 available.  And I think for that question, it might

23 depend on, to the degree there are duplicates, where

24 those duplicate files arise, because in that case,



 1  we're -- the question at issue is the number of files

 2  that were touched by Informatica software and not in

 3  general by the ICCE platform.

 4          So I think in that case, unique files might be

 5  the safer bet unless I had more information about why

 6  there were duplicates and at what points in the process

 7  those duplicates were created.

 8      Q.   Do you plan on supplementing your report or

 9  your opinions based on answers to these questions?

10      A.   I'm not sure at the moment.  I don't have any

11  explicit plan to right now, but I imagine that might

12  happen depending on how the case turns out.

13      Q.   What paragraphs may you have to change or that

14  might be incorrect at this point?

15          MR. SCOTT:  Objection.

16      A.   So I think the paragraphs that would be

17  subject to potential revision would be paragraphs 34, 68,

18  and 69, including the charts in those paragraphs.

19      Q.   So that was 34.  What's the next one?

20      A.   68.

21      Q.   Okay.  And what else?

22      A.   And as I sit here right now, I think the only

23  other one would be 69.

24      Q.   Do you see where -- in the last sentence where



1    it says:  "The maximum percentage of documents available

2    on the Lexis Advance and Lexis.com products that were

3    processed by the ICCE platform according to the ICCE

4    processed documents percentage report is 15.15 percent on

5    September 6, 2017"?  Do you see that?

6        A.    I think it says 15.05 percent.

7        Q.    Thank you for that clarification.  Do you

8    think that may have to be modified?

9        A.    Yeah, I may need to modify that sentence

10   either with respect to the number or the way in which

11   it's described.

12       Q.    And what about Figure 5?  May that have to be

13   modified?

14       A.    It's possible I would modify that too.

15       Q.    Okay.  And I think the next paragraph you said

16   is paragraph 69?

17       A.    I believe I said 68 and 69.

18       Q.    Okay.  Do you see in the last sentence where

19   you say:  "And the hourly weighted average CPU core,

20   equivalents during the early time period was therefore

21   almost certainly not greater than either the hourly

22   weighted average CPU core equivalents during the middle

23   time period or late time period"?  Do you see that?

24       A.    Are you looking at paragraph 68?



1        Q.    Yeah, 68, the last sentence.

2        A.    Are you looking at the sentence that starts

3    with "since the instructions"?

4        Q.    Yeah.

5        A.    Okay.

6        Q.    Why don't we just -- I'll revise my question

7    to be with respect to that entire sentence, might that

8    have to be modified?

9        A.    I think it's possible but unlikely.  I don't

10   really expect this to change unless there's some vast

11   difference after looking at the -- the uniqueness of the

12   files.

13       Q.    And, then, what may change with respect to

14   paragraph 69?

15       A.    Well, I may change the graph at the end.

16       Q.    Figure 16?

17       A.    Yes, Figure 16.

18       Q.    Anywhere else in your report that you may want

19   to change?

20       A.    As I sit here right now, that's all I can

21   think of.

22       Q.    Do you know who's going to go through all this

23   data and determine what's unique and what's not unique?

24       A.    Well, I haven't asked anyone to yet, so I



1   don't know who ultimately would do that.  I imagine

2   I'll go through it myself, but I'll have to talk to

3   someone to -- probably from RELX to make that

4   determination.

5        Q.    And who would that likely be?

6        A.    I'll probably talk to Mr. Groff first and see

7   what he says.

8        Q.    All right.  Back to Exhibit 4, if we could.

9   So we were showing that for April 10, 2015, the

10  highlighted line shows that ICCE processed 2,025,684

11  documents, right?

12       A.    Yes, that is the number of this spreadsheet.

13       Q.    Okay.  If you go to the next page, is this

14  printed from Expert Discovery 000010?

15       A.    Yes, I believe it is, at least given the title

16  at the top.

17       Q.    And if you look at this, this chart -- this

18  chart shows the number of documents as a total by day; is

19  that correct?

20       A.    I'll look at it for one moment.  Yes, I

21  believe that's the case.

22       Q.    So if you look, for example, at that date of

23  April 10, 2015, which is the same date we were looking on

24  the previous page, do you see that there are 44,796,536



CHRISTOPHER RUCINSKI                              June 20, 2018
RELX INC. vs INFORMATICA LLC                                  231

1  documents in the repository from ICCE?

2       A.    That's the number that's on the spreadsheet,

3  yes.

4       Q.    Right.  And that's the total documents for

5  that day; is that correct -- for ICCE?

6       A.    Yes, that's under the ICCE total document

7  count header, so I do think that's the total document

8  count for ICCE that day.

9       Q.    And isn't it true that if you wanted to see

10 the number of documents that were added from the previous

11 day, or 4/9/2015, you would just subtract the previous

12 day's total?

13      A.    Give me one moment.  I think that's generally

14 the case.  The reason I'm hesitating about this for a

15 moment is because if that were the case, you would expect

16 the document counts here to be monotonically increasing,

17 which is to say that they wouldn't decrease on a

18 particular day.

19           For the Product Total Document Counts column,

20 which I understand is analogous to the ICCE Total

21 Document Count column in Row 455, the number on that day,

22 April 6, is less than the day before it.  So I think this

23 may still be cumulative, as you suggest, but there may be

24 certain additions or deletions that are accounting for



1  some of the discrepancies here.

2      Q.    And what would account for the discrepancy in

3  going from a higher number to a lower number.  Is that

4  what you're saying?

5      A.    Right.  So there could have been documents

6  that were removed from the system.  That's what I'm

7  saying.

8      Q.    Okay.  So let's look at the difference between

9  April 9, 2015, and April 10, 2015.  Do you see that --

10     A.    I do.

11     Q.    -- on the ICCE total document count?

12     A.    I do.

13     Q.    So if you subtract the value that's provided

14  on April 9 from the value provided on April 10, that will

15  show you how much you add -- were added in that

16  particular day; is that correct?

17         MR. SCOTT:  Objection.

18     A.    I believe it will show you the total count, so

19  that would account for, potentially, additions and

20  deletions, but you could see the difference that were --

21  that were processed through the system on the two days.

22     Q.    Okay.  Would you do that calculation?  Maybe

23  Mr. Scott can give you his famous calculator again.

24     A.    I think it's 312,964.



1      Q.    Why don't you go ahead and do it just to be

2   sure.

3      A.    Sure.

4      Q.    Be accurate.

5      A.    Okay.  So I had -- ah, okay.  I transposed the

6   numbers.  So -- there's a call from potential scam.

7   Should I answer --

8            MR. SCOTT:  No, we don't need to talk to them.

9   That's why I have that on there.

10     A.    Okay.  If I entered this right, it's 181,949.

11  Does that match what you have, or did I enter that --

12     Q.    I'm sorry.  What do you have?

13     A.    181,949.

14     Q.    No, that's not what I get.

15     A.    Let me -- let me try that one more time.

16  That's not what I had either.

17     Q.    You were closer the first time.  You were real

18  close.

19     A.    So we're talking about -- oh, I'm sorry.  The

20  10th minus the 9th.  That is -- that is my problem.

21  Okay.  So that looks like 311,964.  Does that match what

22  you got?

23     Q.    Yes.

24     A.    Okay.



 1          Q.    So is it fair to say that on April 10, 2015,
 2    311,964 documents were added --
 3                MR. SCOTT:  Objection.  Asked and --
 4          Q.    -- through the ICCE?
 5          A.    That's my impression.  Well, I think this
 6    document is showing the total number from the ICCE
 7    platform on the various dates, so, yeah, I think the
 8    difference would show the difference in totals between
 9    the two days.
10          Q.    Okay.  Which, in this case, is 311,964, right?
11          A.     If that's the same number I just entered on
12    the phone --
13          Q.    Yeah.
14          A.    -- yes.
15          Q.    Okay.  Now, did you compare that number, which
16    is set forth in Expert Discovery 000010, to the number
17    for that same day in Expert Discovery 00002, which is on
18    the previous page?
19          A.    No, I don't think I compared those two
20    numbers.
21          Q.    Well, if you look on the previous page, which
22    is the 000002 document, it shows a total number of
23    documents processed on the ICCE platform of 2,025,684,
24    whereas on the 000010 document, it shows 311,964.  Can



1   you explain the difference?

2        A.    As I sit here right now, I don't know why the

3   discrepancy is present in these documents.

4        Q.    Shouldn't they be the same?

5        A.    Well, it depends what these documents are

6   actually showing.

7        Q.    You don't know what the documents show?

8        A.    Well, like I said earlier, I think one of them

9   might be related to uniqueness of documents and the other

10  one may not be.

11       Q.    But you don't know?

12       A.    As I sit here right now, I'm not sure.  I'd

13  have to talk to the folks at RELX.

14       Q.    You had mentioned before that you were

15  surprised that -- that it looked like documents may

16  actually go down from one day to another day; is that

17  right?

18            MR. SCOTT:  Objection.  Mischaracterization.

19       A.    I noted specifically on -- this is page 3 of

20  Exhibit 4, that there was -- that there was a day where

21  the total -- the product total document count in the

22  document was less than the previous day.

23       Q.    So I'm sorry.  Where are you looking at?

24  Which --



1      A.    So I'm looking at Row 455 and Row 454 under

2  the Column C.

3      Q.    The Product Total Document Count?

4      A.    Yes, that column.

5      Q.    And so it shows less documents per product

6  total on 4/6/2015 from 4/5/2015?

7      A.    It does, yes.

8      Q.    Does the ICCE platform delete documents?

9      A.    Well, this is respect -- with respect to the

10  product total document count.  So my understanding is

11  that this number is related to the number of documents

12  that are available through the Lexis.com and Lexis

13  Advance products.  So it seems to be that they sometimes

14  do remove documents from the system, according to these

15  numbers.

16      Q.    Would that affect your analysis if you knew

17  that documents were actually removed from the system from

18  day to day?

19      A.    Well, so long as the two columns here are --

20  make sense in terms of ratio, which I think they still

21  do, I don't think that would affect it.  It may change

22  the way in which I describe that number, but overall,

23  that number is a percentage of documents processed

24  through the ICCE component of the platform that actually



1  make it to the -- to the customer at the end.

2      Q.    Are you surprised that the totals went down

3  from one day to the next day?

4      A.    I think I actually did notice this prior, but

5  it made sense to me that perhaps sometimes documents are

6  removed from the system.

7      Q.    How are you going to determine this

8  discrepancy between the number of documents added on

9  April 10, 2015, and the ICCE total document count on the

10  00010 [sic] spreadsheet as compared to the different

11  number provided on the 000002 spreadsheet?

12          MR. SCOTT:  Objection.  Asked and answered.

13      A.    So first of all, I'll talk to someone from

14  RELX, which will probably start out being Mr. Groff; and

15  then we'll probably have to determine the underlying data

16  that was used to generate these documents and account for

17  the discrepancy in some way.

18      Q.    I mean, that's a huge discrepancy, I mean,

19  between what's shown on 00002 [sic] of 2,025,684

20  documents, and what's shown on Expert Discovery 000010

21  which is much more, 2,025,684, right?  The factor of 10,

22  approximately?

23      A.    Well, that may be easily explained by the

24  uniqueness issue that I mentioned earlier.  I'm not sure.



1   I'll have to look into it.

2          Q.    Do you know if these errors change your

3   opinions in --

4              MR. SCOTT:  Objection.

5          Q.    -- any way?

6              MR. DOYLE:  Can I get my whole statement out

7   before you object?

8              MR. SCOTT:  I'll try.

9              MR. DOYLE:  Please do.

10             MR. SCOTT:  I am trying, Scott.  Sometimes

11  it's difficult, as you know.

12         Q.    Did you get the question, sir?

13         A.    Would you repeat it?

14         Q.    Do the errors we just identified change your

15  opinion in any way?

16         A.    So this discrepancy relates to specific

17  portions of my opinions.  I mentioned that I may want to

18  revise portions of them, but I don't think overall they

19  will affect my -- my opinions.

20         Q.    Now, we've given you examples of some errors.

21  How are you going to become comfortable and satisfied

22  that there aren't other errors through all this

23  information?

24             MR. SCOTT:  Objection.



CHRISTOPHER RUCINSKI                                June 20, 2018
RELX INC. vs INFORMATICA LLC                                    239

1        A.    Well, one way in which I'm uncomfortable is

2   that I presume that if Ms. Frederiksen-Cross has found

3   such errors, that they'll be brought to my attention

4   either at deposition or through some other means.  But I

5   will have conversations with Mr. Groff to talk about the

6   origin of data.  I don't think the specific issue with

7   respect to uniqueness of the files on these two sheets

8   affects, for instance, CPU utilization because they're

9   just completely different types of information, but it's

10  worth talking to Mr. Groff just the same.

11       Q.    Well, we don't -- we don't have the underlying

12  data that actually exists at RELX.  Do you understand

13  that?

14       A.    Well, I think the numbers in all of these

15  spreadsheets we looked at come from data at RELX.  I

16  think the question at issue here is what that data

17  represents.

18       Q.    Right.  But what I'm saying is because we

19  don't have the underlying data at RELX, how are we going

20  to determine whether or not the underlying data is

21  actually correct and accurate?

22            MR. SCOTT:  Objection.  Calls for speculation.

23       A.    I think we -- the underlying data, I think, is

24  produced in documents.  I don't think we have to go to



1   RELX to look at the same data.  They can send it to us in

2   a document.

3        Q.   Oh, so the data that populates these

4   spreadsheets is actually in other documents?

5             MR. SCOTT:  Objection.

6        A.   Well, I don't think it exists only in this

7   document that I have here produced for this litigation.

8   I believe it was created based on data that RELX has that

9   they store in their ordinary course of business.

10       Q.   And have you seen that document as they store

11  it in the ordinary course of business?

12       A.   I believe I've only seen the documents that

13  are produced in this litigation.

14       Q.   That's not my question.  I just asked you have

15  you seen the documents that RELX keeps in the ordinary

16  course of business --

17            MR. SCOTT:  Objection.

18       Q.   -- which contain this data?

19       A.   Well, to the extent those documents are

20  produced in this litigation, then I have seen them.  But

21  to the extent they're not produced in this litigation,

22  then I haven't seen them.

23       Q.   Well, you've testified that you received, in

24  many instances, the spreadsheets from Mr. Groff, correct?



1       A.    Well, I don't think I received them directly

2    from Mr. Groff, but from RELX.  Yes, I received

3    spreadsheets from RELX.

4       Q.    And is it true that -- did you investigate any

5    of the data that populates the spreadsheets in any other

6    document that was used to filter and put the data from

7    the underlying documents into this spreadsheet?

8             MR. SCOTT:  Objection.

9       A.    Well, I relied on the data as it was produced

10   and looked for any reasons why it may be -- why it may

11   contain inaccuracies.  And in this case, I seem to have

12   missed one of those instances.

13      Q.    You think there might be more instances?

14      A.    It's possible, but I don't think that would be

15   the case for the utilization data, for instance.

16      Q.    Why is that?  Did you look at every single

17   piece of data, and did you verify every single piece of

18   data for utilization?

19      A.    Well, I looked through the data as produced

20   and actually asked some questions to Mr. Groff about the

21   date, certain time frames that were missing data, for

22   instance, and he provided explanations that seemed

23   reasonable and helped to assuage any concerns that I had

24   about it.



1       Q.    Can you give me an example of that?

2       A.    One moment.  So one example is in Exhibit H to

3   my report, looking at page 2.  At No. 3 towards the

4   middle of this page, I state in this e-mail to Mr. Groff:

5   "Please refer to RELX v Informatica document production

6   ICCEUsage.xlxs, which was produced in the Informatica

7   litigation."  And then at No. 2 below that identifying a

8   particular tab with a particular range of rows that have

9   a different machine name.

10           And so I asked a question to Mr. Groff about

11   what was actually being run on this server during that

12   time.  Mr. Groff replies:  "During this time, psc33817

13   went completely down and was not available for any

14   processing.  When this server was brought back online,

15   the monitoring tool for collecting metrics for the server

16   was not configured the same way, causing the label to be

17   different."

18           So this explained one of the discrepancies

19   that I noticed in the data produced.

20           MR. DOYLE:  Court reporter, please mark as

21   Exhibit 5 a very large sheet with a lot of information on

22   it relating to batch start times and end times.  And it's

23   also the data that is from September 25, 2013, identified

24   as RELX 044494.xls.



1              (Exhibit No. 5, two-page spreadsheet marked

2              for identification)

3         MR. SCOTT:  This is 5, you said?

4         MR. DOYLE:  Just for the record, these two

5    pages actually go side by side.  So the correct way to

6    look at it is to put it side by side.

7    Q.    Sir, have you seen these document -- this

8    document before, or any others like it for other days?

9    A.    This does look familiar, but I don't know if

10   I've viewed this specific document.

11            Is there a question pending?

12   Q.    Yeah.  Have you seen this document before?

13   A.    I think I said that I don't remember if I've

14   seen this specific document, though it does look

15   familiar.

16   Q.    So you've seen other documents like it?

17   A.    I believe so, yes.

18   Q.    And what does it tell you?

19   A.    Well, it looks like for a specific day --

20   maybe part of a specific day, it looks like it shows --

21   it looks like it shows things like something called

22   delivery bundle ID, DPSi, content type, ICCE conv batch

23   name, start and end times, a number of xml documents for

24   a number of other header columns, an ICCE conversion



1  batch name, at least that's what I assume "conv"

2  stands for.  And then there are a number of columns

3  related to FPD which appear to be unpopulated, and then

4  unpopulated columns related to delivery complete or

5  delivery error.

6       Q.    Did you cite this document in your report?

7       A.    I might have.  What's the Bates number of it?

8       Q.    RELX 044494.

9       A.    Yes, I did cite it in my report.

10      Q.    Okay.  Why might you want to look at this

11  document?

12      A.    Well, I think there were documents like this

13  that showed for specific days, for instance, batch start

14  times and end times, but I never saw a document that --

15  that spanned a time frame long enough that I felt was

16  relevant to the question of what the processing time was

17  for the different documents going through the ICCE

18  platform.

19      Q.    Do you recall earlier today that you had not

20  seen any documents that show processing time?

21          MR. SCOTT:  Objection.

22      A.    I may have testified to that effect, and if I

23  did, I forgot that these documents for individual

24  potential portions of dates existed.  I was thinking



1   about documents that showed batch processing times across

2   the relevant time period.

3        Q.    Did you ask for more of these documents?

4        A.    I did ask for documents that showed this

5   across a time period.

6        Q.    What time period?

7        A.    I believe it was for the entirety that the

8   ICCE platform was processing documents.

9        Q.    Which would be what?

10        A.    That would be approximately November 2012

11   through November 2017.

12        Q.    And what was the response?

13        A.    I don't think I got a response with those

14   documents, and so I presumed that they didn't exist for

15   that time period.

16        Q.    So because you didn't receive the documents,

17   you presumed they don't exist?

18        A.    Well, I think I asked for them and never

19   received them, so that was -- that was my conclusion.

20        Q.    Who did you ask?

21        A.    I think I spoke to Mr. Groff and also counsel

22   about it.

23              THE VIDEOGRAPHER:  There's seven minutes left

24   of video disc.



1              MR. DOYLE:  Want to take a break?  Do you have

2    time?

3              THE VIDEOGRAPHER:  The time is -- the time is

4    5:55 p.m.  We are off the record.  This is the end of

5    Disc 4.

6              (Recess)

7              THE VIDEOGRAPHER:  The time is 6:29 p.m.  This

8    is the beginning of Disc 5.  We are on the record.

9        Q.    Mr. Rucinski, you reviewed some of the

10   copyright registration certificates of Informatica in

11   this case?

12       A.    I did review some of those copyright

13   registration certificates, yes.

14       Q.    And do you understand that a copyright

15   registration certificate is evidence of the validity of

16   the copyright?

17             MR. SCOTT:  Objection.  Calls for a legal

18   conclusion.

19       A.    While I'm not here to offer legal opinions, I

20   do understand that the copyright registration is

21   something that's -- that's submitted when applying for a

22   copyright at the copyright office.

23       Q.    Why did you review the copyright registration

24   in this case?



1      A.     Counsel asked me to review what was submitted

2    for the copyrights assigned to Informatica and

3    characterize what was included in those deposits.

4      Q.     Do you have any opinions as to whether or not

5    how those relate to this -- the copyright registrations

6    relate to the copyright infringement allegations in this

7    case?

8      A.     Well, my opinions are stated in my report, and

9    none of them relate to legal matters.  My opinions are

10   related, with respect to the copyright deposits, in terms

11   of what was actually in the deposits, specifically with

12   respect to whether the deposits contained source code

13   that is human readable or executable code that's not.

14     Q.     And do you know whether a copyright

15   registration with source code as a deposit would be

16   effective in a copyright infringement case based on the

17   copying of executable code?

18          MR. SCOTT:  Objection.  Calls for a legal

19   conclusion.

20     A.     That sounds like a legal opinion to me, and I

21   think that's outside the scope of my opinions relating to

22   computer science in this case.

23     Q.     Have you ever reviewed copyright registrations

24   before?



1       A.    Yes, I have reviewed copyright registrations

2   before.

3       Q.    In what context?

4       A.    There was a litigation I worked on that

5   related to copyright infringement where we were working

6   for the -- one moment.  This was a while ago.  We were

7   working for the plaintiffs in this case, and there was a

8   question about copyright ability of certain code as well

9   as website material in the case, and so I reviewed

10  copyright registrations for -- for those copyrights.

11      Q.    You said counsel asked you to review the

12  copyright registrations?

13      A.    Counsel did ask me to do that, yes.

14      Q.    And why was that?

15      MR. SCOTT:  Objection.  Calls for speculation.

16      A.    My understanding is that counsel wanted me to

17  examine the registrations and characterize them in some

18  way.  I don't know exactly why they wanted me to look at

19  the specific registrations.

20      Q.    The copyright registration certificate for the

21  B2B data transformation 9.6.1 describes the copyrighted

22  material as a computer program, right?

23      A.    Let me refer to my report.  Which specific

24  Informatica component were you talking about?



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                      249

1      Q.    9.6.1.  The B2B data transformation 9.6.1.

2      A.    And would you repeat that question?

3      Q.    Sure.

4            MR. DOYLE:  Can you repeat it back, please.

5            (Question read)

6      Q.    I'll read the question again.

7            Is it your understanding that the copyright --

8   copyright registration certificate for B2B Data

9   Transformation 9.6.1 describes the copyrighted material

10  as a, quote, computer program, end quote?

11     A.    I think it lists computer file as the type.

12  At least that's what I wrote in my report.

13     Q.    That the copyright registration certificate

14  describes the copyrighted material as a computer file, is

15  that your --

16     A.    That's my recollection.  That's what I

17  recorded in my report.  So with respect to copyright

18  registration, I think that's what it says.

19     Q.    Okay.  And did you also look at the copyright

20  office's catalog entry for B2B Data Transformation 9.6.1?

21     A.    If you're talking about the copyright deposit,

22  yes, I think we're talking about the same thing.

23     Q.    And what was that -- what did that describe

24  the computer copyrighted material as?



1    A.   As I sit here right now, I don't remember what

2    the cover page described it as.  I was focused on the

3    computer source code that was attached.

4    Q.   And do you understand that the copyright

5    registration certificate for B2B Data Exchange 9.6.1

6    describes the copyrighted material as a, quote, computer

7    program, end quote?

8         MR. SCOTT:  Objection.  Asked and answered.

9    A.   And we're talking about data exchange now?

10   Q.   Yes.

11   A.   So I believe the copyright registration

12   describes -- or lists, quote, computer file as the

13   copyright material for that copyright.  It may say

14   something different on the cover page for the copyright

15   deposit.  I don't remember, as I sit here right now.

16   Q.   And is it your understanding the copyright

17   office's catalog entry for B2B Data Exchange 9.6.1

18   describes the copyrighted material as a, quote, computer

19   file, end quote?

20   A.   I believe the registration that's -- that's

21   publicly available online has computer file listed as

22   the -- as the type of work.

23   Q.   Did you also review Informatica's

24   copyright registration certificate for the Informatica



1  PowerCenter Grid Option?

2       A.    I did review that registration, yes.

3       Q.    And do you understand that the copyright

4  registration certificate for PowerCenter Grid Option

5  describes the copyrighted material as a, quote, computer

6  program, end quote?

7       A.    Well, I looked at the copyright registration

8  information available online for the type of work which I

9  believe listed computer file.  So I don't think I

10  understand what you mean by "the certificate" in this

11  context and for the previous items.

12            (Cell phone)

13            MR. DOYLE:  Can't stop a wife from calling.

14            MR. SCOTT:  That's how you stay married.  But

15  you should answer it too.

16            MR. DOYLE:  No, I know because it'll probably

17  keep -- it'll keep coming and coming and it won't stop

18  and the anger -- anger will build.

19            MR. SCOTT:  Yeah, avoidance is not the answer.

20       Q.    Sir, are you familiar with the difference

21  between a single core CPU and multicore CPU?

22       A.    Yes, I'm familiar with the distinction between

23  a single core CPU and a multicore CPU.

24       Q.    Okay.  And what is your understanding of the



1    advantages of a multicore CPU over a single core CPU?

2        A.    Well, in general, there are -- there are some

3    tradeoffs and benefits to both.  So single core CPUs

4    generally have a higher clock speed for the one core just

5    because there's more space on the actual chip to -- to

6    provide that speed.

7            For multicores, supposing you have two cores

8    for a single CPU, generally, the speed for each core is

9    lower, but in exchange, what you get with a multicore CPU

10   is you can have parallel processing of tasks when the

11   computer program is run.  So, for instance, if you have a

12   computer program that is executing multiple threads to

13   perform different tasks, you can execute each of those

14   threads simultaneously, whereas in a single core case,

15   you would have to wait for -- or kind of put one task on

16   hold while the CPU deals with the -- with the other one

17   and vice versa.

18       Q.    Can a multicore CPU process more workloads at

19   the same time as compared to a single core CPU?

20       A.    In general, yeah, multicore CPUs can process

21   multiple tasks at the same time or multiple threads.  And

22   if the workflows for the Informatica software for certain

23   versions were programmed in that way, then I imagine a

24   workflow, if it were part of the single thread, could



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                      253

 1  execute on one CPU while another workflow on another

 2  thread could execute on another CPU core.

 3      Q.   Why would you want to execute threads in

 4  parallel?

 5      A.   Well, there could be a few reasons why you

 6  might hypothetically want to execute threads in parallel.

 7  One reason might be that you wanted to perform two

 8  different tasks at the same time while using the same

 9  portions of memory.  The threads are in the same address

10  space, so that would be possible.

11           It could be that you have a single process

12  that has components which are not dependent upon one

13  another, and so you can execute those two components at

14  the same time and then combine the results as opposed to

15  processing it one at a time.

16      Q.   Are there advantages to using all the

17  available cores on a server?

18      A.   You're asking that question in general?

19      Q.   Well, with respect to a multicore CPU, are

20  there any advantages to using all of the cores on that

21  server?

22      A.   Do you mean all the cores versus fewer of

23  them?

24      Q.   Sure.



1       A.     Well, if the program you were running could

2    make productive use of all the cores as opposed to just

3    fewer of them, I think, in theory, such a program would

4    be able to be more productive over -- over a certain time

5    period.

6       Q.     Can running tasks in parallel reduce the total

7    time required to process multiple tasks as opposed to

8    running one at a time?

9       A.     Well, in general, it would depend on the

10   speeds of the -- of the cores on the CPU versus the

11   hypothetical single core that we're discussing.  But

12   there are circumstances under which if you have a program

13   that can take advantage of multiple cores, because of the

14   efficiency you would get by executing different

15   components of a process in parallel versus in serial, you

16   could, in theory, get a result quicker on a multicore

17   processor than with a single core.

18      Q.     Is Informatica software the kind of software

19   that can use more than one CPU core at a time?

20          MR. SCOTT:  Objection.  Asked and answered.

21      A.     As far as I know, there are specific

22   circumstances under which that might occur for specific

23   versions of Informatica software.

24      Q.     And are you aware that the Informatica



1  software is the kind of software that can use multiple

2  cores at the same time?

3           MR. SCOTT:  Objection.  Asked and answered.

4      A.    Sorry.  Was that different from the previous

5  question?

6      Q.    No.  I meant to say is the Informatica

7  software, could it use multiple cores for concurrent

8  workflows?

9      A.    I'm not entirely sure about that only because

10 I'm thinking back to Ms. Frederiksen-Cross's report with

11 her testing.  I don't remember if she specified the

12 number of workflows that were part of the test.  I think

13 she specified the number of files, but I don't recall as

14 I sit here right now.

15     Q.    Do you know where else you might be

16 able to obtain that information other than

17 Ms. Frederiksen-Cross's report?

18     A.    It's possible there might be documentation

19 that speaks to that question, but as I sit here right

20 now, I'm not sure of the answer.

21     Q.    If you wanted to determine how many cores were

22 used during processing some hypothetical workload, how

23 would you do the testing?

24     A.    To be clear:  Your question is about



CHRISTOPHER RUCINSKI                                      June 20, 2018
RELX INC. vs INFORMATICA LLC                                          256

1   processing a single workflow?

2        Q.    Sure.

3        A.    In this hypothetical test, are we talking

4   about coming to a conclusion about how the Informatica

5   software would operate in certain circumstances, or are

6   we trying to generalize?

7              I'm just trying to get a feel for what the

8   goal is that you --

9        Q.    I was just asking in general what kind of

10  testing would you do to determine how many cores were

11  used during processing some hypothetical workload.

12       A.    Well, if we cared about a specific workload

13  and we just wanted to see for that one specific workload

14  what would happen for a specific version of Informatica

15  software on a particular hardware setup, I would imagine

16  probably the way to do that would be to install the

17  Informatica software on that hardware setup that we

18  specify for this particular instance, identify the files

19  that we care about processing in this one specific

20  workflow, and then monitor over some period of time the

21  degree to which the Informatica software in this specific

22  case used the different cores that were available to it.

23  And the overall conclusion of such a test would be

24  limited to the specific setup that we had provided.



1      Q.    What do you mean -- oh, the conclusions of the

2   test would be limited to the particular setup that was --

3   you were testing?  Is that what you mean?

4      A.    So in this hypothetical example, my

5   understanding is we're talking about seeing what would

6   happen for a very specific workload if it were run

7   through the Informatica software.  So if want to see how

8   it would work for the very specific workload, it makes

9   sense to me that we would run that workload through the

10  Informatica software for a specific version of the

11  software and the specific version of hardware that we

12  cared about, and then see -- see what happens.

13     Q.    And what did you mean "see what happens"?

14     A.    Well, we could monitor -- we could monitor

15  the CPU cores and see when they were used for processing

16  the workload that -- that we cared about for a specific

17  test.

18     Q.    How would you test to determine whether

19  Informatica makes use of multiple cores concurrently?

20     A.    You're asking in general or for a specific

21  workload again?

22     Q.    In general.

23     A.    Well, if we wanted to generalize, we would

24  probably have to, from an empirical standpoint, install



1  the software on a few different hardware configurations.

2  And then if we wanted to generalize, we would have to

3  come up with a number of different workflows with a

4  number of different numbers of files in each of them,

5  different types of files.

6           We would also -- we would have to consider

7  which versions of the Informatica software we were using.

8  We'd have to run it for some amount of time that we were

9  comfortable with to generalize to -- to larger amounts of

10 time.  For instance, there -- you know, Mr. Groff

11 has stated that there are instances where certain files

12 got -- got stuck or workflows got corrupted, so we'd want

13 to see how -- well, we'd want to test until we

14 encountered situations like that so we could see how it

15 might affect -- how the software was using the various

16 cores that were available to it if we wanted to get to a

17 general case.

18           There may be other considerations.  As I

19 sit here right now, those are the ones that I can think

20 of.

21      Q.    RELX used several servers in a grid; is that

22 correct?

23      A.    So the ICCE platform used a number of servers

24 as part of the ICCE platform that included Informatica



1   software for part of the time period at issue in this

2   case.

3        Q.    Did it use it in a grid?

4        A.    My understanding is that the servers were

5   configured in a grid in order to use the ICCE platform as

6   well as the Informatica software that was incorporated as

7   part of it.

8        Q.    What is a grid?

9        A.    My understanding of a grid is it's a mechanism

10  by which you can organize multiple servers in order to

11  process certain tasks.

12       Q.    Servers of different sizes or of the same

13  size?

14       A.    Well, given that my understanding is that the

15  ICCE platform used servers with different configurations,

16  it sounds like you could use servers in different

17  configurations in the ICCE platform that incorporated the

18  Informatica software for certain time periods, if that's

19  what you mean by size.  I mean, different configurations

20  would at least be different between the servers.

21       Q.    What type of servers were actually used in the

22  RELX grid?

23       A.    The specific servers, if my memory is correct,

24  there were two types.  One was a Dell R710 server, and



 1 | the other was a Dell R910 server.

 2 |     Q.   Okay.  And how many cores do those servers

 3 | have on them?

 4 |     A.   So my recollection, at least for certain

 5 | periods of time, the Dell R710 servers had two sockets,

 6 | and so two CPUs, each CPU had four cores, so that's a

 7 | total of eight cores for the Dell R710 servers.

 8 |          And then for the Dell R910 servers, my

 9 | recollection is that there were four sockets available,

10 | and each of those sockets had a CPU that had eight cores,

11 | and so for those Dell R910 servers, there were 32 cores

12 | on the servers.

13 |     Q.   And what processor speed were the cores?

14 |     A.   I don't recall, as I sit here right now.  I

15 | think it was around 2 gigahertz.

16 |          MR. DOYLE:  I'd like the court reporter to

17 | mark as Exhibit 6 some e-mails, all of which -- well, a

18 | series of e-mails between various individuals including

19 | Chris Boytim, Gil Rosen, and others.

20 |          (Exhibit No. 6, e-mails marked for

21 |          identification)

22 |          MR. SCOTT:  What number is this one?  7?  6.

23 | Thank you.

24 |     Q.   Have you seen these e-mails before?



1      A.    I believe that I have.

2      Q.    What are these e-mails in relation to?

3      A.    It's been a long time since I've looked at

4  them.  Give me a moment.  So in general, these e-mails,

5  which are around the time frame of late 2014, appear to

6  be related to trying to determine an appropriate number

7  of licenses might be for RELX to have with respect to the

8  Informatica software.

9      Q.    Have you seen these e-mails before?

10          MR. SCOTT:  Objection.  Asked and answer.

11     A.    I do think I've seen these e-mails before.

12     Q.    And do you know whether or not these e-mails

13 relate to the sizing model that you opine on in your

14 report?

15     A.    One moment.  So I believe the document

16 attached to the most recent e-mail in Exhibit 6 here,

17 it's entitled "PowerCenter Size and Model,

18 LexisNexisB2.xls," I believe that's the same document

19 that I discuss in my report starting in paragraph 49.

20     Q.    Okay.  And then in paragraph 52 of your

21 report, you state, quote, Informatica did not adhere to

22 the calculations of CPU cores determined in Informatica

23 Sizing Model for RELX, instead selling RELX far more CPU

24 core licenses than the Informatica Sizing Model for RELX



CHRISTOPHER RUCINSKI                                        June 20, 2018
RELX INC. vs INFORMATICA LLC                                         262

 1  calculated using the parameters below.  Right?

 2        A.    I haven't verified it exactly, but that sounds

 3  like an accurate reading of the penultimate sentence of

 4  paragraph 52.

 5        Q.    What is the basis for that assertion?

 6        A.    Well, as I explain in my report, Informatica

 7  Sizing Model for RELX as produced contains calculations

 8  that suggest that, at most, six CPU cores would be

 9  appropriate, and then I did some additional analysis

10  trying to see if there were reasonable other inputs to

11  the document to increase that calculation to be closer to

12  what RELX actually acquired in terms of licenses, and was

13  able to come up with 12 as a maximum instead, which is

14  less than the number of licenses that RELX did actually

15  acquire.

16        Q.    So this is in the 2014 time frame; is that

17  correct -- these e-mails?

18        A.    These e-mails, yes, they all seem to be from

19  the late 2014 time frame.

20        Q.    And are these e-mails about the sizing model

21  that you refer to in your opinion, in your -- in your

22  opinion?

23        A.    In general, they appear to be about -- and

24  there's maybe a dozen of them here.  They appear to be



1   about planning for how many licenses RELX might want.

2   And, then, in this last e-mail, there's a document

3   attached which I believe is the same document I discussed

4   in my report, so they seem related.

5        Q.    And you believe that document to be the sizing

6   model that you discussed in your report, the one that's

7   attached to the e-mail sent on Friday, December 5, 2014,

8   6:59 a.m. from Michael Tomechak it Gil Rosen?

9        A.    I believe that's one -- at least one place

10  where this document shows up.  I'm basing that based on

11  the file name here.

12       Q.    And that's the sizing model that you opine on

13  in your report; is that correct?

14            MR. SCOTT:  Objection.  Asked and answered.

15       A.    I believe it is based on the file name here.

16       Q.    Yeah.  And at this time, how many licenses

17  did -- CPU licenses did RELX have at this time in 2014?

18       A.    I'm trying to remember.  As I sit here right

19  now, I think it was 72.

20       Q.    72.  And do you recall how many CPU cores the

21  Informatica software was deployed on at that time in

22  2014?

23       A.    Well, I wouldn't say the Informatica software

24  was deployed on cores.  It was deployed on servers.  But



1   I believe at this time, this would have been after Nalin

2   Mishra brought up the last three servers and before

3   servers were removed.  So I think at this time, there

4   were seven servers which would mean that there were 104

5   cores available for the ICCE platform that incorporated

6   the Informatica software.

7       Q.    You just said "Nalin Mishra brought up the

8   last three servers."  What does that mean?

9       A.    My recollection is that as an employee of

10  Informatica, Mr. Mishra added servers to the ICCE

11  platform that had the Informatica software deployed

12  on them.  I think that was also done by Mr. Mishra.

13  That's my recollection from the -- some e-mails that

14  I saw.

15      Q.    Your recollection is that Mr. Mishra added

16  servers to the network -- to the platform?

17      A.    That is my recollection, yes.

18      Q.    Are you going to give any -- do you plan to

19  give any testimony at trial about whether or not the

20  actions of Mr. Mishra relate to the copyright

21  infringement in this case?

22      A.    I plan to testify about the opinions that are

23  in my reports.  So to the extent those opinions relate to

24  Mr. Mishra's actions, the answer would be yes.  I'm not



1  sure exactly which opinions those would be, as I sit here

2  right now.

3      Q.    Did you review the service agreement between

4  the parties?

5      A.    There were a number of agreements.  Would you

6  clarify which agreement you're referring to?

7      Q.    It's called the "Service Agreement."

8           MR. SCOTT:  Objection.

9      A.    I did review agreements between the two

10 parties.  I'm not sure if I -- I'm not sure if, in my

11 mind's eye, I have the same agreement you're referring

12 to.

13     Q.    Do you know whether Nalin Mishra was an onsite

14 consultant to RELX?

15     A.    My recollection is that Nalin Mishra was an

16 Informatica employee who was present on -- at RELX to

17 help with the Informatica software.

18     Q.    And is it your belief as part of those duties,

19 he actually installed hardware -- or added hardware to

20 the platform?

21     A.    My recollection is that he stated -- that is

22 Mr. Mishra stated in e-mails that he brought up that he's

23 added certain servers to the ICCE platform that included

24 Informatica software.



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                      266

1        Q.    And can you identify those e-mails?

2        A.    As I sit here right now, I don't remember

3    exactly which they were, but I'm happy to identify those

4    at some later point.

5        Q.    But as you sit here now, you don't know?

6        A.    I don't remember exactly which e-mails they

7    are.  I do remember reading e-mails to that effect where

8    there was an e-mail thread about when certain servers

9    would be added, and Mr. Mishra was involved in that

10   thread, and at some point said, you know, we encountered

11   some difficulties, but now they're -- they're online and

12   part of the ICCE platform in the production environment.

13       Q.    And could you tell from those e-mails whether

14   Mr. Mishra was merely putting software on the server or

15   whether he was connecting up the servers to the platform?

16       A.    Probably want to review the e-mails to be

17   sure.  He may have had a role in the software

18   installation or the -- or adding the -- or put it this

19   way, or reconfiguring the hardware so that it was part of

20   the ICCE platform or some combination of the two.  I'm

21   not 100 percent sure as I sit here right now.

22       Q.    And your support for that statement is these

23   e-mails?

24       A.    That's my recollection of the e-mails, yes.



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                       267

1      Q.    And do you know whether -- what were the roles

2   based on those e-mails of Wisvari and Li?  Do you

3   remember?

4      A.    Based on those e-mails, I don't recall, as I

5   sit here right.

6      Q.    Do you believe that Mr. Mishra also purchased

7   the servers?

8      A.    I don't remember, as I sit here right now.

9      Q.    Okay.  So on December 5, 2014, RELX had 72

10  licenses; is that correct?

11     A.    That is my recollection.

12     Q.    Yet you point to this sizing model which says

13  only what?  How many?  Six CPUs are necessary?

14     A.    As produced, that is the maximum number that

15  it suggests.

16     Q.    Is that mentioned in this set of e-mails?

17     A.    Well, the file is there.

18     Q.    I asked if it's in the e-mails.

19     A.    Well, I think the attachments are part of the

20  e-mails, so yes.

21     Q.    Okay.  Disregard the attachment for a second.

22  Is it in the e-mails?  Let me help you out.

23     A.    Well, I see a -- this is -- the Bates number

24  INFA 0000218569.  This is an e-mail from Christopher



1   Boytim.  It says about halfway through this e-mail:  "To

2   determine if we go forward with an" -- and then in

3   parentheses for each of these numbers -- "6, 8, 12 CPU

4   core system."  So I don't know exactly the context for

5   this, but at least the number 6 does appear here with

6   respect to trying to determine perhaps how many CPU cores

7   would be appropriate.

8        Q.    And does it say that Mike Tomechak and Gil owe

9   you both a capacity recommendation?

10        A.    That is -- those words are present in this

11   e-mail, yes.

12        Q.    Okay.  Did you talk to Gil Rosen or Mike

13   Tomechak about this?

14        A.    No, I didn't speak to them at all.

15        Q.    And is this sizing consistent with the

16   information that you used in the sizing model?

17        A.    Well, in this e-mail, for instance, the number

18   6 is referenced with respect to how many C -- or how many

19   cores each system would have.  That's also the number

20   that is the maximum in the document.  So there does

21   appear to be some relation at least.

22        Q.    Do you know why the sizing model and capacity

23   were being discussed?

24        A.    I don't recall, as I sit here right now.



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                       269

1        Q.    Do you know if this is for a new project?

2        A.    I'm not sure about the overall context to

3   these e-mails.  They do mention PowerCenter, for

4   instance, however.

5        Q.    But it's your understanding, because you use

6   the sizing model in your opinions, that it was for the

7   existing ICCE platform with Informatica on it at that

8   time?

9        A.    That was an assumption I made in my report,

10  yes.

11       Q.    If that assumption is wrong, how does that

12  impact your report?

13       A.    Well, if the document I looked at as part of

14  the report, if there was evidence to show that it was

15  related to a different project and not -- and completely

16  unrelated from the ICCE platform, than -- or rather

17  then -- then I don't think this document would -- would

18  speak to planning for the ICCE platform, assuming there

19  were compelling evidence that it was instead designed to

20  be used for a different project using completely

21  different Informatica software.

22       Q.    So that would mean your opinions are incorrect

23  in your report?

24       A.    Well, I'm saying if we -- if we assume



CHRISTOPHER RUCINSKI                               June 20, 2018
RELX INC. vs INFORMATICA LLC                                    270

1  different things, then my opinions would change.

2       Q.    Sir, is it correct in your conversation with

3  Mr. Vellturo that you talked about the access of

4  alternative -- I'm sorry.  Strike that.

5            In your conversation with Mr. Vellturo, did

6  you tell him about the ability to use alternatives to the

7  Informatica software?

8       A.    We did discuss alternatives that RELX could

9  have used instead of the Informatica software.

10      Q.    And what'd you say about that?

11      A.    Well, my recollection is in particular I

12  mentioned using Java and Perl, as RELX had done in the

13  past to perform a similar operation that the Informatica

14  software was designed to perform.

15      Q.    And do you know whether or not the Informatica

16  software had any advantages over Java and Perl?

17      A.    We didn't discuss that in any detail during

18  the conversation that we had.  I imagine there would be

19  pros and cons to both approaches.

20      Q.    Are you aware that there's documentation that

21  talks about advantages of the Informatica software over

22  Java and Perl?

23      A.    I don't remember seeing specific documentation

24  to that effect, but it could exist, I suppose.



CHRISTOPHER RUCINSKI                                     June 20, 2018
RELX INC. vs INFORMATICA LLC                                      271

1       Q.    Would that change your opinions at all?

2       A.    Well, I'd have to consider the totality of the

3   benefits and disadvantages of using certain software in

4   certain circumstances.  But even if there were

5   alternatives that were better or worse for certain

6   reasons, it seems like they would still be alternatives.

7   There would just be a calculus that would have to be

8   performed by whoever was making the decision about which

9   avenue to pursue.

10      Q.    Are you aware of whether -- yeah.  Sure, there

11  could be -- still be alternatives, but they could -- the

12  alternatives could -- you know, could present issues such

13  as higher maintenance costs, lower processing speed,

14  things like that, right?

15            MR. SCOTT:  Objection.  Calls for speculation.

16      A.    I suppose in theory they might, but I think

17  you would have to consider all the pros and cons of

18  both -- or all the alternatives that were available.  I

19  don't think it's -- or I'd have to consider all the

20  information available with respect to the different

21  dimensions along which certain alternatives may be better

22  or worse than others.

23      Q.    Sure.  Did you do that?

24      A.    Well, in my conversation with Chris Vellturo,



```
 1   we discussed what other alternatives might have been

 2   viable.  We didn't go into detail about the pros and cons

 3   of all the alternatives.

 4       Q.    Do you know what he said about alternatives in

 5   his report?

 6       A.    I have not reviewed his report.

 7             MR. DOYLE:  All right.  Let's mark the

 8   deposition of Jeffrey on this case as Exhibit -- 8?

 9             (Exhibit No. 7, Jeffrey Reihl deposition

10             transcript marked for identification)

11       Q.    Could you go to page 35, please, sir.  First

12   of all, do you know who Jeff Reihl is?

13       A.    One moment.  I assume it's in his deposition

14   here somewhere, but I understand he's employed by RELX in

15   some capacity.

16       Q.    Well, do you know who he is?  I'm just asking.

17       A.    Well, I haven't spoken to him, but I forget

18   his title, as I sit here right now.

19       Q.    Do you understand that he's the chef

20   technology officer at RELX?

21             MR. SCOTT:  Objection.

22       A.    As I sit here right now, I'm not sure, but I

23   believe the CTO of RELX was deposed at some point, so I'm

24   sure it's in this deposition somewhere, and if you
```



1  represent that to me, I'll accept it for now.

2       Q.    Could you go to page 35.

3       A.    Okay.  I'm there.

4       Q.    Do you see where it says:  "Were there any

5  alternatives that were brought to your attention instead

6  of using the Informatica software?"  That was the

7  question in the deposition.

8            Mr. Riehl answered:  "There were no other

9  alternatives that I recall that were brought forward."

10 Do you see that?

11      A.    Well, let me just read the couple lines ahead

12 and before.

13      Q.    Sure.

14      A.    So in his response, he says:  "I am very

15 confident that the team looked at different options

16 including writing the software ourselves, and likely felt

17 that the Informatica software would help us accelerate

18 time to market and was a tool that we could utilize to do

19 that."

20           So it sounds like there were other options

21 that were considered, including writing the software

22 themselves.

23      Q.    Sure.  But which one did they select?

24      A.    My understanding is that they decided to



 1  purchase licenses for the Informatica software.

 2       Q.    But he does say:  "There are no other

 3  alternatives that I recall that were brought forward."

 4  Do you see that?

 5       A.    I do.  And then he further clarifies that he's

 6  confident that the team looked at different options as

 7  well.

 8       Q.    Sure.  But he's answering that none were

 9  brought forward to him, the CTO, right?

10       A.    That may be what he's saying.  He doesn't

11  specify to whom they were brought forward.

12       Q.    Did you ask him about it?

13       A.    Sorry.  Did who ask whom about what?

14       Q.    Did you ask Jeff Reihl about what he said

15  here?

16            MR. SCOTT:  Objection.  Asked and answered.

17       A.    I didn't have any conversations with Jeff

18  Reihl.

19       Q.    I mean, in your infinite wisdom, you said

20  there were a lot of alternatives to the Informatica

21  software, in your opinion, right?

22       A.    Well, I did mention that there were other

23  avenues through which ICCE -- I'm sorry -- RELX

24  could have accomplished what -- what they had set out



1   to do with the ICCE platform.

2        Q.    Did you say anything else other than that?

3        A.    I'm sorry.  Did I say anything else?

4        Q.    Yes.

5        A.    I don't remember the complete deposition

6   testimony that I've given today.

7        Q.    No, I'm not asking about the deposition

8   testimony.  When you spoke to Vellturo, what exactly did

9   you tell him about alternatives?

10       A.    Well, we discussed alternatives such as the

11  Java and Perl scripts that RELX had used in the past, and

12  those may have been a viable way forward with the ICCE

13  platform.

14       Q.    Do you know if those alternatives worked as

15  well as the Informatica software?

16       A.    I didn't do any detailed analysis about the

17  pros and cons of those approaches.  It's my understanding

18  that that was something that was considered.

19       Q.    Did you discuss alternatives with anybody at

20  RELX?

21       A.    As I sit here right now, I'm not sure, but if

22  I did, it would have been with Mr. Groff probably.

23       Q.    But you can't recall right now as you sit

24  here?



CHRISTOPHER RUCINSKI                                      June 20, 2018
RELX INC. vs INFORMATICA LLC                                          276

1          A.    Well, I'm not certain, but I think it may

2     have come up when we were talking about the specific Java

3     and Perl scripts that were still utilized as part of the

4     ICCE platform even with the Informatica software

5     incorporated.

6          Q.    And do you know whether any of the

7     alternatives had all of the performance advantages that

8     the Informatica software had?

9          A.    Well, I'm not sure which performance

10    advantages Informatica software had --

11         Q.    Why not?

12         A.    -- in general.

13         Q.    Why not?

14         A.    Well, we looked at some documents that it

15    wasn't clear what those benefits were, whether they were

16    aspirational.  It's hard for me to answer the question

17    without a knowledge of what the general benefits of

18    Informatica software were, if there were any.  And that

19    wasn't something I focused on in my reports.

20         Q.    If that's the case, how can you say that

21    they're alternatives?

22         A.    Well, just because I don't have a detailed

23    understanding of all of the pros and cons of all the

24    alternatives, I think I can still say that alternatives



CHRISTOPHER RUCINSKI                              June 20, 2018
RELX INC. vs INFORMATICA LLC                              277

 1 | existed and that such alternatives -- at least my
 2 | understanding is they were considered to a degree.
 3 |       Q.    I don't think we can say you have a detailed
 4 | understanding of all the pros and cons, or that you even
 5 | have a non-detailed understanding of pros and cons.
 6 |             MR. SCOTT:  Objection.  Mischaracterization --
 7 |       Q.    What --
 8 |             MR. SCOTT:  -- of testimony.
 9 |       Q.    -- advantages existed with respect to the
10 | Informatica platform?
11 |             MR. SCOTT:  Objection.  Asked and answered.
12 |       Q.    Can you name any?
13 |       A.    When you say "advantages," advantages compared
14 | to what?
15 |       Q.    Compared to anything.
16 |       A.    Well, I think there were some aspirational
17 | benefits that were recorded in documents we reviewed
18 | earlier today.  I don't know or haven't done analysis to
19 | show that those benefits actually manifested themselves
20 | in any way.
21 |       Q.    Why not?
22 |       A.    One of the primary opinions in my report was
23 | examining the question of the degree to which RELX may
24 | have benefited from having the ICCE platform have access



1  to, for instance, 104 cores versus a smaller number of

2  cores for which they were licensed.  And so the question

3  of that differential benefit is different from whether

4  there was a benefit overall to the Informatica software,

5  and so I didn't examine it in much detail.

6       Q.    What factors impact computer performance, in

7  your mind?

8       A.    In general, some examples, in a non-exhaustive

9  list, would include CPU speed, the amount of memory

10 that's installed on the computer, the speed of I/O access

11 to the hard drive or flash drive that's present on the

12 computer, the networking speed of the computer to the

13 Internet or to -- or to other computers.

14       There might be other factors related to

15 specific software configurations such as you could

16 connect it to a VPN, a virtual private network, that may

17 slow down network communications in some degree in

18 exchange for further benefits.  There are probably other

19 considerations, but there are a lot of factors with

20 respect to how a computer might perform in various

21 circumstances.

22       Q.    And does the type of workload matter when

23 answering the question?

24       A.    So specifically to the Informatica software,



1   does the type of workload matter?  With respect to

2   performance?  Is that your question?

3        Q.    I had asked about computer performance in

4   general.

5        A.    Well, in general's different from with respect

6   to the Informatica software, but let me think about that

7   for a moment.

8        Q.    Well, strike that.

9              What steps are involved in capacity planning?

10             MR. SCOTT:  Objection.  Asked and answered.

11        A.    Well, in general, with capacity planning, the

12   objective is to determine what sort of computer system

13   you might need to perform certain tasks, and so the

14   things you might consider are some of the things that I

15   mentioned earlier like CPU speed, network speed or

16   bandwidth, hard drive access speed, among other items.

17        Q.    Do you need to measure current use?

18        A.    When you say "current use," what are you

19   referring to?

20        Q.    Current use of the processing power or

21   processors.

22        A.    Do you need to consider it?  Well, it depends

23   on what you're planning for.  If you're planning for

24   something that is the same or similar to what you're



1  doing at the current time, then you might find that

2  information useful.  I don't think you necessarily need

3  to consider it, but it depends on the circumstances for

4  the exercises -- the exercise that you're performing at

5  the time.

6       Q.    What if you're planning for growth?

7       A.    Again, it would depend if the growth were

8  similar to what you're doing at the current time or the

9  same or if it's different.  Growth in general can be

10 growth along a number of different dimensions, so I'd

11 want to know more about the specific hypothetical that

12 you have in mind.

13      Q.    And how would you measure current use?

14      A.    Well, if we're talking about CPU utilization,

15 then you may look at -- may look at data that you have

16 for CPU utilization for the computers that you have

17 deployed at the current moment.

18      Q.    Do you know of anything else other than CPU

19 utilization in terms of what you would measure to measure

20 current use?

21      A.    Assuming again that you're talking about

22 current use of CPUs, in terms of capacity planning, you

23 may want to consider how many servers that you -- that

24 you currently have or may want to have.  You may want to



CHRISTOPHER RUCINSKI                           June 20, 2018
RELX INC. vs INFORMATICA LLC                         281

1   look at specifically what those cores and those servers

2   are -- are doing.  It could be that your -- like your

3   current setup has servers that have cores that are doing

4   processes that you're -- or executing processes that are

5   unrelated to what you're planning for, and so you may

6   want to consider that as well.

7       Q.    How would you collect the data for those types

8   of measurements?

9       A.    Well, one thing you should do if it were a

10   Linux system is you could run a UNIX command called "top"

11   which shows you the different processes that are -- that

12   are executing on the computer, and so you could see, for

13   instance -- you know, come to some conclusion about what

14   percentage of CPU utilization was related to system

15   processes that the operating system needs versus the

16   processes that you care about for planning or other

17   processes that may be unrelated to the tasks that you're

18   looking to perform.

19       Q.    And when software is running, it uses

20   resources behind -- besides the CPU, right?

21       A.    When software's running, it can use resources

22   like memory or disc or network bandwidth that would be

23   different from the CPU.  There are -- there are others as

24   well.



CHRISTOPHER RUCINSKI                                    June 20, 2018
RELX INC. vs INFORMATICA LLC                                      282

1      Q.    Would you take -- collect data for those

2    measurements as well of those different devices?

3      A.    For the different resources.  If you expected

4    that some of these resources might be a bottleneck, it

5    may be interesting to look at the degree to which those

6    resources are currently being utilized, if you expect the

7    tasks that you're planning for to be similar or the same

8    to the tasks that the system is performing now.

9      Q.    Would you collect information on peak

10   utilization?

11     A.    It all depends on what you're planning for.

12   If peak utilization matters to you for some reason over a

13   certain time period, it may be interesting to consider

14   the degree to which that was -- those peak utilization

15   events were occurring on the existing system.

16     Q.    What metrics would you use those measurements

17   of peak utilization?

18     A.    Would you --

19     Q.    What metrics would you use in your

20   determination of peak utilization?

21     A.    It depends on what you're trying to measure.

22   Peak utilization would probably be defined along

23   dimensions of CPU utilization, and then also the amount

24   of time that that CPU utilization occurred over.  So it



1    would depend on your needs for the specific environment

2    and what you -- what you cared about in terms of peak

3    utilization.

4        Q.    You had mentioned bottlenecks before.  How

5    would you identify a bottleneck?

6        A.    Well, generally, you would look for whether

7    there were certain resources that were close to maximum

8    capacity for whatever resource that -- or the resources

9    that you're considering.  So if you're -- if you're

10   monitoring the system currently and all of the memory's

11   being used and you might be thrashing because parts of

12   the program are being swapped out fairly consistently,

13   then memory might be something that you look at.

14            But in general, you're looking for whether

15   there are resources that are -- that are close to maximum

16   capacity, and so you might want to increase capacity for

17   those resource first before you examine others.

18       Q.    Did you determine -- did you attempt to

19   determine what the bottlenecks are in the ICCE system

20   using Informatica?

21            MR. SCOTT:  Objection.  Assumes facts not in

22   evidence.

23       A.    So specifically to the question of the degree

24   to which RELX may have benefited from having cores



CHRISTOPHER RUCINSKI
RELX INC. vs INFORMATICA LLC

June 20, 2018
284

1    available to the -- or, for instance, 104 cores available

2    for the ICCE platform and incorporated Informatica

3    software, because the -- the issue was CPU capacity

4    measured in cores in this case, that was the item that I

5    focused on.

6            It's possible there were other bottlenecks to

7    the system such that if you were to increase the number

8    of CPU cores for a certain configuration, then those

9    cores would provide no benefit to you because the system

10   would be bottlenecked on some other resource.

11       Q.    How can a bottleneck in one area, for example,

12   I/O, affect utilization of other resources like the CPU?

13       A.    Well, in general, if you have a computer

14   system and it is bottlenecked on I/O, then that is the

15   sort of determining factor in terms of how much

16   processing can be performed by the computer system.  So

17   if your -- your system is maxing out on -- in accessing

18   the hard drive in that way, if you were to increase other

19   resources of the system like the number of CPUs or the

20   number of CPU cores or memory, if it's truly a

21   bottleneck, then you wouldn't see any difference in

22   performance because the system would still be

23   bottlenecked on that same I/O resource.

24       Q.    Do you know what the RETS team was at RELX?



CHRISTOPHER RUCINSKI                              June 20, 2018
RELX INC. vs INFORMATICA LLC                               285

1      A.    As I sit here right now, I don't remember what
2  the acronym stood for.
3      Q.    So you don't know what their role was at RELX?
4      A.    As I sit here right now, I don't remember.
5      Q.    Did you talk to anyone from RETS?
6      A.    Well, I talked to Mr. Groff and Mr. Hoffman,
7  so if they're part of the RETS team, then I did, but I'm
8  not sure if they were.
9      Q.    Did you ask whether they do capacity planning
10 in RETS?
11     A.    I don't think I asked that specific question.
12     Q.    Did you ask anyone that was involved in doing
13 capacity planning for the ICCE network using Informatica
14 at any time during the period?
15     A.    Would you repeat that?  I'm confused about
16 "ICCE network."
17     Q.    Okay.  All I'm asking is did you ever talk to
18 anyone at RELX who actually did capacity planning on the
19 ICCE network or for the ICCE network?
20     A.    Well, I talked to Mr. Groff and Mr. Hoffman.
21 So if they performed capacity planning, then I would have
22 talked to -- I talked to them.  But I don't know -- I
23 don't know whether they did.
24     Q.    So you don't know whether or not you talked to



1   anyone that actually did capacity planning in building

2   the network, the ICCE network; is that right?

3         MR. SCOTT:  Objection.

4   A.     Well, with respect to the ICCE platform, I

5   only talked to Mr. Groff and Mr. Hoffman, so if they

6   performed capacity planning, then I did speak to

7   individuals at RELX that did that; and if they didn't,

8   then I didn't because those were the only individuals

9   that I spoke to from RELX.

10  Q.     Did -- did the folks at RELX, anybody, model

11  for future capacity needs as it related to ICCE and also

12  the Informatica software on the ICCE platform?

13        MR. SCOTT:  Objection.  Calls for speculation.

14  A.     I didn't talk to anyone who -- who mentioned

15  doing that, so as I sit here right now, I'm not aware of

16  anyone who did that.

17  Q.     Do you know if RELX did capacity planning for

18  ICCE?

19  A.     As I sit here right now, I don't recall a

20  specific example of when they -- they would have done

21  that.

22  Q.     I didn't ask you when they would have done it.

23  I'm just asking do you know if RELX did capacity planning

24  for ICCE?



1      A.    So as I sit here right now, I don't recall an

2  instance where -- where I talked to someone who mentioned

3  that RELX was doing capacity planning.

4            THE VIDEOGRAPHER:  We have reached seven

5  hours.

6            MR. SCOTT:  Let's take a short break, and then

7  we'll let you know if we have any redirect.

8            MR. DOYLE:  Okay.  Will you give me five more

9  minutes?

10            MR. SCOTT:  No.

11            THE VIDEOGRAPHER:  The time is 7:34 p.m. we

12  are off the record.

13            (Whereupon the deposition was concluded at

14            7:34 p.m.)

15

16

17

18

19

20

21

22

23

24



1                   COMMONWEALTH OF MASSACHUSETTS

2                        ESSEX COUNTY

3

4        I, DEBORAH J. BATEMAN, Court Reporter and Notary

5   Public in and for the Commonwealth of Massachusetts, do

6   hereby certify that the witness whose deposition is

7   hereinbefore set forth, was duly sworn and that such

8   deposition is a true record of the testimony given by the

9   witness.

10       I further certify that I am neither related to or

11  employed by any of the parties in or counsel to this

12  action, nor am I financially interested in the outcome of

13  this action.

14       I witness whereof, I have set my hand and seal

15  this 3rd day of July, 2018.

16

17

18

19

20   _____

21   Deborah J. Bateman, Notary Public in and

22   for The Commonwealth of Massachusetts

23   My Commission Expires: November 2, 2023

24



1                  DEPOSITION ERRATA SHEET

2

3    Our Assignment No. J2333077

4    Case Caption: RELX INC. vs INFORMATICA LLC

5

6

7            DECLARATION UNDER PENALTY OF PERJURY

8          I declare under penalty of perjury that I have

9    read the entire transcript of my Deposition taken in the

10   captioned matter or the same has been read to me, and the

11   same is true and accurate, save and  except for changes

12   and/or corrections, if any, as indicated by me on the

13   DEPOSITION ERRATA SHEET hereof, with the understanding

14   that I offer these changes as if still under oath.

15          Signed on the _____ day of

16   _____, 20___.

17

18   _____

19   CHRISTOPHER RUCINSKI

20

21

22

23

24



CHRISTOPHER RUCINSKI
RELX INC. vs INFORMATICA LLC

June 20, 2018
290

1           DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23  SIGNATURE:_____DATE:_____

24  CHRISTOPHER RUCINSKI



CHRISTOPHER RUCINSKI
RELX INC. vs INFORMATICA LLC

June 20, 2018
291

1        DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23  SIGNATURE:_____DATE:_____

24  CHRISTOPHER RUCINSKI

